1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11  PACIFIC RIVERS COUNCIL,              No. 2:05-cv-00953-MCE-GGH

12            Plaintiff,

13       v.                              <u>MEMORANDUM AND ORDER</u>

14  UNITED STATES FOREST SERVICE;
    MARK REY, in his official
15  capacity as Under Secretary of
    Agriculture, DALE BOSWORTH, in
16  his capacity as Chief of the
    United States Forest Service,
17  JACK BLACKWELL, in his official
    capacity as Regional Forester,
18  Region 5, United States Forest
    Service,
19
              Defendants.
20
          and
21
    CALIFORNIA FORESTRY ASSOCIATION
22  et al., QUINCY LIBRARY GROUP,
    an unincorporated citizens groups;
23  PLUMAS COUNTY; and CALIFORNIA
    SKI INDUSTRY ASSOCIATION,
24
              Defendant-Intervenors.
25

26                        ----oo0oo----

27  ///

28  ///

                              1

1    Through this lawsuit, Plaintiff Pacific Rivers Council

2  ("Plaintiff") challenges the 2004 Sierra Nevada Forest Plan

3  Amendment ("SNFPA"), commonly known as the 2004 Framework, on

4  grounds that it violates the National Environmental Policy Act of

5  1969 ("NEPA") by failing to adequately analyze the direct,

6  indirect, and cumulative impacts entailed by implementation of

7  the Framework.  Plaintiff additionally contends that the 2004

8  Framework runs counter to the provisions of the Administrative

9  Procedures Act ("APA"), claiming that the changes it makes in

10  management of the forests contained within the Sierra Nevada

11  region are not supported by the record.  Defendants are the

12  United States Forest Service and several federal officials who

13  had roles in promulgating the 2004 Framework and adjudicating

14  Plaintiff's appeal (hereinafter collectively referred to as

15  "Defendants").   Presently before the Court are cross motions for

16  summary judgment filed on behalf of both the Plaintiff and

17  Defendants.

18

19                        **FACTUAL BACKGROUND**

20

21    The Sierra Nevada region contains approximately 11.5 million

22  acres of National Forest Service land with eleven National

23  Forests. Within that region, there are "dozens of complex

24  ecosystems each with numerous, inter-connected social, economic

25  and ecological components."  SNFPA 1920.  Those ecosystems

26  include numerous watersheds supporting diverse habitats --

27  rivers, streams, lakes, ponds, wetlands and riparian areas that

28  are home to a rich array of native aquatic species.

2

1    In the late 1980s, the Forest Service began developing a

2  comprehensive strategy for managing the myriad resources found

3  within the region.  In 1995, the Regional Forester for the

4  Pacific Southwest Region of the Forest Service issued a draft

5  Environmental Impact Statement ("EIS") outlining its management

6  proposal.  SNFPA 229.[1]   Additionally, in 1996, the United States

7  Congress sponsored a comprehensive scientific and socioeconomic

8  analysis of the Sierra Nevada which culminated in the so-called

9  Sierra Nevada Ecosystem Report ("SNEP Report").

10    After extensive public participation and the preparation of

11  a Final EIS which responded to public concerns, the Regional

12  Forester issued, in 2001, a Record of Decision ("ROD") which

13  adopted management objectives in five major areas: old forest

14  ecosystems; aquatic, riparian, and meadow ecosystems; fire and

15  fuels; noxious weeds; and hardwood ecosystems on the lower

16  westside of the Sierras.  Id. at 231-35.  Among the more

17  difficult issues confronted by the ROD was striking the

18  appropriate balance between excessive fuel buildups as a result

19  of decades of fire repression and conserving key habitat for

20  wildlife species dependent on old forest environments.  The 2001

21  ROD included a network of "old forest emphasis areas" which

22  consisted of approximately 40 percent of all the national forest

23  land in the Sierra Nevada region.  The purpose was to provide a

24  contiguous network of old forest ecosystems which were conducive

25  to species preferring such habitat such as the California Spotted

26  Owl, the American Marten and the Pacific Fisher.  SNFPA 236.

27

28    [1] Documents found within the first eight-volume record are
cited as SNFPA, followed by the Bates-stamp number.

3

Aside from other areas slated for specific treatment (such as the limited "urban wildland intermix" which was  designed to create a buffer between developed areas and the forest), the 2001 Framework specified a "general forest" land allocation intended to increase the density of large old trees and the continuity and distribution of old forests across the landscape.  SNFPA 236-37.

The 2001 Framework also included a comprehensive Aquatic Management Strategy ("AMS") which consisted of a set of management goals, standards and guidelines to improve aquatic habitats throughout the Sierra Nevada.  SNFPA 00292.  Riparian Conservation Objectives ("RCOs")[2] were identified for purposes of evaluating whether proposed activities were consistent with desired conditions described by AMS goals.  SNFPA 00295-00296. Additionally, two land allocations, Riparian Conservation Areas ("RCAs") and Critical Aquatic Refuges ("CARs") were reserved for purposes of preserving, restoring and or enhancing aquatic, riparian and meadow ecosystems in order to protect habitat for species using those areas.  SNFPA 00292-00296.

In order to protect old forest conditions within its specific areas of emphasis, the 2001 Framework generally prohibited logging that would remove trees over 12 inches in diameter or logging that would reduce canopy cover by more than 10 percent.  SNFPA 328.

///

///

_____

[2] Riparian Conservation Objectives "...provide a checklist for evaluating whether a proposed activity is consistent with the desired conditions described by the AMS goals."  Each RCO has associated standards and management guidelines.  SNFPA 00295.

Even within the "general forest" areas, the 2001 Framework prohibited logging of trees over 20 inches in diameter.  SNFPA 336.  It was only within the intermix zones that no canopy restrictions were imposed and logging of trees up to 30 inches was permitted.  SNFPA 333, 315.

Although the Forest Service ultimately affirmed adoption of the 2001 ROD despite receipt of approximately 200 administrative appeals, it nonetheless directed the Regional Forester to conduct an additional review with respect to specific concerns like wildfire risk and the Forest Service's responsibilities under the Herger-Feinstein Quincy Library Group Forest Recovery Act ("HFQLG Act"), a congressional mandate which established a Pilot Program for fire suppression through a combination of fire breaks, group selection logging and individual logging.  SNFPA 1918.  A management review team was assembled by the Regional Forester for this purpose.

In March 2003, the team concluded that the 2001 ROD's "cautious approach" to active fuels management had limited its effectiveness in many treatment areas.  The management review team further found that revisions to vegetation management rules would decrease flammable fuels while protecting critical wildlife habitat by guarding against the risk of stand-replacing wildfire.  See SNFPA 1918, 1926.  Moreover, with respect to the California Spotted Owl ("CASPO" or "owl"), the team felt that the 2001 ROD had unnecessarily "took a worst case approach to estimating effects" on the owl.

///

///

1  SNFPA 1968.[3]  In addition to citing recent research indicating

2  that habitat losses resulting from fuel treatments were less than

3  previously believed, the team further found that the 2001 ROD's

4  extensive reliance on maintaining extensive canopy cover was

5  impracticable to implement.

6      Following receipt of the team's findings, the Regional

7  Forester ordered that management strategy alternatives in

8  addition to those considered in the 2001 FEIS be considered.  A

9  draft supplemental environmental impact statement ("DSEIS") was

10 thereafter released to the public in January 2004.  While the

11 same five areas of concern were targeted in the DSEIS as in its

12 2001 predecessor, in 2004 a new action alternative was identified

13 (Alternative S2), in addition to the alternative selected by the

14 2001 Framework (Alternative S1) and the seven alternatives that

15 had previously been considered before adoption of the 2001

16 Framework (Alternatives F2-F8).[4]

17 ///

18 ///

19 ///

20

21      [3] The 2001 Framework's CASPO analysis was largely predicated
   on a July 1992 report (the "CASPO Report") that recommended
22 establishment of a 300-acre Protected Activity Center ("PAC")
   around all known owl nest sites, a complete prohibition of
23 logging within the PACs, more limited logging prohibition of
   trees over 30 inches in diameter in all habitat suitable for owl
24 nesting and foraging, and a prohibition on logging that would
   reduce canopy cover below 40 percent in owl nesting habitat.
25 SNFPA 1037-40.

26      [4] The DSEIS also considered seven additional alternatives in
   addition to those considered in detail but eliminated the seven
27 from extensive consideration because they were found to be
   inconsistent with the purpose and need of the DSEIS.  SNFPA 3163-
28 65.

