IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| PACIFIC RIVERS COUNCIL,<br><br>　　　　　Plaintiff<br><br>　　v.<br><br>UNITED STATES FOREST SERVICE, *et al.*<br><br>　　　　　Federal Defendants,<br>　　and<br><br>CALIFORNIA FORESTRY ASS'N,<br>AMERICAN FOREST & PAPER ASS'N,<br>QUINCY LIBRARY GROUP; PLUMAS<br>COUNTY CALIFORNIA<br><br>　　　　　Defendant-Intervenors. | Nos. CIV-S-05-0953 MCE/GGH<br><br><br>**[proposed] ORDER ON REMAND** |

1    Before this Court is the question of the appropriate remedy for a legal deficiency in the

2    Supplemental Environmental Impact Statement ("SEIS") the Forest Service prepared pursuant to

3    the National Environmental Policy Act ("NEPA") for the 2004 Sierra Nevada Forest Plan

4    Amendment (also referred to as the "2004 Framework" or the "SNFPA").

5    On appeal of this Court's merits ruling, the Ninth Circuit concluded that the Forest

6    Service failed to take a hard look at the environmental consequences of the 2004 Framework on

7    fish and remanded the matter for determination of the appropriate remedy.  Pacific Rivers

8    Council v. U.S. Forest Serv., 689 F.3d 1012 (9th Cir. 2012).  Pacific Rivers Council ("PRC"),

9    urges this Court to vacate and enjoin the 2004 Framework and all projects issued under the 2004

10   Framework.  Such draconian relief is not warranted.  Vacatur of the 2004 Framework would be

11   extremely disruptive and environmentally harmful, and an indiscriminate injunction against all

12   projects issued under the 2004 Framework's direction is both unnecessary to remedy PRC's

13   injury and contrary to the public interest.

14   Therefore, as set forth below, the Court **DENIES** PRC's request to vacate the 2004

15   Framework and **DENIES** PRC's request for injunctive relief.  The Court **ORDERS** the Forest

16   Service to prepare a supplemental EIS to address the deficiencies in the 2004 SEIS no later than

17   September 30, 2014.

## BACKGROUND

18

19   The 2004 Framework, which amended the Forest Plans for 11 national forests covering

20   11.5 million acres within the Sierra Nevada region, represents the Forest Service's attempt at the

21   "unenviable task" of balancing protection of wildlife with effective reduction of hazardous fuels

22   in order to decrease the risk of stand-replacing wildfire.  Sierra Nevada Forest Prot. Campaign

23   ("SNFPC") v. Rey, 573 F. Supp. 2d 1316, 1338 (E.D. Cal. 2008).  In four related cases, plaintiffs

24   challenged the 2004 Framework alleging numerous deficiencies under NEPA and the National

25   Forest Management Act ("NFMA").  Sierra Nevada Forest Prot. Campaign ("SNFPC") v. Rey,

26   573 F. Supp. 2d 1316 (E.D. Cal. 2008)[1]; California ex rel. Lockyer ("California") v. U.S. Dep't

27   _____

28   [1]    During the course of litigation Sierra Nevada Forest Protection Campaign changed its
     name to Sierra Forest Legacy ("SFL").  For clarity, the Court refers to that litigation as SFL.

of Agric., No. 05-211, 2008 WL 3863479 (E.D. Cal. Aug. 19 and Sept. 3, 2008); Pacific Rivers Council ("PRC") v. U.S. Forest Serv., No. 05-953, 2008 WL 4291209 (E.D. Cal. Sept. 18, 2008); and California Forestry Ass'n ("CFA") v. Bosworth, No. 05-905, 2008 WL 4370074 (E.D. Cal. Sept. 24, 2008). In August and September 2008, this Court issued summary judgment opinions in all four cases.

In this case, this Court granted summary judgment to the Forest Service on all issues. PRC, 2008 WL 4291209, at *22.  PRC appealed.  In a February 3, 2012 opinion, a divided panel of the Ninth Circuit concluded that the Forest Service adequately addressed impacts to amphibians in the 2004 SEIS, but failed to adequately address impacts to individual fish species. PRC v. U.S. Forest Serv., 668 F.3d 609, 627 (9th Cir. 2012).  The United States sought rehearing and rehearing en banc.  On June 20, 2012, the Court of Appeals issued a superseding opinion which did not materially alter its February 3, 2012 decision, and denied the petition for rehearing and rehearing en banc.  Pacific Rivers Council v. U.S. Forest Serv., 689 F.3d 1012 (9th Cir. 2012).  The Court of Appeals remanded the case to this Court.  On November 16, 2012, the Forest Service filed a petition for a writ of certiorari with the U.S. Supreme Court.

After separate proceedings on appeal, see SFL v. Sherman, 646 F.3d 1161 (9th Cir. 2011), the SFL and California cases challenging the Framework are concurrently before this Court on the question of remedy.

## ANALYSIS

PRC asks this Court to vacate the 2004 Framework and all actions taken in reliance upon the 2004 Framework, reinstate the 2001 Framework, and enjoin all logging, burning, road activity, and grazing in the Sierra Nevada National Forests that is inconsistent with the 2001 Framework.  Defendants urge the Court to leave the 2004 Framework in place, let project-level decisions move forward, and direct the agency to prepare a supplemental EIS addressing the NEPA deficiency identified by the Ninth Circuit.

PRC's request to vacate the 2004 Framework is denied.  Under the two-part vacatur test recently adopted by the Ninth Circuit, the limited nature of the NEPA error and the disruption that would be caused by a temporary return to the 2001 Framework both favor leaving the 2004

Framework in place during remand.  PRC's broad request that all project decisions, licenses and permits issued under the 2004 Framework be vacated as well as enjoined is also denied.  PRC falls well short of demonstrating that its members will suffer an injury-in-fact justifying such broad injunctive relief, and the equities clearly weigh in favor of allowing decisions made under the 2004 Framework to proceed unimpeded during remand.

### A.     The Legal Standards for Vacatur

Vacatur is a species of equitable relief and courts are not mechanically obligated to vacate agency decisions that they find invalid.  As the Ninth Circuit explained in Nat'l Wildlife Fed'n v. Espy:

> Although the district court has power to do so, *it is not required to set aside every unlawful agency action*.  The court's decision to grant or deny injunctive or declaratory relief under the APA is controlled by principles of equity.

45 F.3d 1337, 1343 (9th Cir. 1995) (emphasis added).  See also Humane Soc'y v. Locke, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) (stating that a court may remand without vacatur to allow the agency action to remain in force until the action can be considered or replaced); Pit River Tribe v. U.S. Forest Serv., 615 F.3d 1069, 1080-81 (9th Cir. 2010) ("Our courts have long held that relief for a NEPA violation is subject to equity principles."); Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th  Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures."); W. Oil and Gas Ass'n v. EPA, 633 F.2d 803, 813 (9th Cir. 1980) ("[G]uided by authorities that recognize that a reviewing court has discretion to shape an equitable remedy, we leave the challenged designations in effect.").

Nothing in the Administrative Procedure Act, which provides the basis for this Court's review of the 2004 Framework SEIS, restricts the range of equitable remedies available to the Court, including the issuance of declaratory relief without setting aside the agency action.  See 5 U.S.C. § 702 ("[n]othing herein . . . affects . . . the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground"); 5 U.S.C. § 703 (authorizing suit for declaratory or injunctive relief).

The Ninth Circuit recently clarified the standards that should be applied when determining whether a procedurally invalid agency action should be vacated or left in place

during a remand.  Emphasizing that a "flawed rule need not be vacated," the Ninth Circuit held that the determination of "[w]hether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" <u>California Communities Against Toxics v. U.S. EPA</u> ("<u>CCAT</u>"), 688 F.3d 989, 992 (9th Cir. 2012) (quoting <u>Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n</u>, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).  As discussed below, the record before this Court indicates that the legal flaw in the 2004 Framework SEIS is not a very serious one and that vacating the 2004 Framework would have extremely disruptive consequences to both the Forest Service and the general public.

