UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC RIVERS COUNCIL, | No.  2:05-cv-00953-MCE-AC |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| UNITED STATES FOREST SERVICE, et al., | |
| Federal Defendants. | |
| and | |
| CALIFORNIA FORSTRY ASS'N; AMERICAN FOREST & PAPER ASS'N; QUINCY LIBRARY GROUP; PLUMAS COUNTY, CALIFORNIA; CALIFORNIA SKI INDUSTRY ASS'N, | |
| Defendant-Intervenors. | |

Presently before this Court is the question of the appropriate remedy for a legal

deficiency in the Supplemental Environmental Impact Statement ("SEIS") the Forest

Service prepared pursuant to the National Environmental Policy Act ("NEPA") for the

2004 Sierra Nevada Forest Plan Amendment (also referred to as the "2004 Framework"

or the "SNFPA").

///

///

1

1    On appeal of this Court's merits ruling, the Ninth Circuit concluded that the Forest

2    Service failed to take a hard look at the environmental consequences of the 2004

3    Framework on fish and remanded the matter for determination of the appropriate

4    remedy.  Pacific Rivers Council v. U.S. Forest Serv., 689 F.3d 1012 (9th Cir. 2012).

5    Pacific Rivers Council ("PRC") urges this Court to vacate and enjoin the 2004

6    Framework and all projects issued under the 2004 Framework.  Such draconian relief,

7    however, is unwarranted.  Vacatur of the 2004 Framework would be both unduly

8    disruptive and environmentally harmful, and an indiscriminate injunction against all

9    projects issued under the 2004 Framework's direction is both unnecessary to remedy

10   PRC's injury and contrary to the public interest.

11   Therefore, as set forth below, the Court will deny PRC's request to vacate the

12   2004 Framework as well as its request for injunctive relief.  The Forest Service will be

13   directed to prepare a supplemental EIS to address the deficiencies in the 2004 SEIS no

14   later than September 30, 2014.

15

16   **BACKGROUND**

17

18   The 2004 Framework, which amended the Forest Plans for 11 national forests

19   covering 11.5 million acres within the Sierra Nevada region, represents the Forest

20   Service's attempt at the "unenviable task" of balancing protection of wildlife with effective

21   reduction of hazardous fuels in order to decrease the risk of stand-replacing wildfire.

22   Sierra Nevada Forest Prot. Campaign ("SNFPC") v. Rey, 573 F. Supp. 2d 1316, 1338

23   (E.D. Cal. 2008).

24   ///

25   ///

26   ///

27   ///

28   ///

2

In four related cases, plaintiffs challenged the 2004 Framework alleging numerous deficiencies under NEPA and the National Forest Management Act ("NFMA").  Sierra Nevada Forest Prot. Campaign ("SNFPC") v. Rey, 573 F. Supp. 2d 1316 (E.D. Cal. 2008)[1]; California ex rel. Lockyer ("California") v. U.S. Dep't of Agric., No. 05-211, 2008 WL 3863479 (E.D. Cal. Aug. 19 and Sept. 3, 2008); Pacific Rivers Council ("PRC") v. U.S. Forest Serv., No. 05-953, 2008 WL 4291209 (E.D. Cal. Sept. 18, 2008); and California Forestry Ass'n ("CFA") v. Bosworth, No. 05-905, 2008 WL 4370074 (E.D. Cal. Sept. 24, 2008). In August and September 2008, this Court issued summary judgment opinions in all four cases.

In this case, this Court granted summary judgment to the Forest Service on all issues. PRC, 2008 WL 4291209, at *22.  PRC appealed.  In a February 3, 2012 opinion, a divided panel of the Ninth Circuit concluded that the Forest Service adequately addressed impacts to amphibians in the 2004 SEIS, but failed to adequately address impacts to individual fish species.  PRC v. U.S. Forest Serv., 668 F.3d 609, 627 (9th Cir. 2012).  The United States sought rehearing and rehearing en banc.  On June 20, 2012, the Court of Appeals issued a superseding opinion which did not materially alter its February 3, 2012 decision, and denied the petition for rehearing and rehearing en banc. Pacific Rivers Council v. U.S. Forest Serv., 689 F.3d 1012 (9th Cir. 2012).  The Court of Appeals remanded the case to this Court.  On November 16, 2012, the Forest Service filed a petition for a writ of certiorari with the United States Supreme Court.  Certiorari was thereafter granted by the Supreme Court on March 18, 2013.

After separate proceedings on appeal, see SFL v. Sherman, 646 F.3d 1161 (9th Cir. 2011), the SFL and California cases challenging the Framework were concurrently before this Court on the question of remedy.

///

///

_____

[1] During the course of litigation Sierra Nevada Forest Protection Campaign changed its name to Sierra Forest Legacy ("SFL").  For clarity, the Court refers to that litigation as SFL.

1   On April 15, 2013, the Court issued a separate Memorandum and Order with regard to
2   the proper remedy for those cases.

3

4                                     **ANALYSIS**

5

6          PRC asks this Court to vacate the 2004 Framework and all actions taken in
7   reliance upon the 2004 Framework, reinstate the 2001 Framework, and enjoin all
8   logging, burning, road activity and grazing in the Sierra Nevada National Forests that is
9   inconsistent with the 2001 Framework.  Defendants urge the Court to leave the 2004
10  Framework in place, let project-level decisions move forward and direct the agency to
11  prepare a supplemental EIS addressing the NEPA deficiency identified by the Ninth
12  Circuit; namely, the likely environmental consequences on fish that implementation of
13  the 2004 Framework may pose.
14          PRC's request to vacate the 2004 Framework is denied.  Under the two-part
15  vacatur test recently adopted by the Ninth Circuit, the limited nature of the NEPA error
16  and the disruption that would be caused by a temporary return to the 2001 Framework
17  both favor leaving the 2004 Framework in place during remand.  PRC's broad request
18  that all project decisions, licenses and permits issued under the 2004 Framework be
19  vacated as well as enjoined is also denied.  PRC falls well short of demonstrating that its
20  members will suffer an injury-in-fact justifying such broad injunctive relief, and the
21  equities clearly weigh in favor of allowing decisions made under the 2004 Framework to
22  proceed unimpeded during remand.

23

24          **A.      The Legal Standards for Vacatur**

25

26          Vacatur is a species of equitable relief and courts are not mechanically obligated
27  to vacate agency decisions that they find invalid.  As the Ninth Circuit explained in <u>Nat'l</u>
28  <u>Wildlife Fed'n v. Espy</u>:

1   "Although the district court has power to do so, <u>it is not required to set aside every</u>

2   <u>unlawful agency action</u>.  The court's decision to grant or deny injunctive or declaratory

3   relief under the APA is controlled by principles of equity."  45 F.3d 1337, 1343 (9th Cir.

4   1995) (emphasis added).  <u>See also</u> <u>Humane Soc'y v. Locke</u>, 626 F.3d 1040, 1053 n.7

5   (9th Cir. 2010) (stating that a court may remand without vacatur to allow the agency

6   action to remain in force until the action can be considered or replaced);  <u>Pit River Tribe</u>

7   <u>v. U.S. Forest Serv.</u>, 615 F.3d 1069, 1080-81 (9th Cir. 2010) ("Our courts have long held

8   that relief for a NEPA violation is subject to equity principles.");  <u>Idaho Farm Bureau</u>

9   <u>Fed'n v. Babbitt</u>, 58 F.3d 1392, 1405 (9th  Cir. 1995) ("[W]hen equity demands, the

10  regulation can be left in place while the agency follows the necessary procedures.");

11  <u>W. Oil and Gas Ass'n v. EPA</u>, 633 F.2d 803, 813 (9th Cir. 1980) ("[G]uided by authorities

12  that recognize that a reviewing court has discretion to shape an equitable remedy, we

13  leave the challenged designations in effect.").

14         Nothing in the Administrative Procedure Act, which provides the basis for this

15  Court's review of the 2004 Framework SEIS, restricts the range of equitable remedies

16  available to the Court, including the issuance of declaratory relief without setting aside

17  the agency action.  <u>See</u> 5 U.S.C. § 702 ("[n]othing herein . . . affects . . . the power or

18  duty of the court to dismiss any action or deny relief on any other appropriate legal or

19  equitable ground"); 5 U.S.C. § 703 (authorizing suit for declaratory or injunctive relief).