Following the public comment period after dissemination of the DSEIS, the SEIS in final form also included responses to various issues raised, including comments by the United States Fish and Wildlife Service, by the United States Environmental Protection Agency, by California resources protection agencies, and by the Science Consistency Review ("SCR") team.[5]

With respect to aquatic species, the 2004 ROD employ the same Aquatic Management Strategy as the 2001 Framework, with a few exceptions as explained in the SEIS.  SNFPA 3277-3285; SNFPA 3000 (the 2004 ROD retains "Critical Aquatic Refuges, the Riparian Conservation Areas, and the goals of the Aquatic Management Strategy"); SNFPA 3052-3056 (describing standards and guidelines).  Similar to the 2001 Framework, the comprehensive AMS of the 2004 Framework requires management of RCAs to "preserve, enhance and restore habitat for riparian and aquatic-dependent species; ensure that water quality is maintained or restored; enhance habitat conservation for species associated with the transition zones between upslope and riparian areas; and provide greater connectivity with watersheds."  SNFPA 3280.

The 2004 Framework also specifies that road construction and reconstruction must meet several best management practices ("BMPs") in order to protect watersheds: 1) design new stream crossings and replace stream crossings to withstand at least a 100-year flood;

///

---

[5] The SCR consisted of eleven scientists convened by the Pacific Southwest Research Station in Davis, California, and included experts in fire and fuels management, forest ecology, and species viability.  SNFPA 3503.

2) design stream crossings to minimize the diversion of streamflow out of the channel and down the road in the event of a crossing failure; 3) design stream crossings to minimize disruption to natural hydrologic flow paths, including the diversion of streamflow and interception of surface and subsurface water; 4) avoid wetlands or minimize effects to natural flow patterns in wetlands; and 5) avoid road construction in meadows.  SNFPA 3049.  The 2004 Framework further outlines management standards and guidelines for fire and fuels management, SNFPA 3039-3040, mechanical thinning treatments, SNFPA 3040-41, salvage harvest, SNFPA 3042-3043, and hardwood management, SNFPA 3043.

By adopting the SEIS on January 21, 2004, the Regional Forester replaced the 2001 ROD with its 2004 successor and amended the forest plans for all eleven national forests situated in the Sierra Nevada.  SNFPA 2987-3061.  The 2004 ROD reasoned that the 2001 Framework "prescribed technical solutions that do not produce needed results, or offered methods we often dare not attempt in the current Sierra Nevada."  SNFPA 2995.  The 2004 Framework reasoned that the methods as adopted in 2001 fail to reverse the damage, and growing threat, of catastrophic fires quickly enough.  Id.

The Chief of the Forestry Service ultimately affirmed the 2004 ROD,[6] with the direction that details of the ROD's adaptive management be submitted to him within six months.

---

[6] In so affirming, Forest Service Chief Dale Bosworth denied 6,241 separate administrative appeals of the 2004 Framework. SNFPA 3998.

1  SNFPA 3997-4305.  The Regional Forester submitted that

2  supplemental information to the Chief on March 31, 2005.

3       Through the present lawsuit, Plaintiff alleges that the 2004

4  Framework as ultimately adopted runs afoul of both the APA and

5  NEPA on a programmatic basis.  Specifically, Plaintiff contends

6  that the 2004 Framework violates the APA because it failed to

7  include a reasoned analysis for changing the approach advocated

8  by its predecessor, the 2001 Framework.  Moreover, Plaintiff also

9  argues that the 2004 Framework runs afoul of NEPA because it was

10 adopted without adequate disclosure of its significant

11 environmental impacts.

12

13                      **PROCEDURAL FRAMEWORK**

14

15      Congress enacted NEPA in 1969 to protect the environment by

16 requiring certain procedural safeguards before an agency takes

17 action affecting the environment.  The NEPA process is designed

18 to "ensure that the agency ... will have detailed information

19 concerning significant environmental impacts; it also guarantees

20 that the relevant information will be made available to the

21 larger [public] audience."  <u>Blue Mountains Biodiversity Project</u>

22 <u>v. Blackwood</u>, 171 F.3d 1208, 121 (9th Cir. 1998).  The purpose of

23 NEPA is to "ensure a process, not to ensure any result."  <u>Id</u>.

24 "NEPA emphasizes the importance of coherent and comprehensive up-

25 front environmental analysis to ensure informed decision-making

26 to the end that the agency will not act on incomplete

27 information, only to regret its decision after it is too late to

28 correct."

Center for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003).  Complete analysis under NEPA also assures that the public has sufficient information to challenge the agency's decision.  Robertson v. Methow Valley Citizens, 490 U.S. 332, 349 (1989); Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1151 (9th Cir. 1998).

NEPA requires that all federal agencies, including the Forest Service, prepare a "detailed statement" that discusses the environmental ramifications, and alternatives, to all "major Federal Actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  An agency must take a "hard look" at the consequences, environmental impacts, and adverse environmental effects of a proposed action within an environmental impact statement ("EIS"), when required.  Kleppe v. Sierra Club, 427 U.S. 390, 410, n.21 (1976).

Given its status as a statutory scheme intended to safeguard procedure rather than substance,[7] NEPA does not mandate that an EIS be based on a particular scientific methodology, nor does it require a reviewing court to weigh conflicting scientific data.  Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985).  An agency must be given discretion to rely on the reasonable opinions of its own qualified experts, even if the court might find contrary views more persuasive. See, e.g., Kleppe, 427 U.S. at 420, n. 21.

---

[7] The National Forestry Management Act ("NFMA"), 16 U.S.C. § 1600 et seq, provides for substantive, as opposed to procedural protection with regard to actions that affect the environment. Plaintiff has not alleged any violation of the NFMA through this lawsuit.

NEPA does not allow an agency to rely on the conclusions and opinions of its staff, however, without providing both supporting analysis and data.  Idaho Sporting Cong., 137 F.3d at 1150. Credible scientific evidence that contraindicates a proposed action must be evaluated and disclosed.  40 C.F.R. § 1502.9(b).

Because NEPA itself contains no provisions allowing a private right of action (see Lujan v. National Wildlife Federation, 497 U.S. 871, 882 (1990)), a party can obtain judicial review of alleged violations of NEPA only under the waiver of sovereign immunity contained within the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Earth Island Institute v. U.S. Forest Serv., 351 F.3d 1291, 1300 (9th Cir. 2005).

Under the APA, the court must determine whether, based on a review of the agency's administrative record, agency action was "arbitrary and capricious," outside the scope of the agency's statutory authority, or otherwise not in accordance with the law. Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356 (9th Cir. 1994).  Review under the APA is "searching and careful."  Ocean Advocates, 361 F.3d at 1118.  However, the court may not substitute its own judgment for that of the agency. Id. (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)).

///

///

///

///

1    In reviewing an agency's actions, the standard to be
2  employed is decidedly deferential to the agency's expertise.
3  Salmon River, 32 F.3d at 1356.  Although the scope of review for
4  agency action is accordingly limited, such action is not
5  unimpeachable.  The reviewing court must determine whether there
6  is a rational connection between the facts and resulting judgment
7  so as to support the agency's determination.  Baltimore Gas and
8  Elec. v. NRDC, 462 U.S. 87, 105-06 (1983), citing Bowman Trans.
9  Inc. v. Arkansas-Best Freight Sys. Inc., 419 U.S. 281, 285-86
10  (1974).  An agency's review is arbitrary and capricious if it
11  fails to consider important aspects of the issues before it, if
12  it supports its decisions with explanations contrary to the
13  evidence, or if its decision is either inherently implausible or
14  contrary to governing law.  The Lands Council v. Powell, 395 F.3d
15  1019, 1026 (9th Cir. 2005).