PRC asserts that in conducting this analysis, the Court should presume vacatur is the appropriate remedy and that the Forest Service should bear the burden of demonstrating vacatur is not warranted.  While the Court does not believe that PRC has identified any controlling precedent that imposes the burden of proof on Defendants, the Court concludes that even if such a burden exists, Defendants have carried that burden in this case by providing overwhelming factual evidence to support the conclusion that vacating the 2004 Framework would be inequitable under controlling Ninth Circuit law.

In addition to arguing that vacatur is the presumptive remedy under the APA, PRC also suggests that vacatur is only withheld in situations where environmental harm is likely to flow from vacating a flawed agency decision.[2]  This is not correct.  The <u>CCAT</u> court made clear that in addition to weighing the environmental consequences of vacatur, courts should consider economic and other practical concerns.  <u>Id.</u> at 994 ("If saving a snail warrants judicial restraint, so does saving the power supply.") (internal citation omitted).  In <u>CCAT</u>, the Ninth Circuit noted that vacatur of the challenged rule could delay the construction of the new Sentinel power plant, which would not only have negative environmental impacts, but also negative economic impacts and would have created "needless and duplicative legislative effort."  <u>Id.</u> at 993-94.  Based on

---

[2]      Even if PRC were correct that a flawed agency decision should only be left in place when doing so would avoid environmental harm, Defendants have submitted abundant and convincing evidence, which PRC has not effectively rebutted, that vacating the 2004 Framework would likely result in environmental harm throughout the Sierra Nevada.

1   these consequences, the Court remanded the rule "without vacatur so that construction of

2   Sentinel may proceed without delay."  Id.

3        In sum, vacatur, like injunctive relief, is an equitable remedy that is only granted in

4   particular circumstances; neither remedy issues as a matter of course upon the showing of a legal

5   violation.  And, while the tests for vacatur and injunctive relief are not identical, both take into

6   account a balancing of the equities and involve an analysis of the likely consequences to the

7   parties and to the public from issuing such relief.  As detailed below, the facts before this Court

8   indicate that vacatur of the 2004 Framework is not appropriate, despite the Forest Service's

9   failure to fully comply with NEPA.

10              **1.    Vacatur of the 2004 Framework is Not Warranted**

11       Applying the two CCAT factors here indicates that the 2004 Framework should not be

12  vacated.

13       The first CCAT factor looks to "how serious the agency's errors are."  CCAT, 688 F.3d

14  at 992.  Here, the Court of Appeals faulted the Forest Service for not including a discussion of

15  the impacts of the 2004 Framework on individual fish species. PRC, 689 F.3d at 1028.

16  However, that merits finding does not demonstrate a serious error for several reasons.[3]  First,

17  since both Frameworks have the same basic protective measures for aquatic species, there is no

18  major substantive difference between the two Frameworks with regard to impacts on fish.

19  Second, because the 2001 EIS analyzed the impacts on individual fish species from a broad

20  range of management alternatives, within which the 2004 Framework falls, both the agency and

21  the public were apprised of the likely programmatic consequences of the 2004 Framework on

22  fish.  Third, because the 2004 SEIS disclosed the environmental consequences of the 2004

23  Framework on aquatic habitat, the SEIS provided information to the agency and public on the

24  habitat where fish live.  And, finally, to the extent that there is a deficit in analysis of impacts to

25  _____

26  [3]      PRC suggests that the Forest Service's failure to disclose the impacts to individual fish
    species in the 2004 SEIS was such a serious legal error that vacatur is warranted as a matter of
27  law.  Of course, this argument fails to recognize that the Ninth Circuit, despite identifying the
    legal error, did not vacate the 2004 Framework decision.  If vacatur were the necessary
28  consequence of the legal violation that the Ninth Circuit identified, there would have been no
    need to remand the matter to this Court to determine the appropriate remedy

1   fish, additional analysis can be completed at the site-specific level before any ground-disturbing

2   actions take place that could harm fish or PRC's members.  Each of these points is addressed in

3   greater detail below. [4]

4        First, because the 2004 and 2001 Frameworks have nearly identical protective measures

5   for fish, projects issued pursuant to the 2004 Framework are not likely to result in appreciably

6   different impacts to fish from those issued pursuant to the 2001 Framework.[5]  See SNFPA

7   03486 ("The proposed changes considered in the [2004] SEIS would not alter the existing

8   strategy, [and thus] [p]rotection of most fish would therefore be similar.").  The two Frameworks

9   utilize virtually the same Aquatic Management Strategy ("AMS"), Standards and Guidelines

10  ("S&Gs") applicable to fish, and Best Management Practices ("BMPs").  See SNFPA 03281; see

11  also Kellett Decl. (ECF 177-2) at ¶¶ 5-7  (describing similar S&Gs related to Riparian

12  Conservations Areas and Critical Aquatic Refuges); Hill Decl. (ECF 177-3) at ¶¶ 23-33

13  (describing similar S&Gs related to erosion from timber harvest), Yost Decl. (ECF 177-4) at ¶¶

14  8-12 (describing similar S&Gs related to grazing).

15       In preparing the SEIS for the 2004 Framework, the Agency prepared a "Consistency

16  Review" to determine the extent to which the changes proposed in the 2004 Framework would

17  result in environmental impacts that had not been addressed in the 2001 EIS.  In the Consistency

18  Review, the Forest Service concluded that the AMS under the 2004 Framework was essentially

19  the same as that for the 2001 Framework and that the effects of management pursuant to that

20  strategy had already been analyzed and disclosed in the 2001 EIS.  Beyond this general finding,

21  the Consistency Review evaluated the potential impacts of changed management on individual

22  species of fish and concluded that the 2004 Framework "would not be expected to produce

23

---

24  [4]    The combined weight of these four reasons strongly indicates that the SEIS's deficiency
25  is not serious enough to warrant vacatur.  However, each of the reasons independently convinces
    the Court that vacatur is not warranted here, particularly when considered along with the second
26  CCAT factor – the disruptive consequences that would flow from vacatur.
    [5]    As discussed further below, to the extent there are likely to be materially different
27  impacts upon fish from the two Frameworks, the weight of evidence indicates that the 2004
    Framework will be more effective in conserving fish species over time due to its superiority in
28  facilitating effective fuel-reduction treatments, which should help avoid the adverse impacts to
    fish that result from severe wildfires.

1    appreciably different results" from those disclosed in the 2001 FEIS.  *See* SNFPA 03487-88

2    (discussing impacts to fourteen Endangered, Threatened, and Proposed Species of fish); see also

3    SNFPA 03491-92 (discussing impacts to nine Forest Service Sensitive Species of fish); SNFPA

4    03493 (discussing impacts to thirteen Moderately and Highly Vulnerable Species and Species of

5    Concern of fish).  Because the 2004 Framework shares the same aquatic management strategy as

6    the 2001 Framework and should not result in an increase in adverse impacts to fish as compared

7    to the 2001 Framework, the Forest Service's failure to reanalyze impacts to individual fish

8    species does not constitute a serious legal error that warrants vacatur.

9            Second, because the 2004 Framework envisions a scope and type of management within

10   the range of alternatives examined in the 2001 EIS, the 2004 Framework is not expected to have

11   materially different impacts on fish from the alternatives that were analyzed in the 2001 EIS.

12   During remedy proceedings, the Forest Service provided credible and unrebutted testimony from

13   Donald Yasuda, a wildlife biologist that helped prepare the 2004 Framework SEIS.  Mr. Yasuda

14   stated:

15           [T]he levels and types of activities that [the 2004 Framework] authorizes fall within the
             range of activity levels and types covered by the range of alternatives disclosed in the
16           2001 EIS.  That is, some of the alternatives considered in the 2001 FEIS (such as F4 and
             F7) proposed more intensive and expansive land management, while other alternatives in
17           the 2001 FEIS (such as F2 and F5) proposed less intensive and expansive management
             than the 2004 Framework.  Despite this wide range of proposed management, within
18           which the 2004 Framework would have fallen, the expected outcomes for fish species
             was the same for all the alternatives considered.  Therefore, based on the analytical
19           approach used in the 2001 FEIS, the 2004 Framework would likely have the same
             magnitude of impacts on fish species as the other alternatives considered in the 2001
20           FEIS, including the 2001 Framework decision.