20         The Ninth Circuit recently clarified the standards that should be applied when

21  determining whether a procedurally invalid agency action should be vacated or left in

22  place during a remand.  Emphasizing that a "flawed rule need not be vacated," the Ninth

23  Circuit held that the determination of "[w]hether agency action should be vacated

24  depends on how serious the agency's errors are 'and the disruptive consequences of an

25  interim change that may itself be changed.'" <u>California Communities Against Toxics v.</u>

26  <u>U.S. EPA</u> ("<u>CCAT</u>"), 688 F.3d 989, 992 (9th Cir. 2012) (quoting <u>Allied-Signal, Inc. v. U.S.</u>

27  <u>Nuclear Regulatory Comm'n</u>, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

28  ///

1    As discussed below, the record before this Court indicates that the legal flaw in the 2004

2    Framework SEIS is not a grave one.   Vacating the 2004 Framework in the face of the

3    Forest Service's relatively minor NEPA error, however, would have extremely disruptive

4    consequences to both the Forest Service and the general public.

5        PRC asserts that in conducting any remedy analysis in the instant matter, the

6    Court should presume vacatur is the appropriate remedy and that the Forest Service

7    should bear the burden of demonstrating vacatur is not warranted.  While the Court does

8    not believe that PRC has identified any controlling precedent that imposes the burden of

9    proof on Defendants, the Court concludes that even if such a burden exists, Defendants

10   have carried that burden in this case by providing overwhelming factual evidence to

11   support the conclusion that vacating the 2004 Framework would be inequitable under

12   controlling Ninth Circuit law.

13       In addition to arguing that vacatur is the presumptive remedy under the APA, PRC

14   also suggests that vacatur should be withheld only in situations where environmental

15   harm is likely to flow from vacating a flawed agency decision.[2]  This is not correct.  The

16   CCAT court made clear that in addition to weighing the environmental consequences of

17   vacatur, courts should consider economic and other practical concerns.  Id. at 994 ("If

18   saving a snail warrants judicial restraint, so does saving the power supply.") (internal

19   citation omitted).  In CCAT, the Ninth Circuit noted that vacatur of the challenged rule

20   could delay the construction of a new Sentinel power plant.  The Ninth Circuit reasoned

21   that such delay would entail both environmental and economic impacts, as well as

22   "needless and duplicative legislative effort."  Id. at 993-94.  Based on these

23   consequences, the Court remanded the rule "without vacatur so that construction of

24   Sentinel may proceed without delay."  Id.

25   ///

26   _____

27       [2] Even if PRC were correct that a flawed agency decision should only be left in place when doing
     so would avoid environmental harm, Defendants have submitted abundant and convincing evidence,
     which PRC has not effectively rebutted, that vacating the 2004 Framework would likely result in
28   environmental harm throughout the Sierra Nevada.

1    In sum, vacatur, like injunctive relief, is an equitable remedy that is only granted in

2  particular circumstances; neither remedy issues as a matter of course upon the showing

3  of a legal violation.  And while the tests for vacatur and injunctive relief are not identical,

4  both take into account a balancing of the equities and involve an analysis of the likely

5  consequences to the parties and to the public from issuing such relief.  As detailed

6  below, the facts before this Court indicate that vacatur of the 2004 Framework is not

7  appropriate, despite the Forest Service's failure to fully comply with NEPA.

8

9              **1.    Vacatur of the 2004 Framework is Not Warranted**

10

11   Applying the two CCAT factors here indicates that the 2004 Framework should

12  not be vacated.

13   The first CCAT factor looks to "how serious the agency's errors are."  CCAT,

14  688 F.3d at 992.  Here, the Court of Appeals faulted the Forest Service for not including

15  a discussion of the impacts of the 2004 Framework on individual fish species. PRC,

16  689 F.3d at 1028.  However, that merits finding does not demonstrate a serious error for

17  several reasons.[3]  First, since both Frameworks have the same basic protective

18  measures for aquatic species, there is no major substantive difference between the two

19  Frameworks with regard to impacts on fish.  Second, because the 2001 EIS analyzed

20  the impacts on individual fish species from a broad range of management alternatives,

21  within which the 2004 Framework falls, both the agency and the public were apprised of

22  the likely programmatic consequences of the 2004 Framework on fish.

23  ///

24  ///

25 ───────────────
      [3] PRC suggests that the Forest Service's failure to disclose the impacts to individual fish species
26  in the 2004 SEIS was such a serious legal error that vacatur is warranted as a matter of law.  Of course,
    this argument fails to recognize that the Ninth Circuit, despite identifying the legal error, did not vacate the
27  2004 Framework decision.  If vacatur were the necessary consequence of the legal violation that the Ninth
    Circuit identified, there would have been no need to remand the matter to this Court to determine the
28  appropriate remedy.

1   Third, because the 2004 SEIS disclosed the environmental consequences of the 2004

2   Framework on aquatic habitat, the SEIS provided information to the agency and public

3   on the habitat where fish live.  And, finally, to the extent that there is a deficit in analysis

4   of impacts to fish, additional analysis can be completed at the site-specific level before

5   any ground-disturbing actions take place that could harm fish or PRC's members.  Each

6   of these points is addressed in greater detail below.[4]

7           First, because the 2004 and 2001 Frameworks have nearly identical protective

8   measures for fish, projects issued pursuant to the 2004 Framework are not likely to

9   result in appreciably different impacts to fish from those issued pursuant to the 2001

10   Framework.[5]  See SNFPA 03486 ("The proposed changes considered in the [2004]

11   SEIS would not alter the existing strategy, [and thus] [p]rotection of most fish would

12   therefore be similar.").  The two Frameworks utilize virtually the same Aquatic

13   Management Strategy ("AMS"), Standards and Guidelines ("S&Gs") applicable to fish,

14   and Best Management Practices ("BMPs").  See SNFPA 03281; see also Kellett Decl.

15   (ECF 177-2) at ¶¶ 5-7  (describing similar S&Gs related to Riparian Conservations Areas

16   and Critical Aquatic Refuges); Hill Decl. (ECF 177-3) at ¶¶ 23-33 (describing similar

17   S&Gs related to erosion from timber harvest), Yost Decl. (ECF 177-4) at ¶¶ 8-12

18   (describing similar S&Gs related to grazing).

19           Additionally, in preparing the SEIS for the 2004 Framework, the Forest Service

20   prepared a "Consistency Review" to determine the extent to which the changes

21   proposed in the 2004 Framework would result in environmental impacts that had not

22   been addressed in the 2001 EIS.

23

24           [4] The combined weight of these four reasons strongly indicates that the SEIS's deficiency is not
25   serious enough to warrant vacatur.  However, each of the reasons independently convinces the Court that
     vacatur is not warranted here, particularly when considered along with the second CCAT factor – the
26   disruptive consequences that would flow from vacatur.

27           [5] As discussed further below, to the extent there are likely to be materially different impacts upon
     fish from the two Frameworks, the weight of evidence indicates that the 2004 Framework will be more
28   effective in conserving fish species over time due to its superiority in facilitating effective fuel-reduction
     treatments, which should help avoid the adverse impacts to fish that result from severe wildfires.

1    In the Consistency Review, the Forest Service concluded that the AMS under the 2004

2    Framework was essentially the same as that for the 2001 Framework and that the

3    effects of management pursuant to that strategy had already been analyzed and

4    disclosed in the 2001 EIS.  Beyond this general finding, the Consistency Review

5    evaluated the potential impacts of changed management on individual species of fish

6    and concluded that the 2004 Framework "would not be expected to produce appreciably

7    different results" from those disclosed in the 2001 FEIS.  See SNFPA 03487-88

8    (discussing impacts to fourteen Endangered, Threatened and Proposed Species of fish);

9    see also SNFPA 03491-92 (discussing impacts to nine Forest Service Sensitive Species

10   of fish); SNFPA 03493 (discussing impacts to thirteen Moderately and Highly Vulnerable

11   Species and Species of Concern of fish).  Because the 2004 Framework shares the

12   same aquatic management strategy as the 2001 Framework and should not result in an

13   increase in adverse impacts to fish as compared to the 2001 Framework, the Forest

14   Service's failure to reanalyze impacts to individual fish species does not constitute a

15   serious legal error that warrants vacatur.