16
17                              **STANDARD**
18
19    Summary judgment is an appropriate procedure in reviewing
20  agency decisions under the dictates of the APA.  See, e.g.,
21  Northwest Motorcycle Assn. v. U.S. Dept. Of Agric., 18 F.3d 1468,
22  1471-72 (9th Cir. 1994).  Under Federal Rule of Civil Procedure
23  56, summary judgment may accordingly be had where, viewing the
24  evidence and the inferences arising therefrom in favor of the
25  nonmovant, there are no genuine issues of material fact in
26  dispute."  Id. at 1472.
27  ///
28  ///

In cases involving agency action, however, the court's task "is not to resolve contested facts questions which may exist in the underlying administrative record", but rather to determine whether the agency decision was arbitrary and capricious as defined by the APA and discussed above. Gilbert Equipment Co., Inc. v. Higgins, 709 F. Supp. 1071, 1077 (S.D. Ala. 1989); aff'd, Gilbert Equipment Co. Inc. v. Higgins, 894 F.2d 412 (11th Cir. 1990); see also Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985).  Consequently, in reviewing an agency decision, the court must be "searching and careful" in ensuring that the agency has taken a "hard look" at the environmental consequences of its proposed action. Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 858-59 (9th Cir. 2005);  Or. Natural Res. Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997).

**ANALYSIS**

**I.   NEPA CLAIMS**

> **A.   Plaintiff has preserved its NEPA Claims by adequately raising them in the administrative review process.**

Defendants first take issue with Plaintiff's NEPA claims on grounds that Plaintiff failed to raise many of the objections it now asserts to the 2004 Framework during the public comment period prior to the Framework's adoption.  Defendants are correct in asserting that a failure to raise specific objections during that period results in a waiver of objections subsequently made.

///

///

///

13

1   <u>See</u> <u>Dep't of Public Transp. v. Pub. Citizen</u>, 541 U.S. 752, 764-

2   765 (2004) (the failure to raise "particular objections" in a

3   parties comments results in a forfeiture of those objections);

4   <u>Vermont Yankee Nuclear Power v. NRDC</u>, 435 U.S. 519, 553-54

5   (1978).  Moreover, "persons challenging an agency's compliance

6   with NEPA must 'structure their participation so that it...

7   alerts the agency to the [parties'] position and contentions,' in

8   order to allow the agency to give the issue meaningful

9   consideration.  <u>Pub. Citizen</u>, 541 U.S. at 764 (quoting <u>Vermont</u>

10  <u>Yankee,</u> 435 U.S. at 553).

11      Defendants allege that while Plaintiff properly submitted

12  comments in response to the 2004 Framework Draft SEIS, it failed

13  to include any discussion of direct and indirect effects on fish

14  and amphibian species from logging and prescribed burning

15  activities, deficiencies it now raises here as NEPA violations in

16  the First Cause of Action.  Defendants consequently claim that

17  because the Forest Service's opportunity to examine and respond

18  to Plaintiff's objections was thereby eliminated, the objections

19  it raises now with respect to fish and amphibian species must be

20  forfeited.  In addition, Intervenor-Defendant California Forestry

21  Association alleges that Plaintiff did not meaningfully alert

22  decisionmakers to the alleged NEPA inadequacies concerning

23  timber harvesting/thinning, grazing and mitigation.

24  ///

25  ///

26  ///

27  ///

28  ///

14

1    A review of both Plaintiff's 2004 Framework comments and its

2 administrative appeal reveals these contentions are misplaced.

3 First, in its initial response to the draft SEIS, Plaintiff

4 expressed the concern that logging, fuels treatments, and road

5 construction/use will all have adverse impacts to aquatic and

6 riparian systems and ecosystems, thereby alerting the Forest

7 Service to Plaintiff's concerns.  See SNFPA 3596, Public Concern

8 4.19.  Plaintiff's administrative appeal also addresses concerns

9 regarding the effect on both fish and amphibians from logging

10 grazing, fuels treatment and road construction on watersheds and

11 riparian areas.  PRC 55, 113-14.[8]  As Plaintiff points out, it

12 even submitted a 28-page review of published scientific papers

13 and journal articles that address logging, prescribed burning and

14 the impact of these activities on aquatic ecosystems, including

15 stream temperatures.  PRC 118-46.

16    Significant, too, is the fact that Plaintiff's Framework

17 comments and appeal both incorporate by reference earlier

18 commentary submitted by Plaintiff during the process which

19 ultimately adopted the 2001 Framework, and offered to resubmit

20 hard copies of any of those comments at the Forest Service's

21 request.  The previous commentary also addressed the Forest

22 Service's purported failure to adequately analyze the impacts of

23 logging, prescribed burning and road construction on aquatic and

24 riparian habitat.  PRC at 51-59.

25

26    [8] References to "PRC", followed by a bates-stamped number,
refer to portions of Plaintiff's comments and appeal submitted in
27 connection with both the 2004 and 2001 Frameworks and are
attached as Ex. "A" to Plaintiff's Excerpts of Record filed with
28 this Court.

15

Finally, despite California Forestry Association's arguments to the contrary, Plaintiff did specifically discuss Defendants' alleged failure to consider  mitigation measures through incorporation by reference in its administrative appeal.   PRC 52, 102-103.

Given this participation at various stages of administrative review, the Court finds that the Forest Service was provided adequate notice as to the nature of the NEPA claims Plaintiff presently makes in this lawsuit.   Consequently Defendants' procedural challenge in that regard is rejected.

The Court is, however, persuaded by another procedural argument advanced with regard to the admissibility of the post-decisional litigation declaration of Jonathan J. Rhodes offered by Plaintiff in support of its Motion.   While the Framework was adopted in a January 1, 2004 ROD, the Rhodes declaration is dated October 1, 2005 and cites to materials dating from late 2004. The APA, however, which provides for review under NEPA, limits the scope of judicial review to the record before the agency at the time it made its decision.   5 U.S.C. § 706.   Because the Rhodes Declaration was not part of that initial record, it cannot be considered in determining whether the Framework is arbitrary. Southwest Ctr. For Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996).   Instead, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."   Camp v. Pitts, 411 U.S. 138, 142 (1973).

///

///

While Plaintiff argues that the Rhodes Declaration provides further support for its contention that the FSEIS failed to adequately analyze the impacts of the 2004 Framework on aquatic ecosystems and associated species, particularly through road construction, it fails to show why it could not have submitted such information earlier.  See United States v. LA Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952).  Consequently the Rhodes Declaration will be disregarded.

**B.    The Forest Service did take the requisite "hard look" at the direct and indirect effects to aquatic ecosystems for purposes of complying with NEPA.**

In its First Cause of Action, Plaintiff alleges that the Forest Service's adoption of the 2004 Framework violated NEPA by inadequately analyzing the direct and indirect impacts of contemplated logging, prescribed burning, skid trails and log landing construction on fish, aquatic and amphibian species. Pl.'s Compl., ¶¶ 81, 83, 84.   Similarly, in the Third Cause of Action, Plaintiff asserts the Forest Service neglected to adequately consider the effects of the entire road system and road management actions proposed under the 2004 Framework.  Pl.'s Compl, ¶¶ 106, 111.

As indicated above, NEPA only requires that federal agencies like the Forest Service establish a consistent process for considering environmental impacts, and take a "hard look" at the consequences of such impacts.  Vermont Yankee Nuclear Power v. NRDC, 435 U.S. at 558.

///

So long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." Id.

While NEPA requires an evaluation of environmental effects, it imposes no substantive constraints on the Agency's decision making. Robertson v. Methow Valley Citizens, 490 U.S. at 350 (So long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs"); Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356 (9th Cir. 1994) NEPA "does not dictate a substantive environmental result").  NEPA even presumes that agencies will have a preferred action, requiring only that impacts be evaluated objectively and in good faith.  See 40 C.F.R. § 1502.14(3) (requiring identification of agency's preferred alternative); Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir. 2001) ("NEPA assumes as inevitable an institutional bias within an agency proposing a project....").

Judicial review under NEPA cannot extend to the substantive need for, or desirability of, a particular policy like increased protection against wildfires or heightened protection for wildlife.  See Mobil Oil Expl. & Prod. Southeast, Inc. v. United Dist. Cos., 498 U.S. 211, 230-31 (1991); Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. at 541-48; Personal Watercraft Ass'n v. Dept. of Commerce, 48 F.3d 540, 544-56 (D.C. Cir. 1995).

///

///

The Constitution reserves such policy decisions for assessment and determination by the Executive and Legislative branches of government.

Here, Plaintiff has identified NEPA violations grounded on allegations that the increased logging and fuels management activities contemplated by the 2004 Framework will adversely affect aquatic and riparian species.  Plaintiff points to the fact that such activities can increase erosion and runoff, elevate sedimentation levels, adversely affect water temperatures and riparian microclimate, and alter stream structure and fish habitat.  While the FSEIS recognizes these potential dangers (see SNFPA 3281-82), Plaintiff nonetheless argues that the 2004 Framework still fail to take the "hard look" at such effects required by NEPA.