21

22   Yasuda Decl. (ECF 177-1) at ¶ 8.  Given that the 2004 Framework is not likely to have

23   significantly different impacts on fish from the 2001 Framework or any of the other alternatives

24   analyzed in the 2001 FEIS, the Forest Service's failure to conduct a new species-by-species fish

25   analysis is not so serious a legal error as to warrant vacatur.

26           Third, while the 2004 SEIS did not provide an analysis of impacts to individual fish

27   species, the 2004 SEIS did analyze the effects of the 2001 and 2004 Frameworks on aquatic

28   ecosystems -- where fish live.  The 2004 SEIS recognized that even though the aquatic

1   management regimes for the two alternatives were largely the same, there was the potential for

2   some minor differences in impacts to aquatic habitat from Alternatives S1 and S2.  Based on this,

3   the 2004 SEIS provided an analysis of those impacts.  See 2004 SEIS at 207-15 (providing

4   detailed discussion of environmental consequences to "Aquatic, Riparian, and Meadow

5   Ecosystems").  While the Ninth Circuit made clear that the 2004 SEIS should have provided a

6   species-by-species analysis of impacts to fish, the fact that the SEIS included a discussion of

7   impacts to aquatic habitat reduces the seriousness of the agency's legal error.

8           Finally, the seriousness of the Forest Service's error is mitigated by the programmatic

9   nature of the 2004 Framework.  The 2004 Framework itself does not directly authorize any

10  ground-disturbing activities.  SNFPA 03010 ("This ROD does not authorize timber sales or any

11  other specific activity on the Sierra Nevada national forests.  Site-specific decisions will be made

12  on projects in compliance with NEPA, ESA, and other environmental laws following applicable

13  public involvement and administrative appeal procedures.")  Any action that may potentially

14  impact individual fish species requires separate, project-level analysis pursuant to NEPA.  That

15  site-specific evaluation affords the Forest Service the opportunity to consider the impacts to fish

16  before taking an action that can cause injury to PRC's members.

17          In sum, the record before the Court shows that the effect of the 2004 Framework on fish

18  would be largely the same as the effect of the alternatives addressed in the 2001 FEIS.  Because

19  the effects of those alternatives were already considered by the Forest Service and disclosed to

20  the public, the absence of new analysis—while a violation NEPA—is not a serious deficiency

21  warranting vacatur.  Furthermore, the seriousness of the NEPA violation is minimized by the fact

22  that the 2004 SEIS did provide an analysis of impacts to aquatic habitat, and project-level NEPA

23  documents will provide further analysis of impacts to fish species at the site-specific level, where

24  those impacts can be best understood.  While the Court orders that the NEPA deficiency in the

25  2004 SEIS be corrected, it does not believe the NEPA error raises serious doubts that the

26  "agency chose correctly."  Allied-Signal, 988 F.2d at 150.   Therefore, the first CCAT factor

27  favors remanding the 2004 Framework SEIS to the Forest Service without vacating the 2004

28  Framework decision.

Under the second <u>CCAT</u> factor, the evidence before the Court shows that an interim return to the 2001 Framework will have extremely "'disruptive consequences.'"  688 F.3d at 992 (quoting <u>Allied-Signal</u>, 988 F. 2d at 150).  PRC ignores the practical consequences of vacating the 2004 Framework, apparently assuming that management of the 11 national forests subject to the Framework can simply and seamlessly proceed under the 2001 Framework.  Defendants have convincingly demonstrated, through extensive and compelling factual submissions and record citations, that project planning in the National Forest System is a lengthy and expensive endeavor, and that vacating the 2004 Framework would have enormous disruptive consequences. Even if vacatur would not impact projects with decisions already made (an issue addressed below), Defendants have demonstrated that vacatur would disrupt approximately 146 projects currently in various stages of the planning process across the Sierra Nevada.  According to unrebutted evidence submitted by Defendants, reanalyzing large projects developed under the 2004 Framework for possible re-issuance under the 2001 Framework could be extremely expensive and time consuming, and would adversely impact the public interest.  The likely result of vacatur of the 2004 Framework is a virtual shut-down of the project development pipeline for the entire region while the Forest Service either reconfigures and reanalyzes 2004 Framework projects to make them consistent with the 2001 Framework, or suspends work on all significant forest management projects currently being planned until the Forest Service completes the SEIS for the 2004 Framework.  The court in <u>CCAT</u> made clear that delaying planned projects is a disruptive consequence that must be considered in determining whether vacatur is warranted.[6] 688 F.3d at 993-94.  <u>See also</u> <u>Idaho Farm Bureau Fed'n</u>, 58 F.3d at 1405-06 (noting expenditure of public resources constitutes equitable concern weighing against vacatur).

_____

[6]     PRC argues that the disruptive effects of vacatur should not be considered by the Court because the Forest Service has continued to plan site-specific projects with the knowledge that the Framework could be set aside, such that any disruptive consequences are a problem of the Forest Service's own making.  This position conflicts with the Ninth Circuit's direction to consider the disruptive consequences of vacatur in determining whether the requested relief is appropriate.  Furthermore, the law does not obligate an agency to self-enjoin simply because litigation is filed.

1      In addition to logistical and financial disruptions, vacatur would have harmful

2  environmental consequences.  See, e.g., Idaho Farm Bureau Fed'n, 58 F.3d at 1405 (leaving

3  invalid rule in place to avoid environmental harm).   The evidence before the Court in this case

4  and the related Framework cases indicates that leaving the 2004 Framework in place while the

5  Agency corrects the deficiency in its NEPA analysis is environmentally preferable to returning

6  management of the Sierra Nevada to the 2001 Framework, even temporarily.  The weight of

7  evidence before the Court indicates that 2004 Framework is environmentally superior to the

8  2001 Framework in numerous regards, including reducing the threat of catastrophic wildfire (and

9  the associated adverse impacts to fish), protecting and creating habitat for old forest species like

10  the California spotted owl, and addressing non-fire related threats to forest health, including

11  drought, insect infestation and climate change.

12      PRC claims that leaving the 2004 Framework in place will cause environmental harm, as

13  it "threatens harm to already-imperiled Sierra Nevada fish species."  PRC Br. at 8 (ECF 175).

14  As set forth in detail below, the record belies PRC's claim that implementation of the 2004

15  Framework will significantly harm aquatic habitats or fish species.  Indeed, the weight of the

16  evidence before the Court indicates that implementing vegetation management projects pursuant

17  to the 2004 Framework should result in a long-term benefit to aquatic and riparian resources –

18  including fish – by reducing serious erosion and sedimentation caused by catastrophic wildfires.

19      PRC departs from the CCAT factors to suggest that vacatur is necessary to "ensure that

20  the Forest Service undertakes an open-minded review" of the impacts to individual fish species.

21  PRC Br. at 10.  The Court finds this claim unpersuasive.  The Forest Service is entitled to a

22  presumption that it will act in good faith in preparing its analysis of impacts to individual fish

23  species.  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971) (federal

24  agencies are entitled to a "presumption of regularity").  The law is clear that courts cannot

25  assume that because an agency has failed to comply with NEPA in the past it will fail to do so in

26  the future.  Sierra Club v. Penfold, 857 F.2d 1307, 1319 (9th Cir. 1988).  Here, PRC provides

27  nothing to rebut the presumption that the Forest Service will correct the error in the 2004 SEIS in

28  good faith.  Further, as a factual matter, it is unclear how the status quo –whether it is the 2004

Framework or the 2001 Framework—alters the Agency's incentives to properly evaluate effects on fish on remand.  In this regard, the Ninth Circuit's decision in <u>Northern Cheyenne Tribe v. Hodel</u>, 851 F.2d 1152 (9th Cir. 1988), is instructive.  There, the plaintiffs argued that coal leases issued without proper NEPA should be voided, and not merely suspended, to avoid the new NEPA being tainted by bureaucratic commitment to the leases. The Court disagreed, finding:

> [T]he difference between voiding the lease and suspending them does not create any major difference in the process that must now go on.  We see no reason to suppose that the Secretary will feel greater commitment to the original project if the leases are not voided but held in abeyance until a new evaluation is made . . . . We assume the Secretary will comply with the law.