16       Second, because the 2004 Framework envisions a scope and type of

17   management within the range of alternatives examined in the 2001 EIS, the 2004

18   Framework is not expected to have materially different impacts on fish from the

19   alternatives that were analyzed in the 2001 EIS.  During remedy proceedings, the Forest

20   Service provided credible and unrebutted testimony from Donald Yasuda, a wildlife

21   biologist that helped prepare the 2004 Framework SEIS.  Mr. Yasuda stated:

22           [T]he levels and types of activities that [the 2004 Framework]
             authorizes fall within the range of activity levels and types
23           covered by the range of alternatives disclosed in the 2001
             EIS.  That is, some of the alternatives considered in the 2001
24           FEIS (such as F4 and F7) proposed more intensive and
             expansive land management, while other alternatives in the
25           2001 FEIS (such as F2 and F5) proposed less intensive and
             expansive management than the 2004 Framework.  Despite
26           this wide range of proposed management, within which the
             2004 Framework would have fallen, the expected outcomes
27           for fish species was the same for all the alternatives
             considered.  Therefore, based on the analytical approach
28           used in the 2001 FEIS, the 2004 Framework would likely

1

2

> have the same magnitude of impacts on fish species as the
> other alternatives considered in the 2001 FEIS, including the
> 2001 Framework decision.

3    Yasuda Decl. (ECF 177-1) at ¶ 8.  Given that the 2004 Framework is not likely to have

4    significantly different impacts on fish from the 2001 Framework or any of the other

5    alternatives analyzed in the 2001 FEIS, the Forest Service's failure to conduct a new

6    species-by-species fish analysis is not so serious a legal error as to warrant vacatur.

7        Third, while the 2004 SEIS did not provide an analysis of impacts to individual fish

8    species, the 2004 SEIS did analyze the effects of the 2001 and 2004 Frameworks on

9    aquatic ecosystems -- where fish live.  The 2004 SEIS recognized that even though the

10   aquatic management regimes for the two alternatives were largely the same, there was

11   the potential for some minor differences in impacts to aquatic habitat from Alternatives

12   S1 and S2.  Based on this, the 2004 SEIS provided an analysis of those impacts.  See

13   2004 SEIS at 207-15 (providing detailed discussion of environmental consequences to

14   "Aquatic, Riparian, and Meadow Ecosystems").  While the Ninth Circuit made clear that

15   the 2004 SEIS should have provided a species-by-species analysis of impacts to fish,

16   the fact that the SEIS included a discussion of impacts to aquatic habitat reduces the

17   seriousness of the agency's legal error.

18       Finally, the seriousness of the Forest Service's error is mitigated by the

19   programmatic nature of the 2004 Framework.  The 2004 Framework itself does not

20   directly authorize any ground-disturbing activities.  SNFPA 03010 ("This ROD does not

21   authorize timber sales or any other specific activity on the Sierra Nevada national

22   forests.  Site-specific decisions will be made on projects in compliance with NEPA, ESA,

23   and other environmental laws following applicable public involvement and administrative

24   appeal procedures.")  Any action that may potentially impact individual fish species

25   requires separate, project-level analysis pursuant to NEPA.  That site-specific evaluation

26   affords the Forest Service the opportunity to consider the impacts to fish before taking

27   an action that can cause injury to PRC's members.

28   ///

1       In sum, the record before the Court shows that the effect of the 2004 Framework

2   on fish will likely be largely the same as the effect of the alternatives addressed in the

3   2001 FEIS.  Because the effects of those alternatives were already considered by the

4   Forest Service and disclosed to the public, the absence of new analysis—while a

5   violation NEPA—is not a serious deficiency warranting vacatur.  Furthermore, the

6   seriousness of the NEPA violation is minimized by the fact that the 2004 SEIS did

7   provide an analysis of impacts to aquatic habitat, and project-level NEPA documents will

8   provide further analysis of impacts to fish species at the site-specific level, where those

9   impacts can be best understood.  While the Court orders that the NEPA deficiency in the

10   2004 SEIS be corrected, it does not believe the NEPA error raises serious doubts that

11   the "agency chose correctly."  Allied-Signal, 988 F.2d at 150.   Therefore, the first CCAT

12   factor favors remanding the 2004 Framework SEIS to the Forest Service without

13   vacating the 2004 Framework decision.

14       Under the second CCAT factor, the evidence before the Court shows that an

15   interim return to the 2001 Framework will have extremely "'disruptive consequences.'"

16   688 F.3d at 992 (quoting Allied-Signal, 988 F. 2d at 150).  PRC ignores the practical

17   consequences of vacating the 2004 Framework, apparently assuming that management

18   of the 11 national forests subject to the Framework can simply and seamlessly proceed

19   under the 2001 Framework.  Defendants have convincingly demonstrated, through

20   extensive and compelling factual submissions and record citations, that project planning

21   in the National Forest System is a lengthy and expensive endeavor, and that vacating

22   the 2004 Framework would have enormous disruptive consequences.  Even if vacatur

23   would not impact projects with decisions already made (an issue addressed below),

24   Defendants have demonstrated that vacatur would disrupt approximately 146 projects

25   currently in various stages of the planning process across the Sierra Nevada.

26   ///

27   ///

28   ///

1    According to unrebutted evidence submitted by Defendants, reanalyzing large projects

2    developed under the 2004 Framework for possible re-issuance under the 2001

3    Framework could be extremely expensive and time consuming, and would adversely

4    impact the public interest.  The likely result of vacatur of the 2004 Framework is a virtual

5    shut-down of the project development pipeline for the entire region while the Forest

6    Service either reconfigures and reanalyzes 2004 Framework projects to make them

7    consistent with the 2001 Framework, or suspends work on all significant forest

8    management projects currently being planned until the Forest Service completes the

9    SEIS for the 2004 Framework.  The court in CCAT made clear that delaying planned

10   projects is a disruptive consequence that must be considered in determining whether

11   vacatur is warranted.[6]  688 F.3d at 993-94.  See also Idaho Farm Bureau Fed'n, 58 F.3d

12   at 1405-06 (noting expenditure of public resources constitutes equitable concern

13   weighing against vacatur).

14          In addition to logistical and financial disruptions, vacatur would have harmful

15   environmental consequences.  See, e.g., Idaho Farm Bureau Fed'n, 58 F.3d at 1405

16   (leaving invalid rule in place to avoid environmental harm).   The evidence before the

17   Court in this case and the related Framework cases indicates that leaving the 2004

18   Framework in place while the Agency corrects the deficiency in its NEPA analysis is

19   environmentally preferable to returning management of the Sierra Nevada to the 2001

20   Framework, even temporarily.

21   ///

22   ///

23   ///

24   ///

25   _____

26   [6] PRC argues that the disruptive effects of vacatur should not be considered by the Court because
     the Forest Service has continued to plan site-specific projects with the knowledge that the Framework
     could be set aside, such that any disruptive consequences are a problem of the Forest Service's own
27   making.  This position conflicts with the Ninth Circuit's direction to consider the disruptive consequences of
     vacatur in determining whether the requested relief is appropriate.  Furthermore, the law does not obligate
28   an agency to self-enjoin simply because litigation is filed.

12

1   The weight of evidence before the Court indicates that 2004 Framework is

2   environmentally superior to the 2001 Framework in numerous regards, including

3   reducing the threat of catastrophic wildfire (and the associated adverse impacts to fish),

4   protecting and creating habitat for old forest species like the California spotted owl, and

5   addressing non-fire related threats to forest health, including drought, insect infestation

6   and climate change.

7       PRC claims that leaving the 2004 Framework in place will cause environmental

8   harm, as it "threatens harm to already-imperiled Sierra Nevada fish species."  PRC Br. at

9   8 (ECF 175).  As set forth in detail below, the record belies PRC's claim that

10  implementation of the 2004 Framework will significantly harm aquatic habitats or fish

11  species.  Indeed, the weight of the evidence before the Court indicates that

12  implementing vegetation management projects pursuant to the 2004 Framework should

13  result in a long-term benefit to aquatic and riparian resources – including fish – by

14  reducing serious erosion and sedimentation caused by catastrophic wildfires.

15      PRC departs from the CCAT factors to suggest that vacatur is necessary to

16  "ensure that the Forest Service undertakes an open-minded review" of the impacts to

17  individual fish species.  PRC Br. at 10.  The Court finds this claim unpersuasive.  The

18  Forest Service is entitled to a presumption that it will act in good faith in preparing its

19  analysis of impacts to individual fish species.  Citizens to Preserve Overton Park, Inc. v.

20  Volpe, 401 U.S. 402, 415 (1971) (federal agencies are entitled to a "presumption of

21  regularity").  The law is clear that courts cannot assume that because an agency has

22  failed to comply with NEPA in the past, it will fail to do so in the future.  Sierra Club v.