Specifically, Plaintiff claims that the effects upon native fish species, some of which are listed are listed as endangered or threatened, is not analyzed.  Plaintiff further contends that the Framework fails to address how increased construction and use of log skid trails and landings- "the primary potential sources for sediment"- will directly or indirectly impact aquatic ecosystems and associated species.  See SNFPA 3281.  According to Plaintiff, the FSEIS fails to provide adequate quantification of the risks involved in this regard.  Finally, Plaintiff maintains that the 2004 Framework fails to sufficiently consider the effects of increased grazing upon aquatic/riparian dependent species.

///

///

1    In weighing the viability of these claims, the Court must

2 first consider the extent of analysis required given the 2004

3 Framework's unquestioned status as a programmatic, rather than

4 site-specific, EIS.[9]   The level of "detail that NEPA requires

5 depends upon the nature and scope of the proposed action."

6 California v. Block, 690 F.2d 753, 761 (9th Cir. 1982); Northwest

7 Coalition for Alternatives to Pesticides v. Lyng, 844 F.2d 588,

8 592 (9th Cir. 1988).  Considerably less detail is required for a

9 programmatic EIS than for a site-specific project.  See Resources

10 Ltd., Inc. v. Robertson, 35 F.3d 1300, 1306 (9th Cir. 1994) ("We

11 are convinced that such specific analysis is better done when a

12 specific development action is to be taken, not at the

13 programmatic level.").  Whether or not an EIS is part of a multi-

14 level planning process is also relevant, since the level of

15 detail required depends on what stage is involved.  See, e.g.,

16 Tribal Village of Akutan v. Hodel, 869 F.2d 1185, 1192 (9th Cir.

17 1988.  Forest planning and implementation are properly considered

18 as multi-staged processes.  See Ohio Forestry Ass'n, Inc. v.

19 Sierra Club, 523 U.S. 726, 729-730 (1998).

20    In assessing land use management plans like the 2004

21 Framework, the Ninth Circuit has repeatedly recognized that the

22 level of detail required for a programmatic EIS accompanying such

23 plans is not as great as that required for the analysis of

24 effects for site-specific actions.

25 ///

26 ///

27

28        [9] Plaintiff concedes the programmatic nature of the 2004
Framework SEIS in its Opposition to Defendants' Motion, 1:5-6.

1  See Friends of Yosemite Valley v. Norton, 348 F.3d 789 (9th Cir.

2  2003); Resources Ltd., Inc. v. Robertson, 35 F.3d at 1306; Salmon

3  River Concerned Citizens v. Robertson, 32 F.3d 1346 (9th Cir.

4  1994); California v. Block, 690 F.2d at 761, 765.  While a

5  programmatic EIS has to include enough detail to foster informed

6  decision-making, "site-specific impacts need not be fully

7  evaluated until a critical decision has been made to act on site

8  development."  Friends of Yosemite Valley, 348 F.3d at 800.,

9  quoting N. Alaska Envtl. Ctr. v. Lujan, 961 F.2d 886, 890-91 (9th

10 Cir. 1992).   As a programmatic decision, the 2004 Framework does

11 not make a "critical decision" involving the irretrievable

12 commitment of resources.  Resources Ltd, Inc. v. Robertson, 789

13 F. Supp. at 1540.

14     A programmatic forest plan like the 2004 Framework does not

15 authorize the cutting of any trees or other on-the-ground

16 activity. Instead, it only establishes the standards and

17 guidelines under which future projects permitting such harvest

18 could occur.  See Ohio Forestry Ass'n, Inc. v. Sierra Club, 523

19 U.S. at 729.  This is consistent with the terms of the 2004

20 Framework, which plainly indicates that it does not authorize any

21 actual timber harvest, road construction, log landing or skid

22 trail construction, or grazing.  See SNFPA 3014 (the amended

23 plans "do not provide final authorization for any activity").

24 The Framework also unequivocally provides that future site-

25 specific authorization of actual timber harvest would have to

26 comply with NEPA, where effects would be analyzed in more detail

27 according to site-specific factors.  See SNFPA 3010, 3690, 4019.

28 ///

1    With respect to road construction, the Forest Service's

2  response to public commentary on the 2004 Framework made this

3  programmatic/site-specific distinction abundantly clear, stating

4  that "actual locations and miles of roadwork will be determined

5  through project-level planning and analysis".  SNFPA 3631.  The

6  Forest Service went on to explain:

7         The SNFPA FEIS and the FSEIS are programmatic documents
        and therefore do not propose specific roads.  When
8         site-specific projects are proposed, the roads analysis
        process would analyze the need for public,
9         administrative, and commercial access with the economic
        costs and environmental concerns of the road system.
10        The project level environmental document would display
        the direct, indirect, and cumulative costs of any road
11        proposals.

12  SNFPA 3630.

13    Moreover, the effects of timber harvest in general are

14  simply too site-specific to be meaningfully analyzed at the

15  regional scale of the 2004 Framework.  Impacts stemming from the

16  delivery of coarse woody debris ("CWD") to streams following

17  logging, for example, which is important for stabilizing stream

18  channels and furnishing cover for fish, "is difficult at the

19  bioregional scale due to the extreme variability in the condition

20  of [riparian conservation areas] and the relative importance of

21  CWD in maintaining stream channel structure and function."  SNFPA

22  3282.  Such effects are more meaningfully evaluated in landscape

23  and project-level analyses using individual watershed and site-

24  specific parameters such as "stream width, tree heights,

25  distances from streams, slope steepness", and other factors.  Id.

26  In addition, hydrological effects from timber harvesting are

27  subject to further evaluation and appropriate mitigation on a

28  future project basis.  SNFPA 3281.

The 2004 Framework also recognizes that where timber harvesting effects are too variable or site-specific to lend themselves to detailed, quantitative analysis at the bioregional scale, individual effects are nonetheless subject to scrutiny on a project-by-project basis.  See SNFPA 3010, 3690, 4019 (noting that future decisions to authorize timber harvest would have to comply with NEPA).

The Court consequently rejects as unwarranted and unworkable the level of detail Plaintiff advocates as being required in the 2004 Framework.  Instead, Plaintiff's desire to address environmental impacts "at an early stage" must be "tempered by the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences."  California v. Block, 690 F.2d at 761.  Having found that only more general analysis of environmental impacts is required in the Framework as a programmatic document, the Court now turns to the specific areas of concern identified by Plaintiff to determine whether NEPA's overall mandate has been satisfied.

### 1.  Effects from timber harvest activities.

As the FSEIS recognizes, recent fire seasons illustrate the risks from inaction as the number and severity of acres burned in wildfires continues to increase, with tragic losses to communities, their people and resources, as well as to wildland firefighters.
///

1  In terms of acreage, over the last 30 years wildfire in the

2  Sierra Nevada has burned an average of 43,000 acres per year,

3  whereas in the last ten years, that average has risen to 63,000

4  acres per year. SNFPA 3083.   To the extent that forests are

5  overstocked and drought conditions are present, an overall lack

6  of sufficient moisture makes the forest drier and not only more

7  susceptible to fire but also prone to insect and disease damage.

8  SNFPA 2996.   The Forest Service has the unenviable task of

9  attempting to simultaneously weigh these significant competing

10  considerations with the risks, both long and short term, on fish

11  and animal species.

12      Contrary to Plaintiff's contention, the FSEIS does describe

13  the increased timber harvesting and thinning contemplated by the

14  2004 Framework, along with its likely impacts on aquatic and

15  riparian species and environments.  SNFPA 3120-3151, 3277-85;

16  3305-11, 3356-62; 3366-78, 3386-97.  Possible impacts from timber

17  harvest are discussed, including runoff water temperatures as

18  well as sedimentation which can result from skid trails and log

19  landings. SNFPA 3281.  Effects of fuel treatments on the supply

20  of CWD, which is important for stabilizing stream channels and

21  providing cover for fish, is also analyzed.  SNFPA 3282.  As

22  indicated above, the Framework is also clear in specifying that

23  further analysis would be conducted at the site-specific project

24  level.   SNFPA 3281 (observing that "[l]andscape and project

25  analysis would be used to further evaluate and mitigate possible

26  hydrologic effects on a local scale").