<u>Id.</u> at 1157.  The situation here is no different.  The 2004 Framework has been in place for eight years; whether it remains in place or is vacated during the remand is not likely to alter the Agency's analysis of impacts to fish or the agency's conclusion about what is the best management regime for the future.  The Forest Service must evaluate in good faith the effects of the 2004 Framework on individual fish species, as required by this Order, regardless of whether the 2004 Framework is vacated or left in place during the remand.

In sum, both of the <u>CCAT</u> factors counsel strongly in favor of remanding the 2004 Framework without vacatur.

## 2.    Vacatur of all Forest Service Project-Level Decisions is Inappropriate

In addition to seeking vacatur of the 2004 Framework decision, PRC requests that the Court vacate "any timber sales and the issuance of permits beyond those authorized by the 2001 Framework."  PRC Br. at 10.  However, vacatur is only available for the specific agency decision challenged by a Plaintiff.  Here, the only agency decision that PRC has challenged is the adoption of the 2004 Framework.  Therefore, the only agency decision potentially subject to vacatur is the 2004 Framework decision itself.

The APA grants federal courts jurisdiction to review "final agency action," 5 U.S.C. § 704, and to "set aside" agency actions found to be arbitrary or capricious, <u>id.</u> at 706(2).  The only final agency action challenged by PRC in this litigation is the adoption of the 2004 Framework.  Without reviewing site-specific actions issued under the 2004 Framework, this Court cannot

1  determine whether they are in fact arbitrary or capricious or should be set aside.  That

2  determination must be made "in the context of site specific actions, if and when they actually

3  arise."  Idaho Sporting Cong. v. Rittenhouse, 305 F.3d 957, 974 (9th Cir. 2002).  Contrary to

4  PRC's assumption, the mere fact that decisions were rendered under the 2004 Framework does

5  not mean they are arbitrary or capricious.  See, e.g., Wyoming Outdoor Council v. U.S. Forest

6  Serv., 165 F.3d 43, 51 (D.C. Cir. 1999) (finding agency could engage in "further efforts to fulfill

7  its NEPA obligations" at the site-specific decision stage).  Moreover, even assuming all

8  decisions issued under the 2004 Framework were procedurally invalid, PRC's request for

9  wholesale vacatur of agency actions not before the Court is still inappropriate because it

10  precludes the Court from applying the equitable test for determining whether vacatur is

11  warranted under the standards announced in CCAT.

12        PRC claims that in SFL the Ninth Circuit made "clear that its discussion of vacatur under

13  the APA encompassed not only the 2004 Framework itself, but also approvals made to

14  implement the 2004 Framework."  PRC Br. at 10.  Nowhere in SFL, however, does the court

15  address the parameters of vacatur; the discussion referred to by PRC is simply the Court of

16  Appeals' conclusion that this Court has jurisdiction to issue injunctive relief barring

17  implementation of a program-level decision.  646 F.3d at 1185.  This is a far cry from holding

18  that because the 2004 Framework suffers a procedural deficiency, all actions issued under the

19  2004 Framework must be vacated.  Indeed, were that the law, the court in SFL would not have

20  remanded the matter to this Court for remedy proceedings; it would have simply vacated all

21  agency actions taken under the 2004 Framework.

22         PRC also points to the Ninth Circuit's decision in Klamath Siskiyou Wildlands Ctr. v.

23  Boody, 468 F.3d 549 (9th Cir. 2006), PRC Br. at 11, but that case actually undermines PRC's

24  position.  In Klamath Siskiyou Wildlands, the plaintiff challenged two programmatic decisions

25  and two site-specific timber sales issued pursuant to the programmatic decisions.  468 F.3d at

26  553-54.  The court found that the programmatic decisions and the two projects were "invalid and

27  must be enjoined."  Id. at 562.  Thus, in sharp contrast to this case, plaintiffs in Klamath Siskiyou

28  Wildlands directly challenged site-specific decisions and those decisions and their underlying

administrative records were before the court for review.  Furthermore, in <u>Klamath Siskiyou</u> <u>Wildlands</u>, the court "enjoined" the decisions being challenged; it did not "vacate" them.

     <u>Idaho Sporting Congress v. Rittenhouse</u>, 305 F.3d 957 (9th Cir. 2002), also undercuts PRC's claim to wholesale vacatur of all decisions issued under the 2004 Framework.  In <u>Idaho</u> <u>Sporting Congress</u>, the plaintiffs challenged two specific timber sales and a Forest Plan standard. <u>Id.</u> at 966.  The court found the plan standard invalid and held that the two sales should be set aside and enjoined.  <u>Id.</u> at 974.  However, the court explicitly refused to extend relief beyond the two projects challenged by plaintiffs, noting that the "sweeping remedy" of "a forest-wide injunction of all logging" was not warranted.  <u>Id.</u>  Thus, nothing in <u>Klamath Siskiyou Wildlands</u> or <u>Idaho Sporting Congress</u> supports the proposition that a plaintiff who challenges only a program-level decision is automatically entitled to broad vacatur of all site-specific projects implementing the program-level decision.

     PRC's request that all site-specific actions issued under the 2004 Framework be vacated is denied.

### B.     PRC is Not Entitled to an Injunction

     In addition to its request to vacate the 2004 Framework and all projects issued pursuant to it, PRC also asks this Court to issue a broad injunction barring the Forest Service from "continuing to plan and implement projects (logging, road-construction, grazing, etc.) in reliance on the 2004 Framework."  PRC Br. at 12.  PRC's request would potentially impact over 100,000 acres of already authorized vegetation management projects, grazing on hundreds of thousands of acres, and an unknown number of other undefined Forest Service activities authorized over the past eight years across the 11 National Forests.

     For the reasons set forth below, the Court denies PRC's request for injunctive relief against all activities authorized under the 2004 Framework.

### 1.     The Legal Standards for Injunctive Relief

     To qualify for a permanent injunction, PRC bears the burden of demonstrating:

(1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships

between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

SFL, 646 F.3d at 1184 (quoting eBay Inc. v. MercExchange, 547 U.S. 388, 391 (2006)).  The Supreme Court has made clear that the traditional four factor analysis must be applied in NEPA cases without any "thumb on the scale."  Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2757 (2010).  Further, the Supreme Court has made clear that courts may decline to grant injunctive relief for a NEPA violation where the public interest weighs against such relief, even if that means an irreparable injury goes unaddressed.  Winter v. NRDC, 555 U.S. 7, 25-26 (2008).  See also Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (holding an injunction is an "extraordinary remedy" that does not issue as a matter of course even "though irreparable injury may otherwise result to the plaintiffs").