23  Penfold, 857 F.2d 1307, 1319 (9th Cir. 1988).  Here, PRC provides nothing to rebut the

24  presumption that the Forest Service will correct the error in the 2004 SEIS in good faith.

25  Further, as a factual matter, it is unclear how the status quo— whether it is the 2004

26  Framework or the 2001 Framework—alters the Agency's incentives to properly evaluate

27  effects on fish on remand.

28  ///

1   In this regard, the Ninth Circuit's decision in <u>Northern Cheyenne Tribe v. Hodel</u>, 851 F.2d

2   1152 (9th Cir. 1988), is instructive.  There, the plaintiffs argued that coal leases issued

3   without proper NEPA should be voided, and not merely suspended, to avoid the new

4   NEPA being tainted by bureaucratic commitment to the leases. The Court disagreed,

5   finding:

6          [T]he difference between voiding the lease and suspending
           them does not create any major difference in the process that
7          must now go on.  We see no reason to suppose that the
           Secretary will feel greater commitment to the original project
8          if the leases are not voided but held in abeyance until a new
           evaluation is made . . . . We assume the Secretary will
9          comply with the law.

10  <u>Id.</u> at 1157.  The situation here is no different.  The 2004 Framework has been in place

11  for eight years; whether it remains in place or is vacated during the remand is not likely

12  to alter the Agency's analysis of impacts to fish or the agency's conclusion about what is

13  the best management regime for the future.  The Forest Service must evaluate in good

14  faith the effects of the 2004 Framework on individual fish species, as required by this

15  Order, regardless of whether the 2004 Framework is vacated or left in place during the

16  remand.

17         In sum, both of the <u>CCAT</u> factors counsel strongly in favor of remanding the 2004

18  Framework without vacatur.

19
                **2.    Vacatur of all Forest Service Project-Level Decisions is
20                      Inappropriate**

21

22         In addition to seeking vacatur of the 2004 Framework decision, PRC requests that

23  the Court vacate "any timber sales and the issuance of permits beyond those authorized

24  by the 2001 Framework."  PRC Br. at 10.  However, vacatur is only available for the

25  specific agency decision challenged by a Plaintiff.  Here, the only agency decision that

26  PRC has challenged is the adoption of the 2004 Framework.  Therefore, the only agency

27  decision potentially subject to vacatur is the 2004 Framework decision itself.

28  ///

1       The APA grants federal courts jurisdiction to review "final agency action," 5 U.S.C.

2  § 704, and to "set aside" agency actions found to be arbitrary or capricious, id. at 706(2).

3  The only final agency action challenged by PRC in this litigation is the adoption of the

4  2004 Framework.  Without reviewing site-specific actions issued under the 2004

5  Framework, this Court cannot determine whether they are in fact arbitrary or capricious

6  or should be set aside.  That determination must be made "in the context of site specific

7  actions, if and when they actually arise."  Idaho Sporting Cong. v. Rittenhouse, 305 F.3d

8  957, 974 (9th Cir. 2002).  Contrary to PRC's assumption, the mere fact that decisions

9  were rendered under the 2004 Framework does not mean they are arbitrary or

10  capricious.  See, e.g., Wyoming Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 51

11  (D.C. Cir. 1999) (finding agency could engage in "further efforts to fulfill its NEPA

12  obligations" at the site-specific decision stage).  Moreover, even assuming all decisions

13  issued under the 2004 Framework were procedurally invalid, PRC's request for

14  wholesale vacatur of agency actions not before the Court is still inappropriate because it

15  precludes the Court from applying the equitable test for determining whether vacatur is

16  warranted under the standards announced in CCAT.

17       PRC claims that in SFL the Ninth Circuit made "clear that its discussion of vacatur

18  under the APA encompassed not only the 2004 Framework itself, but also approvals

19  made to implement the 2004 Framework."  PRC Br. at 10.  Nowhere in SFL, however,

20  does the court address the parameters of vacatur; the discussion referred to by PRC is

21  simply the Court of Appeals' conclusion that this Court has jurisdiction to issue injunctive

22  relief barring implementation of a program-level decision.  646 F.3d at 1185.  This is a far

23  cry from holding that because the 2004 Framework suffers a procedural deficiency, all

24  actions issued under the 2004 Framework must be vacated.  Indeed, were that the law,

25  the court in SFL would not have remanded the matter to this Court for remedy

26  proceedings; it would have simply vacated all agency actions taken under the 2004

27  Framework.

28  ///

1    PRC also points to the Ninth Circuit's decision in Klamath Siskiyou Wildlands

2    Ctr. v. Boody, 468 F.3d 549 (9th Cir. 2006), PRC Br. at 11, but that case actually

3    undermines PRC's position.  In Klamath Siskiyou Wildlands, the plaintiff challenged two

4    programmatic decisions and two site-specific timber sales issued pursuant to the

5    programmatic decisions.  468 F.3d at 553-54.  The court found that the programmatic

6    decisions and the two projects were "invalid and must be enjoined."  Id. at 562.  Thus, in

7    sharp contrast to this case, plaintiffs in Klamath Siskiyou Wildlands directly challenged

8    site-specific decisions and those decisions and their underlying administrative records

9    were before the court for review.  Furthermore, in Klamath Siskiyou Wildlands, the court

10   "enjoined" the decisions being challenged; it did not "vacate" them.

11   Idaho Sporting Congress v. Rittenhouse, 305 F.3d 957 (9th Cir. 2002), also

12   undercuts PRC's claim to wholesale vacatur of all decisions issued under the 2004

13   Framework.  In Idaho Sporting Congress, the plaintiffs challenged two specific timber

14   sales and a Forest Plan standard.  Id. at 966.  The court found the plan standard invalid

15   and held that the two sales should be set aside and enjoined.  Id. at 974.  However, the

16   court explicitly refused to extend relief beyond the two projects challenged by plaintiffs,

17   noting that the "sweeping remedy" of "a forest-wide injunction of all logging" was not

18   warranted.  Id.  Thus, nothing in Klamath Siskiyou Wildlands or Idaho Sporting Congress

19   supports the proposition that a plaintiff who challenges only a program-level decision is

20   automatically entitled to broad vacatur of all site-specific projects implementing the

21   program-level decision.

22   PRC's request that all site-specific actions issued under the 2004 Framework be

23   vacated is denied.

24   ///

25   ///

26   ///

27   ///

28   ///

1

**B.      PRC is Not Entitled to an Injunction**

2

3      In addition to its request to vacate the 2004 Framework and all projects issued

4  pursuant to it, PRC also asks this Court to issue a broad injunction barring the Forest

5  Service from "continuing to plan and implement projects (logging, road-construction,

6  grazing, etc.) in reliance on the 2004 Framework."  PRC Br. at 12.  PRC's request would

7  potentially impact over 100,000 acres of already authorized vegetation management

8  projects, grazing on hundreds of thousands of acres, and an unknown number of other

9  undefined Forest Service activities authorized over the past eight years across the 11

10  National Forests.

11      For the reasons set forth below, the Court denies PRC's request for injunctive

12  relief against all activities authorized under the 2004 Framework.

13

14      **1.      The Legal Standards for Injunctive Relief**

15

16      To qualify for a permanent injunction, PRC bears the burden of demonstrating:

17

> (1) that it has suffered an irreparable injury; (2) that remedies
> available at law . . . are inadequate to compensate for that

18

> injury; (3) that, considering the balance of hardships between
> the plaintiff and defendant, a remedy in equity is warranted;

19

> and (4) that the public interest would not be disserved by a
> permanent injunction.

20

21  SFL, 646 F.3d at 1184 (quoting eBay Inc. v. MercExchange, 547 U.S. 388, 391 (2006)).

22  The Supreme Court has made clear that the traditional four factor analysis must be

23  applied in NEPA cases without any "thumb on the scale."  Monsanto Co. v. Geertson

24  Seed Farms, 130 S. Ct. 2743, 2757 (2010).  Further, the Supreme Court has made clear

25  that courts may decline to grant injunctive relief for a NEPA violation where the public

26  interest weighs against such relief, even if that means an irreparable injury goes

27  unaddressed.  Winter v. NRDC, 555 U.S. 7, 25-26 (2008).

28

1    See also Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (holding an

2    injunction is an "extraordinary remedy" that does not issue as a matter of course even

3    "though irreparable injury may otherwise result to the plaintiffs").