27  ///

28  ///

24

Impacts of timber harvest activities on individual aquatic, riparian and meadow species is also addressed.  The Framework's analysis is properly limited to those species likely to be affected by the framework.  Because the Yosemite toad's habitat is found in mountain meadow ecosystems, for example, and because logging is not expected to occur in meadows, the SEIS did not specifically evaluate impacts of logging and skid trails to the toad.  See SNFPA 3373 (most Yosemite toad populations are found in areas where to road use occurs).[10]  Additionally, while Plaintiff contends that the Framework fails to consider its potential impact on a single fish species, an analysis of Framework effects on ten species of fish is found in a July 2003 Biological Assessment ("BA") incorporated by reference into the FSEIS.  See generally SNFPA 2095-2430; see also SNFPA 3304 (incorporating by reference BAs for SEIS and EIS); SNFPA 3487-3488 (referencing 2000 EIS and July 2003 BA for documentation of effect to fishes).  The ten fish species analyzed include the Little Kern golden trout, SNFPA 2232-2238; the Lahontan cutthroat trout, SNFPA 2239-2245; the Paiute cutthroat trout, SNFPA 2246-2251; the Central Valley steelhead, SNFPA 2252-2257; the Central Valley spring-run chinook salmon, SNFPA 2258-2264;

_____

[10] Significant, too, is the fact that the Yosemite toad is not known to exist in the HFQLG Project area, where much of the logging contemplated by the Framework will take place.  Impacts on other toad species also appear to be minimal.  The mountain yellow-frog's habitat overlaps with the Yosemite toad, SNFPA 3369, populations of the Northern leopard frog are not known to exist within the national forest lands covered by the Framework, SNFPA 3370, and reproducing populations of Cascades frogs are only documented to exist at specific locations in the Lassen National Forest.  See SNFPA 3237, 3377.  Consequently the level of impact analysis (SNFPA 3371-78) to these species appears appropriate.

the Modoc sucker, SNFPA 2265-2266; the Lost River sucker and

Shortnose sucker, SNFPA 2267-2269; the Warner sucker, SNFPA 2270-

2277; and the Owen's tui club.  SNFPA 2231-2235.  The July 2003

BA discusses these species' general distribution, status,

reproductive biology and breeding habitat, diet, general habits

use, and further analyzes the Framework's likely direct, indirect

and cumulative effect on the species.  While the BA is

incorporated by reference, such incorporation is deemed adequate

by NEPA.  See 40 C.F.R. §§ 1500.4, 1502.21; Sierra Club v. Clark,

774 F.2d 1406, 1411 (9th Cir. 1985) ("By specifically referring

to prior BLM studies and supporting materials, the FEIS fulfilled

its informational purpose").  Consequently Plaintiff's contention

that the Framework wholly ignored fish species is misplaced and

unsupported by the record.

     To the extent that aquatic species are affected, the

Framework contemplates that risks will be reduced through the

Application of the... Aquatic Management Strategy" or AMS.  SNFPA

3169.  The Framework directs that projects will include Best

Management Practices, or "BMPs, certified by the State Water

Resources Control Board and certified by [EPA] to achieve

compliance with applicable provisions of water quality plans."

SNFPA 3281.  According to a scientific study cited by the

Framework (MacDonald and Stednick 2003), fuel "treatments could

have minimal adverse effects on aquatic ecosystems and water

quality if they are carefully designed and implemented according

to [BMPs]").  SNFPA 3278.  Sediment sources would also be

minimized by application of Soil Quality Standards and BMPs, both

of which have been demonstrated to be effective.  Id.

1      Moreover, the SEIS contains a thorough discussion of the

2   tradeoffs between potential aquatic ecosystem and water quality

3   impacts from fuel management activities and the considerable

4   risks associated with high severity wildfire.   See SNFPA 3278-85.

5   Although Plaintiff may disagree with the Forest Service's

6   decision to proceed with 2004 Framework in light of those

7   tradeoffs, that kind of policy disagreement does not give rise to

8   a NEPA violation.   See, e.g, Northwest Coalition for Alternatives

9   to Pesticides v. Lyng, 844 F.2d 588, 591 (9th Cir. 1988).   The

10  effects of timber harvesting and fuels treatment are adequately

11  addressed for NEPA purposes in the programmatic 2004 Framework.

12

13               **2.   Road Impact Claims.**

14

15      Plaintiff takes particular aim at the 2004 Framework's

16  consideration of impacts from increased road construction and

17  overall road use occasioned by increased logging and fuels

18  treatments, pointing out that roads can deliver more sediment to

19  streams than any other human disturbance in forested

20  environments.   SNFPA 3279.

21      Although Plaintiff may be correct that the volume of

22  potential road construction is considerably more in the 2004

23  Framework than its 2001 predecessor, the overall numbers are

24  still relatively small in light of the vast area of forest

25  involved.   Over a ten-year period, the 2004 Framework

26  contemplates 115 miles of roads spread out over 11.5 million

27  acres in 11 national forests, in addition to reducing road miles

28  than would be constructed or reconstructed.

27

1  SNFPA 3084, 3282-83, 3394-95.  Therefore, the net impact on road
2  and aquatic ecosystems would appear to be minor.

3       Even more significantly, however, the 2004 Framework, like
4  most forest plans, does not itself make final decisions on
5  constructing or reconstructing roads.  See Ohio Forestry Ass'n,
6  Inc. v. Sierra Club, 523 U.S. at 738-39.  At the time the 2004
7  Framework was promulgated the location and construction methods
8  for particular road remained unclear, and that uncertainty as to
9  location made it also unclear just how any potential roads would
10 effect specific environmental concerns like stream proximity.
11 Road construction needs as articulated by the programmatic
12 Framework are nothing more than estimates.  See SNFPA 3368 ("It
13 has been estimated that up to 100 miles of new road construction
14 may be needed....").

15      NEPA compliance with respect to road construction is best
16 deferred to the site-specific point at which timber sales and
17 road construction decisions are made, as recognized by the
18 Framework.  See SNFPA 3010, 3690 4019.  The SEIS complies with
19 NEPA's "rule of reason" by generally describing road construction
20 and use impacts at a level reasonable for the programmatic
21 Framework.  See SNFPA 3278-85, 3394-97.

22

23      **C.  Cumulative Impacts.**

24

25      In its Second Cause of Action, Plaintiff alleges that road
26 use, road construction and timber harvest "cause cumulative
27 effects that must be analyzed in the SEIS."  Pl.'s Compl. ¶95.
28 ///

1    Plaintiff's err in contending that these separate components

2    of the 2003 Framework must be analyzed as cumulative impacts.

3    The regulation implementing NEPA define a cumulative impact as

4    "the impact on the environment which results from the incremental

5    impact of the action when added to <u>other</u> past, present, and

6    reasonably foreseeable actions....." 40 C.F.R. § 1508.7 (emphasis

7    added).  This makes it clear that cumulative impacts necessarily

8    involve consideration of the effects of other actions, and not

9    those caused by activities contemplated within the proposed

10   action itself.  <u>See</u> <u>Blue Mountains Biodiversity Project v.</u>

11   <u>Blackwood</u>, 161 F.3d at 1215 (considering claim that environmental

12   assessment for post-fire salvage sail "fails to address.... three

13   of the four <u>other</u> salvage sales proposed for the Tower Fire

14   area") (emphasis added); <u>Resources Ltd. v. Robertson,</u> 35 F.3d at

15   1305 (rejecting claims that forest plan EIS did not consider

16   "cumulative impact of non-Federal actions on.... grizzly bears").

17   In this case, then, the actions that have to be considered

18   in a cumulative effects analysis are those that are outside the

19   scope of actions contemplated by the Framework: examples would

20   include actions on private lands and past or future timber

21   harvest or grazing activities.  Plaintiff has not identified any

22   such "other" actions, aside from road construction and timber

23   harvest activities encompassed within the Framework itself which

24   are properly analyzed as direct and indirect, and not cumulative,

25   effects of the Framework.