### 2. PRC has Failed to Prove that it will Suffer Irreparable Harm in the Absence of an Injunction

Nowhere in its request for injunctive relief, or in its complaint, does PRC challenge or even identify a single, site-specific project that will irreparably harm its members.[7]  Instead, PRC bases its claimed injury on the generic assertion that because the 2004 Framework ostensibly allows "substantially greater logging, road-construction and grazing [than the 2001 Framework]," and these activities potentially impact fish and aquatic habitats, PRC's members are irreparably harmed by further implementation of any and all activities issued pursuant to the 2004 Framework.  PRC BR. at 14.  This generic and attenuated allegation of environmental harm falls well short of the concrete injury to the plaintiff needed to justify the extraordinary remedy of injunctive relief.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81 (2000) (Article III remedies must redress an "injury to the plaintiff" rather than an "injury to the environment"); Wilderness Soc'y v. Rey,  622 F.3d 1251, 1256 (9th Cir. 2010) (a plaintiff must show a concrete interest in a tract of land that "'is about to be developed by the

---

[7]      Declaration testimony submitted by the Forest Service indicates that PRC has not administratively challenged any project or decision issued under the 2004 Framework over the past eight years.  See Burmark Decl. (ECF 177-5) at ¶¶ 2-3.  Even if it had, PRC would still be obligated to demonstrate in the present lawsuit how such projects irreparably harm its members' interests.

1   Forest Service in a way that harms'" the plaintiff's interests) (quoting <u>Summers v. Earth Island</u>

2   <u>Inst.</u>, 555 U.S. 488, 495 (2009).[8]  To carry its burden of proof as to irreparable injury, a plaintiff

3   must identify the specific, concrete actions that will harm its members' interests if no injunction

4   issues.  PRC has entirely failed to do this.

5       PRC's attempt to demonstrate irreparable harm based on predicted increases in ground-

6   disturbing activities is deficient in a number of regards.  First, the evidence before the Court does

7   not support PRC's assumption that projects implementing the 2004 Framework will have

8   significant adverse impacts on aquatic habitats and fish, particularly when compared to the likely

9   impacts from projects issued pursuant to the 2001 Framework.  Second, PRC's assumption that

10  because the 2004 Framework "allows" more activity, more activity will necessarily be

11  authorized at the site-specific level not only demonstrates a misunderstanding of the Forest

12  Service's staged decision-making process, but it is also belied by the 8-year history of

13  implementing the 2004 Framework.  Finally, to the extent that the 2004 Framework has resulted

14  in increased levels of land management (such as increased thinning for fuel reduction purposes),

15  PRC ignores the fact that programmatic and project-level protective measures are effective at

16  minimizing and avoiding negative impacts to aquatic and riparian habitats when applied in the

17  site-specific context.  Each of these issues is addressed in turn below.

18      First, PRC's assertion that timber harvest, road-building, and grazing under the 2004

19  Framework will lead to detrimental impacts to aquatic habitats and fish above and beyond what

20  would occur under the 2001 Framework is unsupported by the record before the Court.  Rather,

21  the evidence indicates that with regard to direct impacts to aquatic habitats and fish from Forest

22  Service management activities, there is little difference between the 2001 and 2004

23

---

24  [8]     While PRC may not have been required to identify specific projects impacting its
    interests to establish its initial standing to challenge the 2004 Framework, <u>see PRC</u>, 689 F.3d at
25  1020-24, it must do so to establish its entitlement to injunctive relief.  Establishing injury-in-fact
    for purposes of standing is less demanding then demonstrating irreparable harm to obtain
26  injunctive relief.  <u>See Ctr. for Food Safety v. Vilsack</u>, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011)
    ("Of course, . . . a plaintiff may establish standing to seek injunctive relief yet fail to show the
27  likelihood of irreparable harm necessary to obtain it."); <u>Caribbean Marine Serv. Co. v. Baldridge</u>,
    844 F.2d 668, 674 (9th Cir. 1988) (finding that to demonstrate irreparable harm, "[a] plaintiff
28  must do more than merely allege imminent harm sufficient to establish standing").

1   Frameworks.[9]  As this Court has previously noted and the Forest Service experts have

2   demonstrated, both Frameworks use essentially the same Aquatic Management Strategies,

3   Riparian Conversation Objectives, and Critical Aquatic Refuges.  See PRC, 2008 WL 4291209,

4   at *3.  See also Kellett Decl. (ECF 177-2) at ¶ 3; Hill Decl. (ECF 177-3) at ¶ 23-25; Yost Decl.

5   (ECF 177-4) at ¶ 12.  Both Frameworks also utilize substantially the same S&Gs for protection

6   of aquatic and riparian resources, including fish.  See  SNFPA 3285 (S&Gs similar); Kellett

7   Decl. (ECF 177-2) at ¶¶ 5-19 (comparing S&Gs and concluding that changes "are not likely to

8   result in notably greater adverse impacts to fish, aquatic, and riparian resources"); Hill Decl.

9   (ECF 177-3) at ¶¶ 26-33 (comparing S&Gs applicable to RCOs and concluding the changes "are

10  minor and are unlikely to significantly increase risks to water quality or aquatic resources"); Yost

11  Decl. (ECF 177-4) at ¶ 5 (comparing grazing S&Gs relevant to aquatic impacts and finding no

12  significant difference between 2001 and 2004 Frameworks).  As a result, projects implemented

13  pursuant to the 2004 Framework are not likely to result in significantly greater direct impacts to

14  fish and aquatic resources as compared to projects implemented pursuant to the 2001

15  Framework.

16         In support of its position, PRC relies on the declarations of its experts, who opine at

17  length about the harmful effects of logging, grazing, and roads on aquatic systems and fish.

18  However, the allegations of PRC's experts are almost entirely generic and fail to attribute the

19  harms of which they complain to the 2004 Framework itself.  Based on the totality of the

20  evidence, the Court concludes that PRC has failed to demonstrate that implementing the 2004

21  Framework will adversely affect fish and aquatic systems in any way that is materially different

22  from the impacts that would occur from management activities under the 2001 Framework.

23  Therefore, PRC has failed to carry its burden of proving that the 2004 Framework will adversely

24

25  [9]      While the evidence before the court indicates that activities implemented under either the
26  2001 and 2004 Frameworks would likely have negligible effects on fish species due to the robust
    aquatic management strategy and protective S&Gs and BMPs, the evidence also indicates that
27  the 2004 Framework is likely to be more protective to fish species over the long term than the
    2001 Framework, since the 2004 Framework is likely to be more effective in reducing the
28  severity and acreage of wildfires, which can have serious adverse impacts on fish due to erosion,
    sedimentation, and other factors.

affect aquatic systems (and harm PRC's members) above and beyond what might occur under the 2001 Framework.  See Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1022 (9th Cir. 2009) (noting that in considering relief, the court must compare the 2001 and 2004 Frameworks with respect to harms and equities).

Second, PRC's attempt to prove irreparable harm based on an alleged increase in management activity under the 2004 Framework founders on the fact that the record since 2004 does not reflect the vast increase in activities assumed by PRC.  For example, grazing levels in the Sierra Nevada, measured both by acres grazed and Animal Unit Months have declined from 2000 to 2012.  Yost Decl. (177-4) at ¶¶ 3, 5.  Similarly, between the 2004 and 2011, the national forests in the Sierra Nevada have decommissioned more than 10 times the length of roads than they constructed.  Hill Decl. (177-3) at ¶ 46.  And, on a related note, the number of water bodies on NFS lands in the Region listed as impaired due to timber harvest and livestock grazing declined between 2002 and 2010.  Id. at ¶ 35.[10]  These facts, which have not been convincingly rebutted by PRC, undermine PRC's core assumption that the adoption of the 2004 Framework has and will result in increased grazing and road-building.   Because the record before the Court does not support PRC's allegation that the 2004 Framework will result in an increase in grazing and road building, PRC has failed to carry its burden to prove irreparable harm caused by any such increase in those activities.