4

5              **2.    PRC has Failed to Prove that it will Suffer Irreparable Harm in
                       the Absence of an Injunction**

6

7          Nowhere in its request for injunctive relief, or in its complaint, does PRC challenge

8    or even identify a single, site-specific project that will irreparably harm its members.[7]

9    Instead, PRC bases its claimed injury on the generic assertion that because the 2004

10   Framework ostensibly allows "substantially greater logging, road-construction and

11   grazing [than the 2001 Framework]," and these activities potentially impact fish and

12   aquatic habitats, PRC's members are irreparably harmed by further implementation of

13   any and all activities issued pursuant to the 2004 Framework.  PRC BR. at 14.  This

14   generic and attenuated allegation of environmental harm falls well short of the concrete

15   injury to the plaintiff needed to justify the extraordinary remedy of injunctive relief.  See

16   Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81 (2000)

17   (Article III remedies must redress an "injury to the plaintiff" rather than an "injury to the

18   environment"); Wilderness Soc'y v. Rey,  622 F.3d 1251, 1256 (9th Cir. 2010) (a plaintiff

19   must show a concrete interest in a tract of land that "'is about to be developed by the

20   Forest Service in a way that harms'" the plaintiff's interests) (quoting Summers v. Earth

21   Island Inst., 555 U.S. 488, 495 (2009).[8]

22   _____

23          [7] Declaration testimony submitted by the Forest Service indicates that PRC has not
     administratively challenged any project or decision issued under the 2004 Framework over the past eight
     years.  See Burmark Decl. (ECF 177-5) at ¶¶ 2-3.  Even if it had, PRC would still be obligated to

24   demonstrate in the present lawsuit how such projects irreparably harm its members' interests.

25          [8] While PRC may not have been required to identify specific projects impacting its interests to
     establish its initial standing to challenge the 2004 Framework, see PRC, 689 F.3d at 1020-24, it must do

26   so to establish its entitlement to injunctive relief.  Establishing injury-in-fact for purposes of standing is less
     demanding then demonstrating irreparable harm to obtain injunctive relief.  See Ctr. for Food Safety v.

27   Vilsack, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("Of course, . . . a plaintiff may establish standing to seek
     injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it."); Caribbean
     Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988) (finding that to demonstrate irreparable

28   harm, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing").

1  To carry its burden of proof as to irreparable injury, a plaintiff must identify the specific,

2  concrete actions that will harm its members' interests if no injunction issues.  PRC has

3  failed to do this.

4       PRC's attempt to demonstrate irreparable harm based on predicted increases in

5  ground-disturbing activities is also deficient in a number of ways.

6  First, the evidence before the Court does not support PRC's assumption that projects

7  implementing the 2004 Framework will have significant adverse impacts on aquatic

8  habitats and fish, particularly when compared to the likely impacts from projects issued

9  pursuant to the 2001 Framework.  Second, PRC's assumption that because the 2004

10  Framework "allows" more activity, more activity will necessarily be authorized at the site-

11  specific level not only demonstrates a misunderstanding of the Forest Service's staged

12  decision-making process, but it is also belied by the eight-year history of implementing

13  the 2004 Framework.  Finally, to the extent that the 2004 Framework has resulted in

14  increased levels of land management (such as increased thinning for fuel reduction

15  purposes), PRC ignores the fact that programmatic and project-level protective

16  measures are effective at minimizing and avoiding negative impacts to aquatic and

17  riparian habitats when applied in the site-specific context.  Each of these issues is

18  addressed in turn below.

19       First, PRC's assertion that timber harvest, road-building and grazing under the

20  2004 Framework will lead to detrimental impacts to aquatic habitats and fish above and

21  beyond what would occur under the 2001 Framework is unsupported by the record

22  before the Court.  Rather, the evidence indicates that with regard to direct impacts to

23  aquatic habitats and fish from Forest Service management activities, there is little

24  difference between the 2001 and 2004 Frameworks.[9]

25  _____

26       [9] While the evidence before the court indicates that activities implemented under either the 2001
    and 2004 Frameworks would likely have negligible effects on fish species due to the robust aquatic

27  management strategy and protective S&Gs and BMPs, the evidence also indicates that the 2004
    Framework is likely to be more protective to fish species over the long term than the 2001 Framework,

28  since the 2004 Framework is likely to be more effective in reducing the severity and acreage of wildfires,
    which can have serious adverse impacts on fish due to erosion, sedimentation, and other factors.

1    As this Court has previously noted and the Forest Service experts have demonstrated,

2    both Frameworks use essentially the same Aquatic Management Strategies, Riparian

3    Conversation Objectives and Critical Aquatic Refuges.  See PRC, 2008 WL 4291209, at

4    *3.  See also Kellett Decl. (ECF 177-2) at ¶ 3; Hill Decl. (ECF 177-3) at ¶ 23-25; Yost

5    Decl. (ECF 177-4) at ¶ 12.  Both Frameworks also utilize substantially the same S&Gs

6    for protection of aquatic and riparian resources, including fish.  See  SNFPA 3285 (S&Gs

7    similar); Kellett Decl. (ECF 177-2) at ¶¶ 5-19 (comparing S&Gs and concluding that

8    changes "are not likely to result in notably greater adverse impacts to fish, aquatic, and

9    riparian resources"); Hill Decl. (ECF 177-3) at ¶¶ 26-33 (comparing S&Gs applicable to

10   RCOs and concluding the changes "are minor and are unlikely to significantly increase

11   risks to water quality or aquatic resources"); Yost Decl. (ECF 177-4) at ¶ 5 (comparing

12   grazing S&Gs relevant to aquatic impacts and finding no significant difference between

13   2001 and 2004 Frameworks).  As a result, projects implemented pursuant to the 2004

14   Framework are not likely to result in significantly greater direct impacts to fish and

15   aquatic resources as compared to projects implemented pursuant to the 2001

16   Framework.

17          In support of its position, PRC relies on the declarations of its experts, who opine

18   at length about the harmful effects of logging, grazing and roads on aquatic systems and

19   fish.  However, the allegations of PRC's experts are almost entirely generic and fail to

20   attribute the harms of which they complain to the 2004 Framework itself.  Based on the

21   totality of the evidence, the Court concludes that PRC has failed to demonstrate that

22   implementing the 2004 Framework will adversely affect fish and aquatic systems in any

23   way that is materially different from the impacts that would occur from management

24   activities under the 2001 Framework.  Therefore, PRC has failed to carry its burden of

25   proving that the 2004 Framework will adversely affect aquatic systems (and harm PRC's

26   members) above and beyond what might occur under the 2001 Framework.

27   ///

28   ///

1   See Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1022 (9th Cir. 2009) (noting that in

2   considering relief, the court must compare the 2001 and 2004 Frameworks with respect

3   to harms and equities).

4        Second, PRC's attempt to prove irreparable harm based on an alleged increase in

5   management activity under the 2004 Framework founders on the fact that the record

6   since 2004 does not reflect the vast increase in activities assumed by PRC.  For

7   example, grazing levels in the Sierra Nevada, measured both by acres grazed and

8   Animal Unit Months have declined from 2000 to 2012.  Yost Decl. (177-4) at ¶¶ 3, 5.

9   Similarly, between the 2004 and 2011, the national forests in the Sierra Nevada have

10  decommissioned more than 10 times the length of roads than they constructed.  Hill

11  Decl. (177-3) at ¶ 46.  And, on a related note, the number of water bodies on NFS lands

12  in the Region listed as impaired due to timber harvest and livestock grazing declined

13  between 2002 and 2010.  Id. at ¶ 35.[10]  These facts, which have not been convincingly

14  rebutted by PRC, undermine PRC's core assumption that the adoption of the 2004

15  Framework has and will result in increased grazing and road-building.   Because the

16  record before the Court does not support PRC's allegation that the 2004 Framework will

17  result in an increase in grazing and road building, PRC has failed to carry its burden to

18  prove irreparable harm caused by any such increase in those activities.

19       Third, PRC's attempt to base its claim of irreparable injury on the potential

20  increase in land management allowed by the 2004 Framework ignores the actual design

21  features of individual projects, which ensure that an increase in activity levels does not

22  correlate with an increase in adverse impacts.

23  ///

24  ///

25  

26  [10] In contrast to grazing and road-construction, the Forest Service has conceded that vegetation management activities, including thinning for fuel reduction, have increased under the 2004 Framework. However, as discussed in more detail below and in the Forest Service's compelling declaration testimony, the short-term, direct effects to aquatic resources from vegetation management activities are likely to be minimal, while the long-term, indirect effects of such activities may be significant, benefitting aquatic resources by reducing the adverse impacts associated with severe wildfires.