26   ///

27   ///

28   ///

1    To the extent that the 2004 Framework does envision road

2  construction and logging activities, those activities and their

3  associated impacts are in fact addressed as direct and indirect

4  effects.  See, e.g., SNFPA 3279, 3282-83, 3307 (impacts of

5  roads); 3280-82 (impacts of fuel treatments), 3283-84 (timber

6  salvage; 3304-85 (impacts to individual species).  The SEIS also

7  includes separate discussions of the effects of livestock grazing

8  upon affected species, including the willow flycatcher (SNFPA

9  3356-62, the foothill yellow-legged frog, SNFPA 3366-69, the

10  mountain yellow-legged frog, SNFPA 3369, the Yosemite toad, SNFPA

11  3371-75, the northern leopard frog, SNFPA 3375-76, and the

12  cascades frog, SNFPA 3376-78.  Additionally, as indicated above,

13  the July 2003 BA incorporated by reference into the 2004

14  Framework also includes discussion of the potential direct and

15  indirect effects of the Framework upon ten different fish

16  species.  See SNFPA 2232-2277.  As a whole, this discussion is

17  sufficiently thorough to meet the requirements of NEPA.  See

18  Resources Ltd. Inc. v. Robertson, 35 F.3d at 1306.  To the extent

19  additional analysis is necessary when specific site-specific

20  projects are proposed, that discussion should occur then and not

21  at the programmatic level represented by the 2004 Framework.

22    In order to support its claim that a cumulative effects

23  analysis was triggered by the activities encompassed in the

24  Framework itself, Plaintiff argues that because the HFQLG Pilot

25  Project was a separate project from the overall 2004 Framework,

26  full implementation of that project, as contemplated by the

27  Framework, was sufficient to trigger a cumulative effects

28  analysis.  See Pl.'s Opp'n to Defs.' Mot. for Summ. J., 18:9-12.

1   That contention is misplaced.  The HFQLG Pilot Project is part

2   of, and controlled by, the 2004 Framework decision.  See, e.g.,

3   SNFPA 3001 ("This decision provide for implementation of the

4   HFQLG Forest Recovery Pilot Project").

5        Plaintiff also alleges that road construction and logging

6   are connected actions that require a cumulative effects analysis,

7   citing Thomas v. Peterson, 753 F.2d 754 (9th Cir. 1985).  See

8   Pl.'s Opening Points and Authorities, 31:5-7.  Thomas, however,

9   is inapposite.  In that case, the court properly considered the

10  cumulative impacts of two separate actions: one that contemplated

11  timber sales and the other to proposed building a road.  Id. at

12  756-57.  As the Ninth Circuit explained, these were separate

13  actions that could have cumulative effects because the road

14  construction and timber sales were not part of the same proposed

15  action.  Id. at 759.    In other words, because the proposed road

16  connection assessed by Thomas was outside the proposed action for

17  the timber sale, cumulative impacts had to be considered.  Here,

18  on the other hand, the 2004 Framework entails both road

19  construction and logging activities.  As such the need for the

20  cumulative effects analysis considered by Thomas is not present.

21

22  _____D.   **The 2004 Framework also contains an adequate analysis**

23           **of mitigation measures for a programmatic EIS.**

24       In its Fourth Cause of Action, Plaintiff alleges that 2004

25  Framework does not contain an adequate analysis of mitigation

26  measures.  Pl.'s Compl. ¶¶ 113-117.  The level of detail

27  advocated by Plaintiff, however, is not required by a

28  programmatic EIS like the 2004 Framework.

A fully developed mitigation plan is not necessary. Instead, NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated.  Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 528 & n.11 (9th Cir. 1994).  The Forest Service is not prohibited from waiting until site-specific actions are developed before analyzing mitigation measures in more detail.  See N. Alaska Envtl. Ctr. v. Lujan, 961 F.2d at 891 ("The detailed analysis of mitigation measures... demanded by [Plaintiff] is unwarranted at this stage.  The alleged failure of the EISs to consider mitigation measures.... does not foreclose later analysis of [those] factors.").  As indicated above, the 2004 Framework authorizes no ground-disturbing activities and Plaintiff has not shown that more detailed mitigation measures are not better reserved such activities are commenced.

Mitigation measures are in fact adequately disclosed by the 2004 Framework as a programmatic document.  The SEIS describes, for example, how the use of BMPs, soil protection strategies and the AMS have been proved effect in the past and would mitigate significant adverse effects to aquatic resources.  See SNFPA 3278, 3281.  The SEIS considered ten years of monitoring data for road-related BMPs, which found that such measures adequately protected water quality.  SNFPA 3279. In addition, mitigation measures for aquatic and riparian ecosystems are described in greater detail in Appendix A of the SEIS.  See SNFPA 3407-21 and 3428-29.

///

///

With respect to livestock grazing, mitigation measures discussed include 1) the exclusion of grazing from areas with standing water or saturated soils in wet meadow/riparian areas with associated species habitat; 2) site-specific management of the movement of livestock around and in wet areas; and 3) species surveys in suitable unoccupied habitat.  See SNFPA 3046 (for the Yosemite toad).  This contrasts with the circumstances present in Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372 (9th Cir. 1998), a case relied upon by Plaintiff, where the "Forest Service did not even consider mitigation measures." Id. at 1381.  Instead, the description and analysis of mitigation measures present here satisfies NEPA's "rule of reason" for fairly evaluating environmental consequences.

**II.  CLAIMS UNDER THE APA THAT DEFENDANTS FAILED TO PROVIDE THE REQUISITE "REASONED ANALYSIS" FOR ADOPTION OF THE 2004 FRAMEWORK**

Plaintiff's independent APA challenge (as set forth in the Fifth Cause of Action) is predicated on the contention that the Forest Service summarily rejected the 2001 Framework without identifying any sufficient new information or changed circumstances and without reconciling its abrupt change of course with previous findings to the effect that permitting more flexibility for fuel treatments in old-growth forests posed an unacceptable risk to the long-term sustainability of the Sierra Nevada's habitat, wildlife, and ecosystems.

///
///

1    In response to Plaintiff's claim that the Bush

2  Administration promptly jettisoned the 2001 Framework developed

3  by the prior administration after assuming office, Defendants

4  correctly point out that "a change in administration brought

5  about by the people casting their votes is a perfectly reasonable

6  basis for an executive agency's reappraisal of the costs and

7  benefits of its programs and regulations." Motor Vehicle Mfrs.

8  Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S.

9  29, 59 (1983) (Rehnquist, J., concurring in part and dissenting

10 in part).  In National Cable & Tel. Ass'n v. Brand X Internet

11 Servs. ("Brand X"), 545 U.S. 967 (2005), the Supreme Court again

12 reiterated that a new administration may lawfully elect to modify

13 its predecessor's policies:

14       An initial agency interpretation is not instantly
         carved in stone.  On the contrary, the agency.... must
15       consider varying interpretations and the wisdom of its
         policy on a continuing basis, [citation omitted], for
16       example, in response to changed factual circumstances
         or a change in administration...
17

18 Id. at 981 (internal quotations and citations omitted); see also

19 Gorbach v. Reno, 179 F.3d 1111, 1123-24 & n.16 (6th Cir. 1999)

20 (federal agencies have "inherent authority to reconsider their

21 own decisions," as the power to decide includes the power to

22 reach a different conclusion).  Moreover, as counsel for the

23 California Forestry Association points out, "there is no

24 objective reason why the 2001 Framework, adopted in the last days

25 of one Administration, deserves special sanctity" from the next.

26 (Cal. Forestry Ass'n Brief, 17, n.13).

27 ///

28 ///

34

1        Nonetheless, to the extent that the 2004 Framework

2   represented a significant departure from the policies embodied by

3   its 2001 predecessor, the rationale for that change must be

4   adequately articulated.  As long as the agency provides a

5   procedural explanation for the change of course, the APA is

6   satisfied.  Brand X, 545 U.S. at 981; Springfield Inc. v.

7   Buckles, 292 F.3d 813, 819 (D.C. Cir. 2002).  An agency changing

8   its course must "supply a reasoned analysis for the change beyond

9   that which may be required when an agency does not act in the

10  first instance."  See Motor Vehicle Mfrs. Assoc. v. State Farm

11  Mut. Auto. Ins. Co., 463 U.S. at 42.  "[T]he agency must examine

12  the relevant data and articulate a satisfactory explanation for

13  its action including a rational connection between the facts

14  found and the decision made."  Id. at 43.  The standard of review

15  to be employed is not whether an agency's decision is supported

16  by substantial evidence; instead, the Court must uphold a

17  decision for which an administrative hearing is not required

18  unless it is arbitrary or capricious because the requisite

19  reasoned analysis is lacking.  See 5 U.S.C. § 706(2)(A);

20  Wilderness Soc'y v. Thomas, 188 F.3d 1130, 1136 (9th Cir. 1999).

21       In analyzing the propriety of the 2004 Framework, it should

22  also be noted that claims under the APA must be viewed in light

23  of the substantive statutory authority under which the agency

24  acts.  The National Forest Management Act ("NFMA"), which

25  establishes criteria for stewardship of the nation's forests,

26  allows the Forest Service to adopt an amendment to a forest plan

27  at any time.  16 U.S.C. § 1604(f)(4).