Third, PRC's attempt to base its claim of irreparable injury on the potential increase in land management allowed by the 2004 Framework ignores the actual design features of individual projects, which ensure that an increase in activity levels does not correlate with an increase in adverse impacts.  In addition to meeting the S&Gs established by the Framework itself, project-specific decisions follow a series of Best Management Practices ("BMPs")

---

[10]      In contrast to grazing and road-construction, the Forest Service has conceded that vegetation management activities, including thinning for fuel reduction, have increased under the 2004 Framework.  However, as discussed in more detail below and in the Forest Service's compelling declaration testimony, the short-term, direct effects to aquatic resources from vegetation management activities are likely to be minimal, while the long-term, indirect effects of such activities may be significant, benefitting aquatic resources by reducing the adverse impacts associated with severe wildfires.

designed to protect aquatic and riparian resources.  According to evidence provided by the Forest Service and not rebutted by PRC, these BMPs have proven extremely effective in preventing or minimizing adverse impacts to aquatic resources.  For example, recent post-project monitoring found the effectiveness rate of BMPs in the Herger-Feinstein Quincy Library Group ("HFQLG") Pilot Project area to be 97 percent.  ECF 177-6 at 1.  These BMPs are imposed at the project level, above and beyond the particular standards and guidelines required by 2004 Framework. See e.g. Hill Decl. (ECF 177-3) at ¶ 27 (noting BMPs, soil quality standards, and analysis of cumulative watershed effects are required independent of Framework); Yost Decl. (ECF 177-4) at ¶ 17 (noting grazing BMPs exist independent of guidance in Framework); Kellett Decl. (ECF 177-2) at ¶ 21 (noting project specific design features, mitigation and BMPs are expected by minimize or avoid impacts beyond what is required by the Framework S&Gs alone).  Thus, the determination of whether plaintiffs will suffer an injury justifying injunctive relief cannot be answered solely by looking at the increased activity levels potentially allowed under the 2004 Framework without reference to specific projects.  And, the evidence before the Court indicates that when project-level design-features and protective measures are considered, adverse impacts to aquatic resources are generally avoided, even when large areas of land are treated.

The difference between PRC's attempt to establish harm to aquatic and riparian resources based on potential aggregate levels of activities "allowed" under the 2004 Framework and the actual impact of projects once implemented is illustrated by considering a particular site-specific project.  The Slapjack Project,[11] adopted in 2006 pursuant to the 2004 Framework, serves a number of multiple-use goals including: reducing the risk of wildfire, meeting the requirements of the HFQLG Act, and improving aquatic and riparian ecosystems.  ECF 177-8.  In compliance with NEPA, the Forest Service prepared a comprehensive EIS for the project.  With regard to direct impacts on hydrological function, the EIS found that with the use of BMPs there would "only be a small potential of sedimentation to the immediate channel and channels downstream," and that completion of the project would result in long term reduction of impacts on streams.

---

[11]     The Slapjack Project was brought to the Court's attention in the Sierra Forest Legacy case, where plaintiffs there asserted that the project would cause irreparable harm to SFL's members and the environment.

The EIS also addressed impacts to trout species, and concluded that: (1) the project would not result in a significant increase in the sediment delivery to aquatic habitats and could actually reduce sediment transport; (2) there would be no measurable downstream sedimentation effects from the project; and (3) the portion of the project that involved the replacement of culverts would allow fish to pass upstream, resulting in increased fish distribution and, potentially, increased numbers.  ECF 177-8 at 3-279.  Finally, the EIS found that road decommissioning authorized by the project would decrease average road density in the project area.  In short, site-specific evaluation of the Slapjack Project makes clear that the project should benefit aquatic habitat and fish species, even though the project involves extensive timber harvest and road management.  The Slapjack Project illustrates that the question of whether the 2004 Framework causes injury to PRC's members can only be meaningfully evaluated in the context of actual projects that carry out the 2004 Framework's programmatic direction.[12]

For the reasons set forth above, PRC has failed to carry its burden of proving that the adoption of the 2004 Framework will cause its members irreparable injury.  On this basis alone, Plaintiff is not entitled to the injunctive relief it seeks.[13]

### 3.    PRC Has Not Demonstrated That Other Remedies at Law are Inadequate

---

[12]    The Forest Service provided another compelling example, in the grazing context, which makes clear that PRC's allegations of harm are based on speculation that is often rebutted by real world experience.  PRC argues that the 2004 Framework harms its members and the environment by weakening grazing standards designed to protect the Yosemite Toad.  However, PRC has not identified a single a grazing allotment in the Sierra Nevada where grazing standards have been eased and the Yosemite Toad has been harmed.  This failure alone would undermine Plaintiffs' claim of irreparable harm.  However, the Forest Service has presented two further pieces of compelling evidence: 1) the vast majority of grazing allotments in the Sierra Nevada have not relaxed the standards related to Yosemite Toads at the site-specific level, even though the 2004 Framework provided the flexibility to do so; and 2) in those few instances where grazing has been permitted in Yosemite Toad habitat, scientific studies have found that grazing does not create any detectable adverse impacts on toads.  This example highlights the importance of adjudicating harms in the context of forest plans as implemented.
[13]    While the Court has not separately addressed all of Plaintiff's allegations of harm or all of the claims of Plaintiff's experts, the Court is not persuaded by any of Plaintiffs' claims of irreparable harm and, as a general matter, the Court finds the Forest Service's declarants to be more convincing and credible than Plaintiff's.

PRC fails at the second step for injunctive relief because it cannot demonstrate that other remedies available at law are inadequate to avoid injury to its members. eBay Inc. v. MercExchange, 547 U.S. at 391. PRC's alleged injuries can be addressed by declaratory relief. PRC's case against the 2004 Framework is a facial one—PRC has never challenged a single site-specific application of the Framework. Such activities, and their impacts, will occur only through site-specific project decisions. When, and if, the Forest Service authorizes a project under the 2004 Framework that PRC believes will cause it injury, PRC can bring a challenge to that project based on the weight of its declaratory relief against the Framework and ordinary principles of stare decisis. See, e.g., United States v. Am. Friends Serv. Comm., 419 U.S. 7, 11 (1974) (finding that a full and fair opportunity to litigate claims in a separate suit constitutes an adequate remedy at law, thereby undercutting "the existence of irreparable injury"). Given the efficacy of declaratory relief, an injunction against the 2004 Framework is not necessary.[14]

### 4. The Balance of Equities and the Public Interest Favor Leaving the 2004 Framework in Place

In determining whether the injunctive relief requested by PRC is appropriate, this Court must consider the balance of the equities and the public interest. Here, the Court finds that considering the balance of equities and the public interest, the 2004 Framework should remain in place while the agency addresses the deficiency in the 2004 SEIS.

### a. PRC's Injunctive Relief is Unworkable as a Practical Matter

Before considering the equities individually, it is necessary to address the multiple practical impediments that are embedded in PRC's requested injunction. While PRC's injunction—to implement existing projects consistent with the 2001 Framework— sounds simple on paper, the Forest Service has provided credible and unrebutted testimony that modifying existing projects to be consistent with the 2001 Framework would be extremely difficult, time-

---

[14] The Court's findings that PRC has failed to carry its burden of demonstrating irreparable harm and that it has adequate remedies at law are not essential to the Court's conclusion that PRC is not entitled to its requested injunction. Even assuming irreparable harm and a lack of adequate remedies at law, the balance of the equities and consideration of the public interest demonstrate that the injunctive relief sought by PRC is inappropriate.

1    consuming and costly.  Continued implementation of existing projects only to the extent that

2    they are consistent with the 2001 Framework would entail reviewing and potentially modifying

3    the NEPA documents for each project, reviewing and potentially modifying the contracts for

4    each project, and, for timber projects, remarking trees to be compliant with the 2001 Framework.

5    Given the time and expense of this process, the Forest Service has made clear that rather than

6    attempting to implement existing projects consistent with the 2001 Framework, the logical

7    response to PRC's injunction may simply be to shut-down such work until the 2004 Framework

8    NEPA violation can be remedied.  Under either scenario, the cost to the agency and the public

9    would be tremendous, not only in terms of time and money, but also in terms of delayed land

10   management, which would cause both ecological and socio-economic harm.