1    In addition to meeting the S&Gs established by the Framework itself, project-specific

2    decisions follow a series of Best Management Practices ("BMPs") designed to protect

3    aquatic and riparian resources.  According to evidence provided by the Forest Service

4    and not rebutted by PRC, these BMPs have proven extremely effective in preventing or

5    minimizing adverse impacts to aquatic resources.  For example, recent post-project

6    monitoring found the effectiveness rate of BMPs in the Herger-Feinstein Quincy Library

7    Group ("HFQLG") Pilot Project area to be 97 percent.  ECF 177-6 at 1.  These BMPs are

8    imposed at the project level, above and beyond the particular standards and guidelines

9    required by 2004 Framework.  See e.g. Hill Decl. (ECF 177-3) at ¶ 27 (noting BMPs, soil

10   quality standards, and analysis of cumulative watershed effects are required

11   independent of Framework); Yost Decl. (ECF 177-4) at ¶ 17 (noting grazing BMPs exist

12   independent of guidance in Framework); Kellett Decl. (ECF 177-2) at ¶ 21 (noting project

13   specific design features, mitigation and BMPs are expected to minimize or avoid impacts

14   beyond what is required by the Framework S&Gs alone).  Thus, the determination of

15   whether plaintiffs will suffer an injury justifying injunctive relief cannot be answered solely

16   by looking at the increased activity levels potentially allowed under the 2004 Framework

17   without reference to specific projects.  And, the evidence before the Court indicates that

18   when project-level design-features and protective measures are considered, adverse

19   impacts to aquatic resources are generally avoided, even when large areas of land are

20   treated.

21        The difference between PRC's attempt to establish harm to aquatic and riparian

22   resources based on potential aggregate levels of activities "allowed" under the 2004

23   Framework and the actual impact of projects once implemented is illustrated by

24   considering a particular site-specific project.

25   ///

26   ///

27   ///

28   ///

1    The Slapjack Project,[11] adopted in 2006 pursuant to the 2004 Framework, serves a

2    number of multiple-use goals including: reducing the risk of wildfire, meeting the

3    requirements of the HFQLG Act, and improving aquatic and riparian ecosystems.  ECF

4    177-8.  In compliance with NEPA, the Forest Service prepared a comprehensive EIS for

5    the project.  With regard to direct impacts on hydrological function, the EIS found that

6    with the use of BMPs there would "only be a small potential of sedimentation to the

7    immediate channel and channels downstream," and that completion of the project would

8    result in long term reduction of impacts on streams.  The EIS also addressed impacts to

9    trout species and concluded that: (1) the project would not result in a significant increase

10   in the sediment delivery to aquatic habitats and could actually reduce sediment

11   transport; (2) there would be no measurable downstream sedimentation effects from the

12   project; and (3) the portion of the project that involved the replacement of culverts would

13   allow fish to pass upstream, resulting in increased fish distribution and, potentially,

14   increased numbers.  ECF 177-8 at 3-279.  Finally, the EIS found that road

15   decommissioning authorized by the project would decrease average road density in the

16   project area.  In short, site-specific evaluation of the Slapjack Project makes clear that

17   the project should benefit aquatic habitat and fish species, even though the project

18   involves extensive timber harvest and road management.  The Slapjack Project

19   illustrates that the question of whether the 2004 Framework causes injury to PRC's

20   members can only be meaningfully evaluated in the context of actual projects that carry

21   out the 2004 Framework's programmatic direction.[12]

22   _____

23   [11]  The Slapjack Project was brought to the Court's attention in the <u>Sierra Forest Legacy</u> case,
where plaintiffs there asserted that the project would cause irreparable harm to SFL's members and the
24   environment.
[12]  The Forest Service provided another compelling example, in the grazing context, which makes
25   clear that PRC's allegations of harm are based on speculation that is often rebutted by real world
experience.  PRC argues that the 2004 Framework harms its members and the environment by weakening
26   grazing standards designed to protect the Yosemite Toad.  However, PRC has not identified a single
grazing allotment in the Sierra Nevada where grazing standards have been eased and the Yosemite Toad
27   has been harmed.  This failure alone would undermine Plaintiffs' claim of irreparable harm.  However, the
Forest Service has presented two further pieces of compelling evidence: 1) the vast majority of grazing
28   allotments in the Sierra Nevada have not relaxed the standards related to Yosemite Toads at the site-
specific level, even though the 2004 Framework provided the flexibility to do so; and 2) in those few

1    For the reasons set forth above, PRC has failed to carry its burden of proving that

2    the adoption of the 2004 Framework will cause its members irreparable injury.  On this

3    basis alone, Plaintiff is not entitled to the injunctive relief it seeks.[13]

4

5              **3.      PRC Has Not Demonstrated That Other Remedies at Law are
6                        Inadequate**

7    PRC fails at the second step for injunctive relief because it cannot demonstrate

8    that other remedies available at law are inadequate to avoid injury to its members.  eBay

9    Inc. v. MercExchange, 547 U.S. at 391.  PRC's alleged injuries can be addressed by

10   declaratory relief.  PRC's case against the 2004 Framework is a facial one—PRC has

11   never challenged a single site-specific application of the Framework.  Such activities,

12   and their impacts, will occur only through site-specific project decisions. When, and if,

13   the Forest Service authorizes a project under the 2004 Framework that PRC believes

14   will cause it injury, PRC can bring a challenge to that project based on the weight of its

15   declaratory relief against the Framework and ordinary principles of stare decisis.  See,

16   e.g., United States v. Am. Friends Serv. Comm., 419 U.S. 7, 11 (1974) (finding that a full

17   and fair opportunity to litigate claims in a separate suit constitutes an adequate remedy

18   at law, thereby undercutting "the existence of irreparable injury").  Given the efficacy of

19   declaratory relief, an injunction against the 2004 Framework is not necessary.[14]

20   ///

21   ///

22   _____
     instances where grazing has been permitted in Yosemite Toad habitat, scientific studies have found that
23   grazing does not create any detectable adverse impacts on toads.  This example highlights the importance
     of adjudicating harms in the context of forest plans as implemented.

24   [13]    While the Court has not separately addressed all of Plaintiff's allegations of harm or all of the
     claims of Plaintiff's experts, the Court is not persuaded by any of Plaintiffs' claims of irreparable harm and,
25   as a general matter, the Court finds the Forest Service's declarants to be more convincing and credible
     than Plaintiff's.
26   [14]    The Court's findings that PRC has failed to carry its burden of demonstrating irreparable harm
     and that it has adequate remedies at law are not essential to the Court's conclusion that PRC is not
27   entitled to its requested injunction.  Even assuming irreparable harm and a lack of adequate remedies at
     law, the balance of the equities and consideration of the public interest demonstrate that the injunctive
28   relief sought by PRC is inappropriate.

1

       **4.**       **The Balance of Equities and the Public Interest Favor Leaving the 2004 Framework in Place**

2

3       In determining whether the injunctive relief requested by PRC is appropriate, this

4  Court must consider the balance of the equities and the public interest.  Here, the Court

5  finds that considering the balance of equities and the public interest, the 2004

6  Framework should remain in place while the agency addresses the deficiency in the

7  2004 SEIS.

8

9              **a.**       **PRC's Injunctive Relief is Unworkable as a Practical Matter**

10

11       Before considering the equities individually, it is necessary to address the

12  multiple practical impediments that are embedded in PRC's requested injunction.  While

13  PRC's injunction—to implement existing projects consistent with the 2001 Framework—

14  sounds simple on paper, the Forest Service has provided credible and unrebutted

15  testimony that modifying existing projects to be consistent with the 2001 Framework

16  would be extremely difficult, time-consuming and costly.  Continued implementation of

17  existing projects only to the extent that they are consistent with the 2001 Framework

18  would entail reviewing and potentially modifying the NEPA documents for each project,

19  reviewing and potentially modifying the contracts for each project, and, for timber

20  projects, remarking trees to be compliant with the 2001 Framework.  Given the time and

21  expense of this process, the Forest Service has made clear that rather than attempting

22  to implement existing projects consistent with the 2001 Framework, the logical response

23  to PRC's injunction may simply be to shut down such work until the 2004 Framework

24  NEPA violation can be remedied.  Under either scenario, the cost to the agency and the

25  public would be tremendous, not only in terms of time and money, but also in terms of

26  delayed land management, which would cause both ecological and socio-economic

27  harm.