28  ///

35

1   Significantly, too, the NFMA goes on to require that the Forest

2   Service "provide for multiple use and sustained yield" of

3   products and services, including "coordination of outdoor

4   recreation, range, timber, watershed, wildlife and fish, and

5   wilderness."  16 U.S.C. § 1604(e)(1).  In striking the

6   appropriate balance of resources the Forest Service is also

7   expected to "provide for diversity of plant and animal

8   communities (1604(g)(3)(B), and to maintain viable populations of

9   species.  See 36 C.F.R 219.19 (1982); SNFPA 3011.  The case law

10  confirms that forest planning statutes incorporate considerations

11  of multiple use.  Sierra Club v. Espy, 38 F.3d 792, 795 (5th Cir.

12  1994).

13      The burden is on Plaintiff to demonstrate that the Forest

14  Service's action is flawed; otherwise, the agency's action is

15  given a presumption of regularity.  See Clyde K. v. Puyallup

16  School Dist., No. 3, 35 F.3d 1396, 1398 (9th Cir. 1994).  This

17  confers broad discretion to the Forest Service in its balancing

18  of different resource uses, including timber and wildlife.  Such

19  discretion permits the Forest Service to determine the mix of

20  uses that best suits the public interest.  See 16 U.S.C. § 529

21  (directing Secretary of Agriculture to administer the National

22  Forest Service for multiple uses and sustained yield); Perkins v.

23  Bergland, 608 F.2d 803, 806 (9th Cir. 1979)(the mandate to manage

24  for multiple uses "'breathe[s] discretion at every pore.'"

25  (citation omitted); Intermtn. Forest Ass'n v. Lyng, 683 F. Supp.

26  1330, 1337-38 (D. Wyo. 1988).

27  ///

28  ///

36

1      Discretion in managing for multiple use is reflected in

2  pertinent forest management statutes and is also incorporated

3  into the forest planning.   Where the factual issue concerns an

4  opinion or judgment on some environmental or silvicultural

5  matter, on such a "scientific determination.... a reviewing court

6  must generally be at its most deferential."   <u>Baltimore Gas &</u>

7  <u>Elec. Co. v. Natural Resources Def. Council</u>, 462 U.S. 87, 103

8  (1983).   An "agency must have discretion to rely on the

9  reasonable opinions of its own qualified experts even if, as an

10 original matter, a court might find contrary views more

11 persuasive."   <u>Marsh v. Oregon</u>, 490 U.S. 360, 378 (1989).

12     Having determined that considerations of multiple use may be

13 reweighed by the Forest Service, we now turn to specific resource

14 considerations in assessing whether the Forest Service provided

15 the requisite "reasoned analysis" in adopting the provisions of

16 the 2004 Framework.

17

18     **A.  Fire and Fuels Management**

19

20     Contrary to Plaintiff's contention, the record does contain

21 support for the Forest Service's conclusion that the 2004

22 Framework would better address fire and fuels concerns than its

23 predecessor.   The Management Review Team (assembled by the

24 Regional Forester to address specific concerns raised by the

25 Forest Service following adoption of the 2001 Framework)

26 evaluated the fuels strategy encompassed in the 2001 Framework

27 and identified three critical areas meriting improvement.   SNFPA

28 3100-3101.

First, the Team identified the need for fuel treatments to be
strategically placed across the landscape.  Secondly, the group
recommended that enough material be removed to ensure that
wildfires burn at lower intensities and slower speeds in
treatment areas.  Finally, the Management Review Team recognized
the need for cost efficient reduction measures that would allow
program goals to be accomplished within the confines of
appropriated funds.  <u>Id</u>.

The 2004 Framework, in response to those suggestions,
provides more flexibility to strategically locate treatments
across the landscape.  SNFPA 3290, 3291.  Because the 2004
Framework does not restrict the location of mechanical treatments
as much as the 2001 ROD, fire behavior can more effectively be
modified than under the 2001 Framework, which dramatically
limited such treatments in many areas.  See SNFPA 2995; 3290,
3291 (comparing rate of spread, flame length, scorch height, and
projected mortality).  The 2004 Framework also results in the
removal of more hazardous fuels, making mechanical treatment more
effective.  <u>See</u> SNFPA 3290 (noting that the effectiveness of
mechanical treatments under the 2001 ROD was "greatly
compromise[d]" by the fact that 30 percent of the acreage
treatment was limited to removing trees less than six inches in
diameter).  Finally, the increased cost efficiency of the 2004
Framework is illustrated by the fact that while its more
comprehensive treatment objectives would be higher and cost more
to implement, it would also generate 3.5 times more revenue
annually to offset the higher costs necessary to more effectively
reduce fire risk to the landscape.  <u>See</u> SNFPA 3293-94.

The fact that the 2004 Framework addressed the concerns voiced by the Management Review Team with regard to its 2001 predecessor provides a reasoned basis for changing the Forest Service's approach to fire and fuels management, thereby satisfying the APA.

In addition, it was reasonable for the Forest Service to choose a treatment option that, after a decade of implementation, would result in fewer acres experiencing stand-replacing[11] wildfires.  See SNFPA 3287, 3288.  Significantly, too, the management review team also identified numerous practical difficulties in implementing the 2001 Framework.  It identified difficulties in classifying vegetation at the small (one-acre increment) scale required by the 2001 ROD that made it subject to inconsistent classification.  See SNFPA 1947, 3290-01, 3612.  It further found that the 2001 Framework relied upon relatively small discrepancies in canopy cover that were difficult to consistently measure with any precision.  SNFPA 1946-48.  Importantly, also, more than 80 percent of district rangers responding to a survey reported that 2001 Framework standards and guidelines prevented effective treatment.  SNFPA 1928, see also SNFPA 2995.

///

///

///

///

---

[11] A stand-replacing fire is one where most or all vegetation is killed, thereby destroying associated habitat for existing species.  See SNFPA 3287.

39

It must further be emphasized that there is adequate support in the record for the proposition that the 2004 Framework would better meet the Forest Service's goal of moving forest landscapes towards a natural fire regime which, in the long run, would result in more effective fuels treatment.  See SNFPA 3287, 3288 (Table 4.2.4a, Figure 4.2.4b).  The Sierra Nevada faces a situation where nearly 8 million of the 11.5 million acres that comprise national forests in the region are in vegetation condition classes that pose moderate to high risks from wildland fires. SNFPA 2998.[12]   The proliferation of smaller, less fire-resistant tree species (which under natural conditions had in kept in check by widespread, low severity fires) has created a highly-combustible fuel bed, as well as a fire ladder serving to carry ground fire into the crowns of larger trees.  Given that potential tinderbox, it was reasonable for the Forest Service to explore and adopt measures to more effectively address fire danger by reducing the understory of smaller and less desirable vegetation.   The 2004 Framework points out that the magnitude of this increasing danger has been borne out by devastating fires throughout the Western United States in recent years that has occasioned an "unacceptable loss of life, property and critical habitat" calling out for a more effective alteration of current forest conditions.  Id.

---

[12] This acreage has been denoted as falling within Classes 2 and 3, which represent areas where fire regimes have been so altered from their historic range of fire return interval that they are at "moderate risk of losing key ecosystem components" due to wildland fire (Class 2) and areas which are at "greatest risk of ecological collapse" because it has been so long since fire operated as a process in the ecosystem.  Id.

Given such conditions, it was understandable that the current Administration felt less comfortable with the 2001 approach of fighting "fire with fire", which relied more heavily on prescribed burning to reduce overly-dense forests with the hope those fires did not get out of control. This constituted a rational basis for moving, as the 2004 Framework did, to greater reliance on mechanical methods for thinning overly dense forests. SNFPA 2995.