           **b.**    **The Public Interest in Reducing the Threat of Severe Wildfire Favors Leaving the 2004 Framework in Place**

13   One of the principal purposes of the 2004 Framework is to address the risk of

14   catastrophic wildfire.  Based on volumes of evidence in the administrative record and testimony

15   provided by all the parties in the various Framework cases, the Court has concluded that the

16   2001 Framework compromises the Forest Service's ability to effectively address the threat of

17   severe wildfire, and that leaving the 2004 Framework in place during remand (as well as those

18   projects that are issued pursuant to the 2004 Framework) is in the public interest.

19   Reducing the risk of severe wildfire is in the public interest not only because of the threat

20   wildfire poses to human lives and property, but also because of the threat it poses to wildlife.

21   The Forest Service has made clear in the other Framework cases that habitat loss from severe

22   wildfire is the primary threat to the viability of old forest species, including the California

23   spotted owl, the Pacific fisher, and the American marten  See, e.g.,  71 Fed. Reg. 29,886, 29,897

24   (May 24, 2006) (FWS 12-month finding on California spotted owl);  Fed. Def's Op. Br. on

25   Remedy ("Fed. Op. Remedy"), Macfarlane Decl. at ¶ 13, SFL, 05-cv-0205 (ECF 270-2) ("The

26   greatest threat to fisher persistence in the northern and southern Sierra Nevada was habitat

27   modification due to severe wildfire."); Fed. Op. Remedy, Yasuda Decl. at ¶¶ 6-7 SFL, 05-cv-

28   0205 (ECF 270-3) (describing number of owl Protected Activity Centers lost to wildfire).

The evidence submitted to the Court in this case indicates that severe fires also pose significant risks to fish and other aquatic species due to erosion and sedimentation, among other factors.   PRC and its experts argue that the harmful impacts of sediment attributable to grazing, road use, and fuel treatments exceed the harm from sediment caused by wildfire.  The Forest Service experts effectively rebut this testimony. As Forest Service hydrologist Barry Hill explains, recent studies show that sediment yields caused by fuel treatments utilizing BMPs are hundreds to thousands of times lower than sediment yields from severely burned areas.  Hill Decl. (ECF 177-2) at ¶¶ 21-22.  Mr. Hill also makes clear that PRC's affiant misuses the Forest Service's erosion model to overstate impacts of roads, grazing and logging and to understate the impacts of wildfire.  The Forest Service's declarants also debunk PRC's testimony that fire-generated sediment benefits fish, providing extensive scientific and on-the-ground evidence of the adverse effects that severe fire has on aquatic ecosystems.  See Second Kellett Decl. (ECF 189-3) at ¶¶ 5-9 (noting "overwhelming majority" of studies find significant negative effects to fish populations and fish habitat, and concluding that "severe fire is generally a harmful agent that poses significant risks to fish population in the Sierra Nevada."); Henry Decl. (ECF 189-5) at ¶¶ 26-29 (describing harm to fish populations attributable to McNally fire on the Sequoia National Forest).  The Forest Service's experts provide compelling evidence that the adverse effects of wildfire on aquatic resources greatly exceeds those from vegetation management projects, and that fuel reduction work under the 2004 Framework will benefit fish populations in the long term by reducing fire severity.  Second Hill Decl. (ECF 189-2) at ¶ 22 ("[I]n general, adverse effects of wildfire far exceed those of vegetation management project undertaken to reduce fire risks."); Second Kellett Decl. (ECF 189-3) at 9 ("carefully-designed fuels management treatments can help avoid the serious adverse consequences of severe fire and provide a benefit to Sierra Nevada fish populations over the long term").  Indeed, even the 2001 Framework, which PRC supports, was predicated on the principle that "high severity wildfires pose a far greater risk of damaging aquatic systems" than fuel management activities.  SNFPA 00996 CD 19 (FEIS, Vol. 2, at 228).

1    PRC and its experts attempt to undermine the legitimacy of the 2004 Framework by

2    attacking the efficacy of fuel treatments in reducing fire severity and total sediment delivery to

3    watercourses.   However, Forest Service expert Hugh Safford explains that the overwhelming

4    scientific evidence indicates that fuel treatments successfully reduce fire severity and modify fire

5    behavior.  ECF 189-4.  The net result is that fuel reduction treatments contribute little if any

6    sediment in the short term and can effectively minimize the amount of large pulses of sediment

7    caused by wildfires.

8    In sum, contrary to the assertion of PRC and its experts, the weight of the evidence before

9    the Court indicates that fuel treatments to reduce the risk of severe wildfire provide a net benefit

10   to riparian and aquatic resources, including fish.  The public interest in reducing the adverse

11   effects of sedimentation is thus best served by implementing projects designed under the 2004

12   Framework.

13   Like the Plaintiffs in the other Framework cases, PRC asserts that harvest of larger

14   diameter trees allowed under the 2004 Framework serves only financial ends and is unrelated to

15   fire hazard reduction and its associated environmental benefits.  However, the evidence before

16   the Court makes clear that the inclusion of commercially-valuable trees in fuel reduction projects

17   enables the Forest Service to complete far more fuel reduction work than it could accomplish

18   under its limited budget, and thus allows work at the pace and scale necessary to address the

19   region-wide threat of severe wildfire.  See Fed. Op. Remedy, Bahro Decl. at ¶ 9, SFL, 05-cv-

20   0205 (ECF 270-8) ("To be effective at [the landscape scale] we need to have a pattern of

21   treatment areas that is effective in changing the spread and intensity of a large fire as it moves

22   across the landscape."); SNFPA 03079 (2004 Framework allows harvest of some medium-sized

23   trees to increase the likelihood of accomplishing program goals with limited funding); SNFPA

24   03024 (noting need for landscape-level fire and fuel management strategy); SNFPA 03336 ("The

25   pace and intensity of mechanical thinning planned under Alternative S2 is expected to reduce the

26   rate at which habitat . . . is lost to wildfire.").  In other words, even if limiting individual projects

27   to the cutting of small diameter trees could be effective in addressing fire hazard, the agency

28   does not have the resources to fund such projects on the necessary scale and with the necessary

1   speed.  See e.g., Fed. Op. Remedy, Golnick Decl. at ¶ 16, SFL, 05-cv-0205 (ECF 270-15)

2   (shifting from harvest based on commercial infrastructure to service contract work funded solely

3   by the Forest Service would likely result in 66% to 75% reduction in number of acres treated).

4   Therefore, by allowing for the harvest of larger diameter trees, the 2004 Framework enables the

5   agency to conduct far more fuel reduction work than it could under the 2001 Framework.  And,

6   the 2004 Framework retains extensive protective measures and S&Gs to ensure that important

7   environmental values – such as wildlife habitat – are not lost in the process of designing

8   economically-viable projects.  See, e.g., Fed. Op. Remedy, Krueger Decl. ¶ 14, SFL, 05-cv-0205

9   (ECF 270-1) ("projects within the Sierra Nevada and planned pursuant to the 2004 Framework

10  are designed to maintain protected activity centers (PACs), the core areas for nesting and

11  roosting utilized by California spotted owls"); Fed. Op. Remedy, Macfarlane Decl. ¶ 2, SFL, 05-

12  cv-0205 (ECF 270-2) ("due to the standards and guidelines retained by the 2004 Framework, the

13  majority of important marten (and fisher) habitat components would be retained in the course of

14  Forest Service land management activities conducted pursuant to the 2004 Framework"); see

15  also id., Krueger Decl. ¶ 14-19; id., Macfarlane Decl. ¶ 10, 12.

16        PRC's focus on the fact that larger trees can be harvested under the 2004 Framework also

17  ignores that it is superior to the 2001 Framework in reducing fire risk in ways unrelated to tree

18  size.  For example, as this Court has already recognized, the 2004 Framework is far more

19  effective than the 2001 Framework at modifying fire behavior.  PRC, 2008 WL 4291209, at *17

20  (noting the differences in the rate of spread, flame length, scorch height, and projected

21  mortality).  This is the case because the 2001 Framework placed limits on mechanical treatments

22  even within treatment areas, a requirement which "can severely reduce the effectiveness of

23  individual treatment areas in modifying fire behavior," and which is not found in the 2004

24  Framework.  SNFPA 3291; see also Fed. Op. Remedy, Bahro Decl. at ¶¶ 10-14, SFL, 05-cv-

25  0205 (ECF 270-8) (describing the cumulative effect of the overlapping standards and guideline

26  imposed by the 2001 Framework).