28  ///

1

2

**b.      The Public Interest in Reducing the Threat of Severe
          Wildfire Favors Leaving the 2004 Framework in Place**

3      One of the principal purposes of the 2004 Framework is to address the risk of

4   catastrophic wildfire.  Based on volumes of evidence in the administrative record and

5   testimony provided by all the parties in the various Framework cases, the Court has

6   concluded that the 2001 Framework compromises the Forest Service's ability to

7   effectively address the threat of severe wildfire, and that leaving the 2004 Framework in

8   place during remand (as well as those projects that are issued pursuant to the 2004

9   Framework) is in the public interest.

10     Reducing the risk of severe wildfire is in the public interest not only because of the

11  threat wildfire poses to human lives and property, but also because of the threat it poses

12  to wildlife.  The Forest Service has made clear in the other Framework cases that habitat

13  loss from severe wildfire is the primary threat to the viability of old forest species,

14  including the California spotted owl, the Pacific fisher and the American marten  See,

15  e.g., 71 Fed. Reg. 29,886, 29,897 (May 24, 2006) (FWS 12-month finding on California

16  spotted owl);  Fed. Def's Op. Br. on Remedy ("Fed. Op. Remedy"), Macfarlane Decl. at

17  ¶ 13, SFL, 05-cv-0205 (ECF 270-2) ("The greatest threat to fisher persistence in the

18  northern and southern Sierra Nevada was habitat modification due to severe wildfire.");

19  Fed. Op. Remedy, Yasuda Decl. at ¶¶ 6-7 SFL, 05-cv-0205 (ECF 270-3) (describing

20  number of owl Protected Activity Centers lost to wildfire).

21     The evidence submitted to the Court in this case indicates that severe fires also

22  pose significant risks to fish and other aquatic species due to erosion and sedimentation,

23  among other factors.  PRC and its experts argue that the harmful impacts of sediment

24  attributable to grazing, road use and fuel treatments exceed the harm from sediment

25  caused by wildfire.  The Forest Service experts effectively rebut this testimony. As Forest

26  Service hydrologist Barry Hill explains, recent studies show that sediment yields caused

27  by fuel treatments utilizing BMPs are hundreds to thousands of times lower than

28  sediment yields from severely burned areas.

1    Hill Decl. (ECF 177-2) at ¶¶ 21-22.  Mr. Hill also makes clear that PRC's affiant misuses

2    the Forest Service's erosion model to overstate impacts of roads, grazing and logging

3    and to understate the impacts of wildfire.  The Forest Service's declarants also debunk

4    PRC's testimony that fire-generated sediment benefits fish, providing extensive scientific

5    and on-the-ground evidence of the adverse effects that severe fire has on aquatic

6    ecosystems.  See Second Kellett Decl. (ECF 189-3) at ¶¶ 5-9 (noting "overwhelming

7    majority" of studies find significant negative effects to fish populations and fish habitat,

8    and concluding that "severe fire is generally a harmful agent that poses significant risks

9    to fish population in the Sierra Nevada."); Henry Decl. (ECF 189-5) at ¶¶ 26-29

10   (describing harm to fish populations attributable to McNally fire on the Sequoia National

11   Forest).  The Forest Service's experts provide compelling evidence that the adverse

12   effects of wildfire on aquatic resources greatly exceed those from vegetation

13   management projects, and that fuel reduction work under the 2004 Framework will

14   benefit fish populations in the long term by reducing fire severity.  Second Hill Decl. (ECF

15   189-2) at ¶ 22 ("[I]n general, adverse effects of wildfire far exceed those of vegetation

16   management project undertaken to reduce fire risks."); Second Kellett Decl. (ECF 189-3)

17   at 9 ("carefully-designed fuels management treatments can help avoid the serious

18   adverse consequences of severe fire and provide a benefit to Sierra Nevada fish

19   populations over the long term").  Indeed, even the 2001 Framework, which PRC

20   supports, was predicated on the principle that "high severity wildfires pose a far greater

21   risk of damaging aquatic systems" than fuel management activities.  SNFPA 00996 CD

22   19 (FEIS, Vol. 2, at 228).

23          PRC and its experts attempt to undermine the legitimacy of the 2004 Framework

24   by attacking the efficacy of fuel treatments in reducing fire severity and total sediment

25   delivery to watercourses.   However, Forest Service expert Hugh Safford explains that

26   the overwhelming scientific evidence indicates that fuel treatments successfully reduce

27   fire severity and modify fire behavior.  ECF 189-4.

28   ///

1   The net result is that fuel reduction treatments contribute little if any sediment in the short

2   term and can effectively minimize the amount of large pulses of sediment caused by

3   wildfires.

4        In sum, contrary to the assertion of PRC and its experts, the weight of the

5   evidence before the Court indicates that fuel treatments to reduce the risk of severe

6   wildfire provide a net benefit to riparian and aquatic resources, including fish.  The public

7   interest in reducing the adverse effects of sedimentation is thus best served by

8   implementing projects designed under the 2004 Framework.

9        Like the Plaintiffs in the other Framework cases, PRC asserts that harvest of

10  larger diameter trees allowed under the 2004 Framework serves only financial ends and

11  is unrelated to fire hazard reduction and its associated environmental benefits.

12  However, the evidence before the Court makes clear that the inclusion of commercially-

13  valuable trees in fuel reduction projects enables the Forest Service to complete far more

14  fuel reduction work than it could accomplish under its limited budget, and thus allows

15  work at the pace and scale necessary to address the region-wide threat of severe

16  wildfire.  See Fed. Op. Remedy, Bahro Decl. at ¶ 9, SFL, 05-cv-0205 (ECF 270-8) ("To

17  be effective at [the landscape scale] we need to have a pattern of treatment areas that is

18  effective in changing the spread and intensity of a large fire as it moves across the

19  landscape."); SNFPA 03079 (2004 Framework allows harvest of some medium-sized

20  trees to increase the likelihood of accomplishing program goals with limited funding);

21  SNFPA 03024 (noting need for landscape-level fire and fuel management strategy);

22  SNFPA 03336 ("The pace and intensity of mechanical thinning planned under

23  Alternative S2 is expected to reduce the rate at which habitat . . . is lost to wildfire.").  In

24  other words, even if limiting individual projects to the cutting of small diameter trees

25  could be effective in addressing fire hazard, the agency does not have the resources to

26  fund such projects on the necessary scale and with the necessary speed.

27  ///

28  ///

1  See e.g., Fed. Op. Remedy, Golnick Decl. at ¶ 16, SFL, 05-cv-0205 (ECF 270-15)

2  (shifting from harvest based on commercial infrastructure to service contract work

3  funded solely by the Forest Service would likely result in 66% to 75% reduction in

4  number of acres treated).  Therefore, by allowing for the harvest of larger diameter trees,

5  the 2004 Framework enables the agency to conduct far more fuel reduction work than it

6  could under the 2001 Framework.  And the 2004 Framework retains extensive protective

7  measures and S&Gs to ensure that important environmental values – such as wildlife

8  habitat – are not lost in the process of designing economically-viable projects.  See, e.g.,

9  Fed. Op. Remedy, Krueger Decl. ¶ 14, SFL, 05-cv-0205 (ECF 270-1) ("projects within

10  the Sierra Nevada and planned pursuant to the 2004 Framework are designed to

11  maintain protected activity centers (PACs), the core areas for nesting and roosting

12  utilized by California spotted owls"); Fed. Op. Remedy, Macfarlane Decl. ¶ 2, SFL,

13  05-cv-0205 (ECF 270-2) ("due to the standards and guidelines retained by the 2004

14  Framework, the majority of important marten (and fisher) habitat components would be

15  retained in the course of Forest Service land management activities conducted pursuant

16  to the 2004 Framework"); see also id,, Krueger Decl. ¶ 14-19; id., Macfarlane Decl. ¶ 10,

17  12.

18      PRC's focus on the fact that larger trees can be harvested under the 2004

19  Framework also ignores that it is superior to the 2001 Framework in reducing fire risk in

20  ways unrelated to tree size.  For example, as this Court has already recognized, the

21  2004 Framework is far more effective than the 2001 Framework at modifying fire

22  behavior.  PRC, 2008 WL 4291209, at *17 (noting the differences in the rate of spread,

23  flame length, scorch height and projected mortality).  This is the case because the 2001

24  Framework placed limits on mechanical treatments even within treatment areas, a

25  requirement which "can severely reduce the effectiveness of individual treatment areas

26  in modifying fire behavior," and which is not found in the 2004 Framework.