At the same time, much of the increased fuel treatments entailed within the 2004 Framework were attributable to full implementation of the HFQLG Act Pilot Project, which, as stated above, represented a congressional mandate to test the efficacy of improved fires suppression through a combination of fire breaks, group selection logging and individual logging. SNFPA 1918. The Management Review Team found that the 2001 ROD "severely limit[ed]" implementation of the HFQLG Pilot Project, as it did not allow the full extent of group selection envisioned by the HFQLG Act. SNFPA 1967, 1970. Experimentation with such techniques is a valuable tool in refining adaptive management techniques, whereas the 2001 Framework's more passive approach reduced the ability to experiment and obtain information. See SNFPA 3001-02, 3139-43. Such experimentation is anticipated by the provisions of the NFMA (16 U.S.C. § 1604(g)(3)(C), and the management review team concluded that a new direction could more thoroughly test group selection and better fulfill the goals of the HFQLG Act. SNFPA 1967, 1970; see also SNFPA 3002.

///

///

In addition to finding that the impacts to the California spotted owl occasioned by full implementation of the Pilot Project were less than originally believed (as discussed in more detail, _infra_), the Team also found that the community stability goals of the HFQLG Act were not being met.  See SNFPA 1967, 1968 (a "key component" of the Pilot Project is to "provide socio-economic benefit through timber and biomass production, and therefore enhance community stability in the project area."); SNFPA 1969, 1970 ("the community stability, and socio-economic aspects of the Pilot Project are not being implemented"); SNFPA 3001.  See SNFPA 3386, 3697 ("Alternative S2 is designed to better meet[] the goals envisioned by the Pilot Project and will contribute toward producing socio-economic benefits of enhancing community stability in the pilot project area.").  Timber production is a legitimate objective in national forest management and is one of the competing resources the Forest Service is responsible for managing.

Because the record contains adequate support for the conclusion that the 2004 Framework would more effectively reduce landscape fuels, would better protect communities from the risk of catastrophic wildfire, and would further permit fulfillment of the legitimate objectives of the congressionally mandated HFQLG Act, the change in resource use and emphasis represented by the 2004 Framework's provisions concerning fuels and fire managements well within the agency's statutory discretion and consequently do not run afoul of the provisions of the APA.

///

///

42

By revisiting the unnecessary assumptions of the 2001 Framework
and by better providing for community stability, the Forest
Service decided upon a different resource balance that would
address both the needs of wildlife and the duty under the HFQLG
Act to fully implement the Pilot Project.  See SNFPA 3338-39,
3608-09.

### B.  Grazing Impacts

In enacting changes to grazing opportunities available under
the 2004 Framework, Plaintiff also argues that no changed
circumstances were present to justify any change from the grazing
direction mandated by the 2001 Framework.  According to
Plaintiff, the Forest Service was aware at the time it enacted
the 2001 Framework that it was reducing opportunities for grazing
on national forest lands.  In changing the standards for
permissible grazing under the 2004 Framework, Plaintiff contends
that absent altered circumstances and a corresponding "reasoned
analysis", the Forest Service's actions contravened the mandate
of the APA.

The 2004 Framework makes it clear, however, that the full
impact upon grazing of the 2001 Framework was not made clear
until after its enactment.  The 2004 SEIS points out that grazing
effects were considered only "in very general terms" in 2001,
with information at that time still lacking about the
distribution of occupied habitat for species like the Yosemite
toad.  SNFPA 3392.

///

43

Critical survey information for the willow flycatcher, a bird
species depending on habitat where grazing occurs, was also
absent. Id. That dearth of information had been corrected by
the time the 2004 Framework was adopted. See id. ("Much of the
field survey work has since been done and this new information
provides a better foundation from which to evaluate effects.").

After collecting additional survey data, the Management
Review Team found that at least two grazing allotments would go
to non-use based on a restriction to late season grazing at
unoccupied sites. SEIS __01_00063-65.[13] The Team also found
that the 2001 ROD actually provided a disincentive for grazing
permittees to facilitate species recovery. Grazing permittees,
for example, had worked with the Forest Service to develop
protections for nesting willow flycatchers in certain areas with
concentrated flycatcher territories. Those affirmative
protections had ceased with adoption of the 2001 Framework with
only a passive meadow closure and non-use mandates in effect.
Id.

Under the 2004 Framework, on the other hand, change was
initiated that improved the ability to develop site-specific
plans tailored to address conservation at a local level while
still permitting grazing. While 2004 ROD still requires surveys
and protections for occupied sites, it permits grazing on
occupied sites where the Agency has developed a site-specific
management strategy. SNFPA 3048.

---

[13] This designation refers to materials contained on CDs
within the administrative record, with the first designation
referring to the CD volume and the second designation the bates-
stamped number on the bottom of the cited page.

1  That strategy focuses on "protecting the nest site and associated
2  habitat during the breeding season and the long-term
3  sustainability of suitable habitat at breeding sites." Id.  This
4  comports with the Review Team's observation that impacts from
5  grazing (such as flycatcher nest bumping) could be addressed by
6  working with permittees to adjust the timing, location, and
7  intensity of grazing to keep livestock out of willow flycatcher
8  territories during the bird's breeding period.  SEIS_01_00067.

9      Similarly, for the toad, the 2004 Framework excludes grazing
10  from occupied habitat except where an interdisciplinary team has
11  developed a site-specific plan to successfully manage livestock
12  around those areas.  SNFPA 3001.

13      The 2004 FSEIS candidly acknowledges that over half of the
14  124 known willow flycatcher sites are in or near active grazing
15  allotments, making contact between livestock and flycatchers
16  likely.  SNFPA 3221.  The FSEIE further recognizes data
17  suggesting that population trends for the willow flycatcher in
18  the north-central Sierra Nevada are not encouraging.  SNFPA 3322.
19  Nonetheless, by allowing site-specific plans that permit grazing
20  during periods not apt to significantly impact either the
21  flycatcher or the toad, and thereby increasing the use of certain
22  allotments, the Forest Service's actions are neither arbitrary or
23  capricious for purposes of the APA.   This decision to strike a
24  different multiple use balancing between habitat protection and
25  grazing is supported by the record, and amounts to a reasonable
26  exercise of the Forest Service's discretion, as articulated
27  above, to emphasize a different mix of the resources it is
28  entrusted to manage.

1    In addition, with regard to grazing, it must be pointed out

2 that the 2004 Framework does not eliminate environmental

3 protections.  The 2004 Framework retains numerous components of

4 the 2001 ROD that are important to the protection of riparian and

5 aquatic habitat.  See SNFPA 3000 (2004 ROD retains "Critical

6 Aquatic Refuges, the Riparian Conservations Areas, and the goals

7 of the Aquatic Management Strategy ["AMS"]").  The 2004 ROD also

8 built upon two years of field surveys for the Yosemite toad and

9 willow flycatcher, as well as a conservation assessment for the

10 flycatcher, by requiring an interagency conservation strategy for

11 the flycatcher that will incorporate input from the State of

12 California and the FWS.  Id.

13    In sum, whether looking at the 2004 Framework's treatment of

14 fuels and fire, its protection to wildlife, or the balance struck

15 between competing interests like grazing and community

16 protection, the Forest Service had the policy discretion to

17 change the Framework to provide more or less emphasis to any

18 given resource or interest, so long as essential protections were

19 afforded.  In managing forests, every decision involves tradeoffs

20 among competing use values and the competing interests of

21 different species.  Sierra Club v. Espy, 38 F.3d 792, 800-02 (5th

22 Cir. 1994).  Such determinations involve the weighing of both

23 technical policy concerns and scientific methodologies, functions

24 in which this Court should ordinarily not interfere.  See, e.g.,

25 The Lands Council v. McNair, 537 F.3d 981, 988 (9th Cir. 2008)

26 (explaining that choosing between competing scientific approaches

27 is not a "proper role" for the court).

28  ///

Instead, deference should be afforded to the Forest Service, and its methodological choices, in making the hard choices necessary for forest management. Id. at 991.

Under this standard, the policy values the Forest Service emphasized to a greater extent in the 2004 Framework were not arbitrary or capricious so as to violate the APA. Those policy choices were within the Forest Service's "wide discretion to weigh and decide proper" multiple uses under the NFMA and the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C § 528 et seq. Big Hole Ranchers Ass'n v. U.S. Forest Serv., 686 F. Supp. 256, 264 (D. Mont. 1988).

**CONCLUSION**

Based on the foregoing, and following careful review and consideration of the parties' Cross Motions for Summary Judgment in this matter, the Court GRANTS Defendants' Motion for Summary Judgment and consequently DENIES the corresponding Cross Motion for Summary Judgment filed on behalf of Plaintiff.[14] The Clerk is hereby directed to close this file.

IT IS SO ORDERED.

Dated: September 18, 2008

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[14] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs. E.D. Cal. Local Rule 78-230(h).