27        On balance, the public interest in reducing the risk of catastrophic wildfire favors

28  leaving the 2004 Framework in place pending preparation of an SEIS.

1

2

       **c.**     **The Public Interest in Forest Health Supports Leaving the 2004 Framework in Place**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

PRC's requested injunction will compromise the Forest Service's ability to address forest health goals, including the stresses caused by climate change, drought and insects.  This Court has previously concluded that in order to address forest health concerns, the Forest Service "needs the flexibility to remove trees of larger diameter than allowed under the 2001 Framework and to reduce canopy cover below the levels allowed in the 2001 Framework."  Order Denying Inj. Pending Appeal at 16, SFL, 05-cv-0205, (ECF 319).  See also Mem. & Order at 10, SFL, 05-cv-0205 (ECF No. 304) ("2004 Framework offers better long-term forest health").  That conclusion is bolstered by the Forest Service's remedy phase experts, who compellingly explain that cutting trees 20"-30" in diameter and reducing canopy cover below 50%, as allowed under the 2004 Framework, is at times necessary to address non-fire forest health goals.  See, e.g., Fed. Defs' Op. Br. on Remand at 16-17, SFL, 05-cv-0205 (ECF 339).  See also Fed. Op. Remedy, Fettig Decl. at ¶ 4, SFL, 05-cv-0205 (ECF 270-14) (noting trees 20"-30" in diameter are often prime targets for bark beetles); Id., Grulke Decl. at  ¶¶ 2, 10 (ECF 270-13) (responding to climate stressors makes it appropriate to remove trees 20"-30" in diameter and reduce canopy cover below 50%); Id., Sherlock Decl. at ¶¶ 8, 16 (ECF 270-12) (forest thinning to the levels permitted under 2004 Framework is required to reduce competition between trees for limited site resources, thereby increasing the remaining trees' resistance to mortality from drought and insect attacks).

21

22

23

     Addressing these non-fire related forest health goals is unquestionably in the public interest, and the overwhelming weight of the evidence demonstrates that leaving the 2004 Framework in place best enables the Forest Service to do so.[15]

24

25

26

27

28

---

[15]     PRC critiques the Forest Service's emphasis on the forest health benefits of the 2004 Framework by noting that the 2004 SEIS states that the acreage expected to be treated "would be too small to significantly benefit the bioregional condition."  The Court does not agree with this line of argument.  The Forest Service has compellingly demonstrated that there are enormous land management challenges facing the agency (and the public), including reducing fire hazard and improving forest health.  While implementing projects pursuant to the 2004 Framework may not entirely solve these problems in the foreseeable future, it makes little sense to revert to the

1

2

           **d.**      **The Public Interest in Maintaining the Timber and Biomass Industries is Best Served by the 2004 Framework**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

       The Forest Service has presented compelling declaration testimony showing that the 2004 Framework best serves the public interest in providing economic benefits to forest industries and communities, which not only creates jobs but also sustains the infrastructure needed to properly manage forest resources.  Mem. and Order at 10, <u>SFL</u>, 05-cv-0205 (ECF No. 304).  <u>See also</u> Order Denying Inj. Pending Appeal at 18, <u>SFL</u>, 05-cv-0205 (ECF No. 319) ("Reducing harvest to the levels contemplated in the 2001 Framework will lead to closures of some of the few remaining sawmills in the Sierra Nevada as well as some biomass power plants.").  PRC has failed to meaningfully rebut this testimony.  Instead, PRC faults the Forest Service for not "provid[ing] the information necessary to support these claims [of harm to the industrial infrastructure], including current and projected log inventories, alternatives sources of timber and biomass supply on private timberlands, or the minimum timber supply requirements to keep mills running."  PRC Reply at 19 (ECF 187).  This criticism is meritless.  It is not the Forest Service's burden to avoid injunctive relief; it is PRC's burden to prove that it is entitled to such relief.  Furthermore, even though it was not technically required to do so, the Forest Service did provide the Court with extensive evidence to support its arguments related to the impacts of an injunction on the industrial infrastructure, even though it may not have been in the form PRC would have preferred.

20

21

22

23

24

       After considering the evidence presented by the Forest Service without deference to the agency's experts based on their status as agency employees, the Court finds the injunction sought by PRC will negatively impact the timber and forest products industry in the Sierra Nevada.  The economic health of communities and industries in the Sierra Nevada is an important element of the public interest that must be considered in balancing the equities.

25

26

       PRC faults the Forest Service for emphasizing "economic" harms when environmental degradation is at stake.  However, as discussed above and made clear by recent Supreme Court

27

28

---

2001 Framework, which will put the national forests at even greater risks from severe fire and bark-beetle outbreaks.  In short, every bit makes a difference.

precedent, environmental concerns do not trump other public interest factors.  Furthermore, even if purely socio-economic benefits were deemed a lesser public benefit – a position the Court does not accept -- the impact to the timber and biomass industry of imposing the 2001 Framework are more than economic.  The evidence presented by the Forest Service indicates that these industries are critical components of Forest Service land management.  Without these industries, the Forest Service would have to use appropriated funds to pay for projects that could normally be borne by the commercial value of the forest products.  Assuming current budget levels, this would result in a 66% to 75% reduction in acres treated, effectively curtailing the agency's ability to do work on the scale required to reduce fire hazard and improve forest health in the Sierra Nevada.  Fed. Op. Remedy, Golnick Decl. at ¶ 16, <u>SFL</u>, 05-cv-0205 (ECF 270-15).

In sum, there is a strong public interest in sustaining the timber and biomass industry and infrastructure and the socio-economic benefits they provide, which weighs in favor of keeping the 2004 Framework in place and allowing projects issued under the 2004 Framework to proceed.

   **e.**  **The Public Interest in Implementing the HFQLG Pilot Project is Best Served by the 2004 Framework**

This Court previously concluded that full implementation of the HFQLG Pilot Project is in the public interest and best accomplished under the 2004 Framework.  <u>See</u> Mem. & Order at 9, <u>SFL</u>, (ECF 304); Order Denying Inj. Pending Appeal at 15, <u>SFL</u>, 05-cv-0205, (ECF 319). Because the 2001 Framework prohibited many of the actions required by the HFQLG Act, reconfiguring HFQLG projects under the 2001 Framework would frustrate the purposes of the Act.  Fed. Resp. Br. on Remand, Whitman Decl. at ¶ 11, <u>SFL</u>, 05-cv-0205 (ECF 342-1).  PRC makes no attempt to demonstrate that its broad injunction would better serve the public interest in implementation of the Pilot Project than the 2004 Framework.

Based on the administrative record and the testimonial evidence provided by the Forest Service, without granting any special deference to Forest Service experts due to their affiliation with the agency, the Court again finds that the 2004 Framework best serves the public interest in implementation of the HFQLG Pilot Project.

**REMEDY**

Based on the foregoing, the Court denies plaintiffs' request to vacate and enjoin the 2004 Framework and all projects issued pursuant to its direction.

The Court finds that, based on the circumstances of this case, the appropriate remedy is that proposed by the Forest Service, and therefore orders the Forest Service to complete a supplemental EIS that addresses the analytical deficiency identified by the Ninth Circuit in its June 30, 2012 opinion, <u>Pacific Rivers Council v. U.S. Forest Serv.</u>, 689 F.3d 1012 (9th Cir. 2012).  The final supplemental EIS should be issued by September 30, 2014.  In the interim the agency may continue management of National Forest Service lands in the Sierra Nevada consistent with the 2004 Framework.

IT IS SO ORDERED.

Dated:

_____
MORRISON C. ENGLAND, JR.
UNITED STATE JUDGE