27  ///

28  ///

1   SNFPA 3291; see also Fed. Op. Remedy, Bahro Decl. at ¶¶ 10-14, SFL, 05-cv-0205

2   (ECF 270-8) (describing the cumulative effect of the overlapping standards and guideline

3   imposed by the 2001 Framework).

4        On balance, the public interest in reducing the risk of catastrophic wildfire favors

5   leaving the 2004 Framework in place pending preparation of an SEIS.

6

7        c.    The Public Interest in Forest Health Supports Leaving the
              2004 Framework in Place

8

9        PRC's requested injunction will compromise the Forest Service's ability to

10  address forest health goals, including the stresses caused by climate change, drought

11  and insects.  This Court has previously concluded that in order to address forest health

12  concerns, the Forest Service "needs the flexibility to remove trees of larger diameter

13  than allowed under the 2001 Framework and to reduce canopy cover below the levels

14  allowed in the 2001 Framework."  Order Denying Inj. Pending Appeal at 16, SFL,

15  05-cv-0205, (ECF 319).  See also Mem. & Order at 10, SFL, 05-cv-0205 (ECF No. 304)

16  ("2004 Framework offers better long-term forest health").  That conclusion is bolstered by

17  the Forest Service's remedy phase experts, who compellingly explain that cutting trees

18  20"-30" in diameter and reducing canopy cover below 50%, as allowed under the 2004

19  Framework, is at times necessary to address non-fire forest health goals.  See, e.g.,

20  Fed. Defs' Op. Br. on Remand at 16-17, SFL, 05-cv-0205 (ECF 339).  See also Fed. Op.

21  Remedy, Fettig Decl. at ¶ 4, SFL, 05-cv-0205 (ECF 270-14) (noting trees 20"-30" in

22  diameter are often prime targets for bark beetles); Id., Grulke Decl. at  ¶¶ 2, 10 (ECF

23  270-13) (responding to climate stressors makes it appropriate to remove trees 20"-30" in

24  diameter and reduce canopy cover below 50%); Id., Sherlock Decl. at ¶¶ 8, 16 (ECF

25  270-12) (forest thinning to the levels permitted under 2004 Framework is required to

26  reduce competition between trees for limited site resources, thereby increasing the

27  remaining trees' resistance to mortality from drought and insect attacks).

28  ///

1       Addressing these non-fire related forest health goals is unquestionably in the

2 public interest, and the overwhelming weight of the evidence demonstrates that leaving

3 the 2004 Framework in place best enables the Forest Service to do so.[15]

4

5                  **d.**      **The Public Interest in Maintaining the Timber and**
                             **Biomass Industries is Best Served by the 2004**

6                              **Framework**

7       The Forest Service has presented compelling declaration testimony showing that

8 the 2004 Framework best serves the public interest in providing economic benefits to

9 forest industries and communities, which not only creates jobs but also sustains the

10 infrastructure needed to properly manage forest resources.  Mem. and Order at 10, <u>SFL</u>,

11 05-cv-0205 (ECF No. 304).  <u>See also</u> Order Denying Inj. Pending Appeal at 18, <u>SFL</u>,

12 05-cv-0205 (ECF No. 319) ("Reducing harvest to the levels contemplated in the 2001

13 Framework will lead to closures of some of the few remaining sawmills in the Sierra

14 Nevada as well as some biomass power plants.").  PRC has failed to meaningfully rebut

15 this testimony.  Instead, PRC faults the Forest Service for not "provid[ing] the information

16 necessary to support these claims [of harm to the industrial infrastructure], including

17 current and projected log inventories, alternative sources of timber and biomass supply

18 on private timberlands, or the minimum timber supply requirements to keep mills

19 running."  PRC Reply at 19 (ECF 187).  This criticism is meritless.  It is not the Forest

20 Service's burden to avoid injunctive relief; it is PRC's burden to prove that it is entitled to

21 such relief.

22 ///

23 ///

24 _____

25      [15] PRC critiques the Forest Service's emphasis on the forest health benefits of the 2004
Framework by noting that the 2004 SEIS states that the acreage expected to be treated "would be too

26 small to significantly benefit the bioregional condition."  The Court does not agree with this line of
argument.  The Forest Service has compellingly demonstrated that there are enormous land management

27 challenges facing the agency (and the public), including reducing fire hazard and improving forest health.
While implementing projects pursuant to the 2004 Framework may not entirely solve these problems in the
foreseeable future, it makes little sense to revert to the 2001 Framework, which will put the national forests

28 at even greater risks from severe fire and bark-beetle outbreaks.  In short, every bit makes a difference.

1    Furthermore, even though it was not technically required to do so, the Forest Service did

2    provide the Court with extensive evidence to support its arguments related to the

3    impacts of an injunction on the industrial infrastructure, even though it may not have

4    been in the form PRC would have preferred.

5         After considering the evidence presented by the Forest Service without deference

6    to the agency's experts based on their status as agency employees, the Court finds the

7    injunction sought by PRC will negatively impact the timber and forest products industry in

8    the Sierra Nevada.  The economic health of communities and industries in the Sierra

9    Nevada is an important element of the public interest that must be considered in

10   balancing the equities.

11        PRC faults the Forest Service for emphasizing "economic" harms when

12   environmental degradation is at stake.  However, as discussed above and made clear by

13   recent Supreme Court precedent, environmental concerns do not trump other public

14   interest factors.  Furthermore, even if purely socio-economic benefits were deemed a

15   lesser public benefit – a position the Court does not accept -- the impact to the timber

16   and biomass industry of imposing the 2001 Framework is more than economic.  The

17   evidence presented by the Forest Service indicates that these industries are critical

18   components of Forest Service land management.  Without these industries, the Forest

19   Service would have to use appropriated funds to pay for projects that could normally be

20   borne by the commercial value of the forest products.  Assuming current budget levels,

21   this would result in a 66% to 75% reduction in acres treated, effectively curtailing the

22   agency's ability to do work on the scale required to reduce fire hazard and improve

23   forest health in the Sierra Nevada.  Fed. Op. Remedy, Golnick Decl. at ¶ 16, SFL, 05-cv-

24   0205 (ECF 270-15).

25        In sum, there is a strong public interest in sustaining the timber and biomass

26   industry and infrastructure and the socio-economic benefits they provide, which weighs

27   in favor of keeping the 2004 Framework in place and allowing projects issued under the

28   2004 Framework to proceed.

1

2

**e.      The Public Interest in Implementing the HFQLG Pilot
Project is Best Served by the 2004 Framework**

3      This Court previously concluded that full implementation of the HFQLG Pilot

4   Project is in the public interest and best accomplished under the 2004 Framework.  See

5   Mem. & Order at 9, SFL, (ECF 304); Order Denying Inj. Pending Appeal at 15, SFL,

6   05-cv-0205, (ECF 319).  Because the 2001 Framework prohibited many of the actions

7   required by the HFQLG Act, reconfiguring HFQLG projects under the 2001 Framework

8   would frustrate the purposes of the Act.  Fed. Resp. Br. on Remand, Whitman Decl. at

9   ¶ 11, SFL, 05-cv-0205 (ECF 342-1).  PRC makes no attempt to demonstrate that its

10  broad injunction would better serve the public interest in implementation of the Pilot

11  Project than the 2004 Framework.

12     Based on the administrative record and the testimonial evidence provided by the

13  Forest Service, without granting any special deference to Forest Service experts due to

14  their affiliation with the agency, the Court again finds that the 2004 Framework best

15  serves the public interest in implementation of the HFQLG Pilot Project.

16

17                                    **REMEDY**

18

19     Based on the foregoing, the Court denies Plaintiffs' request to vacate and enjoin

20  the 2004 Framework and all projects issued pursuant to its direction.

21     The Court finds that, based on the circumstances of this case, the appropriate

22  remedy is that proposed by the Forest Service, and therefore orders the Forest Service

23  to complete a supplemental EIS that addresses the analytical deficiency identified by the

24  Ninth Circuit in its June 30, 2012 opinion, Pacific Rivers Council v. U.S. Forest Serv.,

25  689 F.3d 1012 (9th Cir. 2012).  The final supplemental EIS should be issued by

26  **September 30, 2014**.

27  ///

28  ///

1    In the interim, the agency may continue management of National Forest Service lands in

2    the Sierra Nevada consistent with the 2004 Framework.

3            IT IS SO ORDERED.

4    DATED:  April 26, 2013

5

6

7                                    MORRISON C. ENGLAND, JR., CHIEF JUDGE
                                     UNITED STATES DISTRICT COURT
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28