IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE MORRISON C. ENGLAND, JR., CHIEF JUDGE

---oOo---


PACIFIC RIVERS COUNCIL,

        Plaintiff,

vs.                       No. 2:05-cv-00953

DALE BOSWORTH, et al.,      Related cases:
                                2:05-cv-00205
                                2:05-cv-00211

        Defendants.

_____/

AND RELATED CASES.
_____/




---oOo---

REPORTER'S TRANSCRIPT

MOTION HEARING

THURSDAY, NOVEMBER 29, 2012

---oOo---






Reported by:  DIANE J. SHEPARD, CSR 6331, RPR

```
1                            APPEARANCES

2          For Plaintiff, Pacific Rivers Council, 2:05-cv-00953

3                  BRIAN GAFFNEY
                   LAW OFFICES OF BRIAN GAFFNEY
4                  605 Market Street
                   San Francisco, California 94105
5
           For the Plaintiff, People of the State of California,
6          2:05-cv-00211:

7                  CALIFORNIA ATTORNEY GENERAL'S OFFICE
                   BY:  HARRISON M. POLLAK
8                  1515 Clay Street, 20th Floor
                   Oakland, California 94612
9
           For Plaintiff, Sierra Nevada Forest Protection
10         Campaign, 2:05-cv-00205:

11                 GREGORY C. LOARIE
                   Earthjustice
12                 50 California Street, Suite 500
                   San Francisco, California 94111
13
           For the Federal Defendants:
14
                   UNITED STATES DEPARTMENT OF JUSTICE
15                 ENVIRONMENT AND NATURAL RESOURCES DIVISION
                   BY:  BARCLAY T. SAMFORD
16                     Trial Attorney
                   999 18th Street
17                 South Terrace - Suite 370
                   Denver, Colorado 80202
18
                   Of Counsel:
19
                   U.S. DEPARTMENT OF AGRICULTURE
20                 OFFICE OF THE GENERAL COUNSEL
                   JAMES L. ROSEN, Senior Counsel
21                 33 New Montgomery
                   San Francisco, California 94105
22
           For Intervenor, California Cattlemen's Association:
23
                   WILLIAM J. THOMAS, JR.
24                 BEST, BEST & KRIEGER LLP
                   500 Capitol Mall, Suite 1700
25                 Sacramento, California 95814
```

1                          SACRAMENTO, CALIFORNIA

2                      THURSDAY, NOVEMBER 29, 2012

3                              ---oOo---

4              THE CLERK:  Calling 05-953 and related cases 05-205

5       and 05-211, Pacific Rivers Council, et al., v. Dale Bosworth,

6       et al.  On for motions hearing, Your Honor.

7              MR. POLLAK:  Your Honor, I'm going to be starting for

8       the plaintiff, should I approach?

9              THE COURT:  Yes.  Your name, please?

10             MR. POLLAK:  I'm Harrison Pollak.  I'm with the

11      California -- Harrison Pollak, I'm with the California Attorney

12      General's Office, representing the People of the State of

13      California.

14             THE COURT:  Which points will you be addressing?

15             MR. POLLAK:  I was going to discuss our proposal for

16      the remedy.

17             THE COURT:  All right.

18             MR. POLLAK:  And then also responding to the Forest

19      Service's proposal.  The related case number that I'm in ends

20      in 00211.

21             Your Honor, I think I speak for everybody in this

22      courtroom in saying that we would all like to find a way to

23      wrap up this case.  It's been going on for a long time.  We now

24      are in a position to do that.  We know what the legal

25      violations are that need to be remedied.  There is the

1    violation of the failure to consider alternatives adequately

2    when the Forest Service adopted the 2004 Framework over the

3    2001 Framework.

4              And we also have in the related Pacific Rivers

5    Council case now a finding that the Forest Service failed to

6    properly analyze the impacts to fish.

7              THE COURT:  And so you would have the entire 2004

8    Framework thrown out, or where do you see that fitting in?

9              MR. POLLAK:  Sure.  Well, Your Honor, so our remedy,

10   there are two different parts of the remedy.  And the first

11   part does address this question of what do you do with the

12   document now that there have been found and confirmed these

13   legal violations.  And the response there is that you need to

14   vacate the framework.  I don't presume to say what the Court

15   needs to do, but the framework should be vacated.

16             THE COURT:  2004.

17             MR. POLLAK:  Excuse me?

18             THE COURT:  The 2004 Framework?

19             MR. POLLAK:  The 2004 Framework.

20             THE COURT:  In its entirety?

21             MR. POLLAK:  In its entirety.  Now, that does not

22   mean that -- it doesn't mean a couple of things that the

23   defendant suggested it could mean.

24             First of all, it does not mean that no aspect of the

25   2004 Framework could be revived and brought back.  Secondly --

1    but that could only happen after the Forest Service has

2    properly analyzed the impacts.

3            But secondly, and perhaps more important, it doesn't

4    mean that there would be a management void once the 2004

5    Framework is gone or is remanded to the agency.  You have the

6    2001 Framework.  And under the Paulson case, Ninth Circuit

7    case, the procedure is to reinstate the rule that was in effect

8    at the time the invalid rule was adopted.  That is at 413 F.3d

9    999.

10           THE COURT:  Now you just cited a case from the Ninth

11   Circuit as if it were binding and absolute precedent on this

12   Court.  Is that true, counsel?

13           MR. POLLAK:  That I cited it now?  I'm not sure which

14   aspect.

15           THE COURT:  The case that you just cited.  You're

16   saying that the procedure is, and you cited a case.  And I'm

17   asking you if that is absolute and complete binding precedent

18   on this Court?

19           MR. POLLAK:  Yes.  It's a Ninth Circuit rule.  But

20   let me --

21           THE COURT:  No.  There are more rulings than just

22   that one absolute.  There are other remedies that are available

23   which do not require that the Court throw out the entire 2004

24   Framework and go back to the 2001 Framework.

25           MR. POLLAK:  And I agree with that.  What Paulson is

 1    binding upon the Court --

 2            THE COURT:  That's my point is that when you say that

 3    this Court's only remedy is to throw out the 2004 and use the

 4    2001, that's not accurate.

 5            MR. POLLAK:  If that's what I said, that's not what I

 6    meant.  What I meant is that if the 2004 Framework is vacated,

 7    what is precedent and binding on the Court is that the 2001

 8    remedy would be reinstated in its place.

 9            Now let's go back to I think the more important

10    question at the moment is, is the Court absolutely required to

11    vacate the 2004 remedy -- I'm sorry -- to vacate the 2004

12    Framework.  And there, what we've said in our briefing and I'll

13    say it here is that the presumptive remedy is, yes, when a rule

14    is found to be invalid, that rule is vacated.  However, that is

15    an equitable remedy.  And this court sitting in equity can

16    under certain circumstances can modify that rule.

17            And so while the APA does state that a court shall

18    set aside unlawful agency action, there have been exceptions

19    made.  And I would like to talk about that because I think

20    really the crux of what happens to the 2004 Framework going

21    forward -- again we're not talking about what to do with the

22    plans already approved.  That's a separate issue.

23            But on the issue of what do you do with this

24    Framework now that it's been found to be invalid in two

25    different respects --

1              THE COURT:  Well, the Framework wasn't found to be

2    invalid.  There's maybe a couple aspects of the Framework.  And

3    I think you need to be accurate when you're saying that the

4    2004 Framework was found to be invalid.  That's not true.

5              MR. POLLAK:  Well --

6              THE COURT:  There was a portion of it that, if you

7    look at, that the court, the Ninth Circuit said that the

8    analysis completed by the Forest Service was not sufficient.

9    And what it would appear to this Court at this point is that

10   the remedy would be if the Ninth Circuit believes that their

11   incorporation by reference of the information contained in the

12   2001 is not adequate, you don't throw the baby out with the

13   bath water, you simply carve into the issue.  Forest Service,

14   prepare a supplemental, and leave everything in its place.

15   Because the entire Framework was not deemed to be invalid.  The

16   entire 2004 Framework.

17             MR. POLLAK:  Well, Your Honor, the entire 2004

18   Framework was not analyzed by the Court.  What was analyzed was

19   whether the Forest Service's process, procedure for adopting

20   that framework was valid.

21             And in that regard, Congress has made very clear that

22   before an agency can adopt a plan like that, it must consider

23   alternatives.  Alternative ways of satisfying -- of meeting the

24   objectives of the plan.  And the Forest Service did not do

25   that.  And specifically it did not do that with respect to the

1    new objective that you see in the 2004 Framework of increasing

2    the revenues from logging by allowing logging of larger trees.

3            And the Forest Service was required, at the time it

4    made the decision to do that, to look at other ways that it

5    could perhaps raise revenues, or change its budgeting, or

6    obtain additional appropriations, and, under NEPA, analyze what

7    the environmental consequences would have been of that

8    approach.

9            And because it did not do that, I agree that every

10   aspect of the 2004 Framework is perhaps not invalid, but the

11   process for deciding to procedure with that framework was

12   invalid, and --

13           THE COURT:  But besides just looking at revenue

14   increases, wasn't the 2004 Framework an attempt to manage a

15   forest that has become overgrown, that has massive fuel loads,

16   that is creating a risk to those who live in the vicinity

17   because of the way that the management has taken place up to

18   this point?

19           I mean, we all know that the forests are overgrown

20   because there's been suppression for how many years.  And as a

21   result of that, when you do have fires, you have fires that

22   burn hotter, burn longer, and go deeper into the ground because

23   of the heat that's generated as a result of the massive amounts

24   of fuel, the fuel load.

25           So aren't there other reasons why the Forest Service

1       was looking to engage in the 2004 Framework besides its

2       monetary gain?

3               MR. POLLAK:  Well, Your Honor, no.  The record shows

4       that is not the case.

5               And the reason I say is that the 2001 Framework also

6       addressed management strategies for reducing fires.  I mean,

7       look, I'm with the Attorney General's Office.  We also

8       represent CalFire.  I certainly don't mean to downplay, and we

9       don't downplay the importance of addressing the fire risk and

10      the buildup of timber and whatnot in the forest.

11              What we take issue with is this idea that those fire

12      risks were not addressed under the 2001 Framework, but they

13      somehow are addressed under the 2004 Framework.

14              Indeed, the final Environmental Impact Statement for

15      the 2004 Framework says, the SEIS, Supplemental EIS, does not

16      suggest that moving these trees, these larger trees, will alter

17      stand structure in ways that significantly enhance fire

18      protection.

19              So when you compare the two different frameworks,

20      it's not as if you have one framework that would allow fires to

21      happen and one that won't.  What you have is one framework that

22      was going to implement some management strategies, and then a

23      second decision that let's allow some more logging of larger

24      trees.  Not because that in itself would reduce the fire risk,

25      but because that is a way we can then pay for more intensive

1        management techniques.

2               In fact, if you look at the 2004 Framework and

3        compare it to the 2001 Framework, with respect to the

4        effectiveness of reducing the fire risk, the real benefits

5        under 2004 only happened later after the first decade.  In the

6        first decade there is about a five percent difference in terms

7        of the estimated amount of forest that will burn.  And so,

8        again, the logging of larger trees under the 2004 Framework is

9        not to reduce that fire risk.

10               The Final Supplemental EIS also states at page 210,

11        the benefits associated with reduced wildlife fire -- with

12        reduced wild fire risk for alternative S2, that's the 2004

13        Framework, are long-term outcomes because substantial

14        differences between the alternatives are not expected to occur

15        for several decades.

16               And so going back to this question of vacatur, again

17        we're not asking the Court to vacate a rule that's going to

18        then result in increased catastrophic fires.  What we're asking

19        is for this rule to be set aside so that the Forest Service can

20        go back and perhaps learn from the process from considering

21        these alternatives.

22               Our experience has been that agencies often do

23        benefit from the public comment.  From the time to, you know,

24        go back, re-assess.  And what they come up with, it might be

25        the 2004 Framework all over again.  In which case, in a year or

1    two, it's back in place.  But it might actually be something

2    that's different or that has some differences.  Some aspects

3    that are the same, some different.

4              You know, it might help to think a little bit about

5    building a house.  You know, if this 2004 Framework were

6    compared to a house that's built from the ground up.  If you

7    find out when it's completed that there is a defect in the

8    foundation, you might have to move out of the house to fix the

9    foundation, but it does not mean that you need to tear the

10   entire house down and start all over.

11             In this case, the decision -- the process that the

12   Forest Service went through to arrive at the 2004 Framework was

13   flawed.  We know that.  And therefore, the forest -- it should

14   be remanded to the Forest Service to reconsider using an

15   appropriate process.

16             But what the Forest Service does with it and what

17   they ultimately decide is up to them.  We're not asking the

18   Court to tell them how to conduct that analysis once it goes

19   back.

20             Your Honor, the second part of the remedy that we

21   propose -- and I just want to highlight why it's important to

22   distinguish between the two aspects.  For vacatur being the

23   presumptive rule when a rule is found invalid, it would be up

24   to the Forest Service to -- it's the Forest Service's burden,

25   really, to persuade the Court why vacatur is not appropriate.

1       It's not the plaintiff's burden to show why an invalid rule

2       should be vacated.

3              For the second question that a remedy must address

4       here, the burden does fall on the plaintiffs.  And that

5       question is, what do you do about forest plans that already

6       about have been approved under the 2004 Framework, that are

7       underway?

8              And there a vacatur would not affect them, in our

9       view.  And so for that, the Court -- would need to meet the

10      burden for injunctive relief.  I think in some of the briefing

11      the Forest Service suggests that we're arguing that injunctive

12      relief is the presumptive remedy, and that is not the case, and

13      we acknowledge that.

14             That said, when the Ninth Circuit remanded the

15      Court's remedy, it made clear a couple of things.  I mean, one,

16      it said that the Court does have jurisdiction to bar

17      implementation of the 2004 Framework.  But it also said that

18      the Court really has to exercise its discretion in crafting a

19      remedy.  A remedy that's tailored to this situation and not

20      simply defer to the Forest Service's view that the 2004

21      Framework is better, therefore, it should be allowed to stay in

22      place, and all the projects should be allowed to stay in place.

23             And so what the Court's task now is really to

24      exercise its discretion and craft a remedy that provides

25      redress for the legal violations, but that also balances the

1          equities and is in the public interest.

2                  Now toward that end, what the plaintiffs have

3          produced is one attempt at crafting an injunction that is not a

4          complete bar of all projects, or a complete halt of all

5          projects that have been approved.  But we really tried to look

6          at, you know, what are the equities, what is the public

7          interest here.  And we proposed what we believe is a very

8          narrow injunction.

9                  And what it would do is, it would say in those areas

10         within the Wildland Urban Interface, or the WUI, W-U-I, allow

11         the 2004 project -- the projects that were approved under the

12         2004 Framework to proceed.  We're not going to touch those.

13         Largely because of the concerns the Court addressed, and, as I

14         said, we share them.  That we don't -- we would not ask the

15         Court to enjoin any projects within the WUI.

16                 Outside of that area, though, what we are asking the

17         Court to do is enjoin projects but only to the extent they are

18         inconsistent with the 2001 Framework.  And what that really

19         gets at again is this logging of the larger trees.

20                 Now, unfortunately, the Forest Service has provided

21         us and the Court with very few specifics about which projects

22         must continue, which projects are critical to continue.  And

23         instead, their response has been largely, look, the 2004

24         Framework is better.  In the long-term it's going to be better.

25         It's more in the public interest.  Therefore, you should let us

1    proceed with everything.  Business as usual.

2         We believe that in order -- that -- we think it's

3    highly unlikely that every single project and every aspect of

4    every project that's been approved is critical, that it

5    continues during the period that the Forest Service is

6    re-examining its management decision.

7         We certainly are prepared to sit down with the Forest

8    Service.  If they have certain projects that they think should

9    go forward, we would look at them.  In fact, a remedy that we

10   proposed to the Ninth Circuit, that the Ninth Circuit didn't

11   reach, would have included a process for that to happen.

12        We just reject the idea that there is no compromise.

13   There is no middle ground here.  That every project must

14   continue.

15        If I could, I would like to briefly address the

16   Forest Service's proposed remedy.  Because while I will admit

17   that the injunction that we propose is not the only possible

18   injunction, I do believe strongly that the proposal that the

19   Forest Service has presented to the Court, both in its briefing

20   and in the proposed decision that it drafted, would not address

21   the legal problems with their decision.  And, quite frankly, it

22   could land us back here again.

23        THE COURT:  Why?

24        MR. POLLAK:  Well, a couple of reasons.  The first is

25   that if you look at the modeling -- I'm sorry.

 1            If you look at the alternatives analysis defect that

 2     the Court has found, there are really two aspects of it.  One

 3     is that the Forest Service went back -- when it adopted the

 4     2004 Framework, it went back and it looked at alternatives that

 5     it had considered in the 2001 Framework without updating the

 6     assumption, the modeling assumptions.  That's one aspect of the

 7     error.

 8            The other aspect, though, is again they did not

 9     develop alternatives to raising additional funds to consider

10     when they adopted the 2004 Framework.

11            Now the remedy that the Forest Service proposes will

12     update the modeling, but it will not -- it does not, and they

13     claim they are not required to, develop new alternatives to

14     analyze.  And if there is -- well, there is no question about

15     that because the Forest Service actually already has issued a

16     draft.  After the last remedy ruling, the Forest Service went

17     ahead and issued a Draft Supplemental EIS where they go back

18     and they redo the modeling, and they don't analyze different

19     alternatives.

20            So we think -- I mean, that's one reason I think we'd

21     be back is because the remedy would not address the NEPA

22     violation.

23            It's interesting.  I mean, the Forest Service now is

24     actually proposing a remedy that is even less stringent than

25     the Court ordered.  Because at the time the Court, believing it

1     did not have jurisdiction to bar implementation for the

2     framework, said when you approve projects at the project level,

3     at least then you should analyze a non-commercial funding

4     alternative.

5              Well, now the Forest Service is saying they don't

6     even need to do that.  So there is going to be no analysis of

7     this non-commercial funding alternative in the Forest Service

8     remedy.

9              Second, the second problem with the Forest Service's

10    remedy is that we believe that allowing the Forest Service to

11    just continue with all of the projects that are under way, to

12    continue relying on the 2004 Framework without having to go

13    back and do any meaningful reconsideration doesn't reflect the

14    kind of balancing that frankly the Ninth Circuit sent this back

15    for the Court to do.

16             It would really just allow the Forest Service to go

17    ahead with everything without, you know, any kind of a nuanced

18    approached.  It's really an all-or-nothing approach that the

19    Forest Service is advocating.  Well, they are advocating all.

20    They saying we're advocating nothing.  We're saying, no, they

21    go forward with some of it, but it can't be the case that they

22    must go forward with all of it.

23             Another problem with the Forest Service's remedy --

24    and Mr. Gaffney for Pacific Rivers Council can also address

25    this -- but they are suggesting that they go back and do

1    separate analyses of the alternatives -- to remedy the

2    alternatives analysis, and then a different document that would

3    address the failure to address the impacts to fish.

4             That would lead to piecemeal analysis.  Among other

5    things, if you're going to develop new alternatives, you need

6    to analyze the impacts of those alternatives on fish.  So doing

7    this kind of piecemeal approach of, really, just post hoc

8    justifications of a decision already made is not going to

9    satisfy requirements under NEPA.

10            So for that reason, we do think that were the Court

11   to simply sign off on what the Forest Service is proposing, it

12   would not -- it would not represent a balancing of the

13   equities, and it would not end up -- provide redress for the

14   legal violations.

15            THE COURT:  Thank you.

16            MR. POLLAK:  Thank you.

17            THE COURT:  Counsel?

18            MR. GAFFNEY:  Your Honor, Brian Gaffney for Pacific

19   Rivers Council.  Do you want to hear from defendant in response

20   to Mr. Pollak's argument and then come back to plaintiffs?

21            THE COURT:  Yes.

22            MR. SAMFORD:  Thank you, Your Honor.  Clay Samford

23   for the federal defendants.

24            The question before the Court, obviously, is the

25   appropriate remedy for the violations of NEPA found in the

1     Supplemental Environmental Impact Statement for the 2004

2     Framework.  With regard to the Sierra Forest Legacy and State

3     of California cases, this Court has previously found that the

4     proper remedy was to leave the 2004 Framework in place, allow

5     projects to move forward while the agency prepared a

6     Supplemental Environmental Impact Statement.

7              The Ninth Circuit in reviewing that remedy determined

8     that this Court has inappropriately deferred to the Forest

9     Service's experts based on their employment with the agency,

10    but didn't find any error in the ultimate remedy issued.  And

11    has asked this Court to review the evidence before the Court

12    again and to issue a remedy.

13             We would submit to the Court that nothing has changed

14    in the status quo.  Plaintiffs haven't put forward any new

15    declarations explaining how evidence has changed since the last

16    time this Court heard the remedy proceedings.  And we would

17    submit that based on the expert testimony before the Court,

18    based on the record, based on the legal standards, this court

19    should, again, issue a remedy that requires the Forest Service

20    to fix its NEPA error in the programmatic framework, but to

21    leave that framework in place while we do so.

22             Now, as you've heard from the State of California,

23    they propose, as well as the other plaintiffs, propose a

24    two-part remedy.  Vacatur of the framework and then injunctive

25    relief against the projects that have already been issued under

1      the framework.

2              And if I can address each of those quickly, Your

3      Honor.  With regard to vacatur, when we briefed the Sierra

4      Forest Legacy and California cases this summer, the standards

5      were a little bit unclear at that time.  Subsequently, as we

6      briefed in the PRC case, the Ninth Circuit has clarified the

7      standards with regard to a vacatur, and that's the California

8      Communities Against Toxics versus EPA case.  And there, the

9      Ninth Circuit made very clear, first, vacatur is an equitable

10     remedy.  This Court is not compelled to vacate an agency action

11     that it's found to be inadequate, as this court understands.

12     It can be left in place while the agency fixes that error.

13             Second, the Court made clear that the inquiry this

14     Court should follow in making that equitable determination is

15     the inquiry set out by the D.C. Circuit in the Allied-Signal

16     case.  And in that case, the D.C. Circuit said the Court should

17     look, first, at the seriousness of the order's deficiencies and

18     the extent of the doubt about whether the agency chose

19     correctly, and, second, at the disruptive consequences of

20     vacatur.

21             In this case, we would submit that both of those

22     prongs, the seriousness of the deficiencies and the disruptive

23     consequences, militate in favor of leaving the 2004 Framework

24     in place and not vacating it.

25             With regard to the seriousness of the deficiencies,

1    in the Sierra Forest Legacy and California cases, the error is

2    one of pulling forward the modeling from the 2001 Framework to

3    the 2004 Framework.  And as we've shown this Court through the

4    testimony of Klaus Barber, who was our modeler, that the actual

5    modeling, when you go back and do it again, using the

6    assumptions made in the 2004 model, the results aren't

7    different.  There is not a significant difference between the

8    outputs in the 2004 and 2001 models.  So the agency was in fact

9    informed of the impacts of the various alternatives.

10        Secondly, the error relates to the non-selected

11   alternatives.  It relates to those alternatives in '01 which we

12   did not select.  And so it's still not the case that the agency

13   was acting without knowledge of the on-the-ground impacts of

14   its decisions.

15        The second error -- and at this point I do need to

16   disagree with the State of California.  The State of California

17   has continued to characterize the other error in the document

18   as failure to consider a non-commercial funding alternative.

19   That error actually was one the Ninth Circuit found in its

20   first decision on the preliminary injunction pending appeal,

21   which is at 526 F.3d 1228.

22        In that case, the Ninth Circuit said the plaintiffs

23   have a likelihood of the success of the merits because the

24   Forest Service failed to consider other methods of funding this

25   sort of work.  However, in the superseding opinion based on a

1    re-hearing on the PI, the Ninth Circuit eliminated that ground

2    of failure.  And this is at 577 F.3d 1015.  And, there, the

3    Court found, first, there is an error in the modeling

4    techniques.  That's at page -- I'm sorry -- 1021.  And then it

5    says, second, the other error is the SEIS introduced

6    substantially new objectives including broadening the basic

7    strategy to include other management objectives like forest

8    health, restoring and maintaining ecosystem, structure and

9    composition, and restoring ecosystems after severe wildfires.

10          So this notion that one of the errors was failure to

11   consider a non-commercial funding alternative is not there.

12   The Ninth Circuit eliminated that as one of the possible

13   errors.  And I don't think this Court found that as one of the

14   errors in the framework.

15          So the evidence before the Court, therefore, shows

16   very compellingly that the error in the NEPA document is not

17   significant.  It's not a serious deficiency in the analysis

18   such that it would suggest that the agency chose incorrectly

19   using the language from the Allied-Signal case.  So under the

20   first Allied-Signal factor, I would suggest that it supports

21   very strongly leaving the 2004 Framework in place.

22          With regard to the disruptive consequences of

23   vacatur, we've put before the Court the testimony of Debra

24   Whitman, who works for the Forest Service, and plaintiffs have

25   never rebutted this testimony.  It showed very clearly that we

1       simply can't stop on a dime.  That when you vacate the 2004

2       Framework, all the projects that are currently in the planning

3       process on eleven national forests, covering 11 million acres

4       of land, it's 146 projects, all suddenly stop.  And the agency

5       has to reconfigure those projects to make them compliant with

6       2001.  They have to revisit the NEPA process.  They have to

7       reconfigure the projects.  And so planning comes to a

8       standstill.

9               And the record shows Ms. Whitman testifies that when

10      faced with that, the Forest Service is likely to stop planning

11      and focus on fixing the 2004 SEIS and then resume planning.

12      And the disruption of that on the Forest Service is significant

13      both in time and in money.

14              And, secondly, the second disruptive consequence of a

15      vacatur is it's a negative impact on the environment.  We've

16      presented to the Court I think compelling testimony that the

17      2004 Framework is better than 2001 Framework with regard to

18      dealing with the threat of catastrophic wildfire, with regard

19      to preserving habitat for old forest species like the

20      California spotted owl, and the Pacific Fisher and American

21      Martin.

22              And we present testimony I think uncontroverted that

23      the number one threat to the survival of all those species is

24      loss of habitat from wildfire.  So the need to address wildfire

25      is critical.

1              In fact, the testimony before the Court shows from

2    2003 to 2008, 33 owl PACs, Protected Activity Centers, have

3    been lost to fire.  None have been lost to forest management.

4              In the pilot area, the Quincy Library Group pilot

5    area, 52,000 acres of owl habitat have been lost to fire.

6    6,900 acres of owl habitat have been downgraded from nesting

7    habitat to foraging habitat.  So it's very clear that fire

8    poses the number one threat to these species.

9              Thirdly, the 2004 Framework better addresses non-fire

10   forest health issues - drought, climate change, insect

11   infestation.  So all these factors make it very clear the 2004

12   Framework is superior to the 2001 Framework and should be left

13   in place pending correction of the errors in the NEPA document.

14             I guess, Your Honor, I would like to turn quickly to

15   the second part of plaintiffs' remedy, which is an injunction

16   against all pending projects.

17             The State of California has labored before the Court

18   to depict their injunction as narrow or carefully tailored.

19   The testimony before the Court from Deborah Whitman makes clear

20   that we can't simply stop implementing projects already issued

21   under the 2004 Framework and begin implementing them as

22   compliant with the 2001 Framework.

23             These projects were planned under the 2004 Framework.

24   There are NEPA documents that assume the 2004 Framework.  The

25   trees are marked under the 2004 Framework.  The contracts are

1    issued under the 2004 Framework.  And so you can't just say

2    stop, do this under 2001.  You would have to go back and redo

3    the NEPA, re-negotiate the contracts.

4             In some cases, they may no longer be viable timber

5    sales.  The timber purchasers have purchased them based on the

6    economics of a sale that includes certain size trees.  If you

7    eliminate those trees, then the timber purchaser is no longer

8    going to want the sale.  So it won't go forward.  So the impact

9    of that injunction is extremely negative on the Forest Service.

10            It's also important, I think, to point out that the

11   State of California has attempted to shift the burden to us.

12   Tell them which projects are important to us.  Tell them which

13   projects have to go forward.  We can't believe that they all

14   need to go forward.  But the burden in an injunctive relief

15   request, Your Honor, is for them to show which projects are

16   causing them harm.  The State of California has still not named

17   a single project in eleven national forests, covering

18   eleven-and-a-half million acres that causes them any harm.  So

19   I would submit to the Court that it's very clear that they

20   continue to bear the burden of showing harm.

21            The final thing I think I would address in relation

22   to the State of California, Your Honor -- and then I'll get

23   back up and talk about the other plaintiffs -- is that they've

24   mischaracterized the reason for cutting these larger trees as

25   being purely economically motivated.

1          They suggested the 2001 Framework, like the 2004

2     Framework, was designed to reduce fire risk, and, therefore,

3     there is no reason to have the larger trees of the 2004

4     Framework being cut.

5          But the evidence shows very clearly that the largest

6     diameter trees included in the 2004 Framework are there in

7     order to allow the Forest Service to conduct Forest Service

8     management on a pace and at a scale that will address the

9     threat of catastrophic wildfire.  The evidence makes very

10    clear, we submitted declarations from Bernie Bahro, from Hugh

11    Safford, among others, who explain how fuel reduction treatment

12    works.  And that if we can work on a scale big enough, treat

13    something like 20 percent of the acres, then we can change

14    landscape-scale fire.  And in order to do that, we have to be

15    able to move quickly enough and treat enough acres to make that

16    happen.  And we can't do that based on appropriated funding.

17         The declaration of Donald Golnick explains that if

18    you did this amount of fuel work on appropriated funding, you

19    would have to reduce the fuel work by in the order of

20    60 percent or increase the agency's budget by that much.  So

21    it's not just about economics.  It's about doing the work on a

22    scale that will actually change or affect the landscape.

23         So I would suggest to the Court that the appropriate

24    remedy in this case, after reconsidering the expert testimony

25    presented by the Forest Service, is to not vacate the 2004

1    Framework, to leave it in place, and to not enjoin projects

2    already issued, but to allow them to proceed.

3              And unless the Court has questions?

4              THE COURT:  No, I don't at this time.  Counsel, are

5    you going to be making any comments at all today?

6              MR. THOMAS:  I can wait until after the plaintiffs

7    have completed.

8              THE COURT:  Let's see.  Mr. Gaffney.

9              MR. GAFFNEY:  Good afternoon, Brian Gaffney for

10   Pacific Rivers Council.  This is actually the first time I've

11   appeared before the Court.  And we're here because after the

12   Ninth Circuit ruled that the Environmental Impact Statement

13   entirely failed to analyze the impacts of the 2004 Framework on

14   fish, we believe that Pacific Rivers Council is entitled to

15   vacatur, and injunctive relief, and declaratory relief.

16             I think I would like to start, Your Honor, by

17   responding to the question that you asked Mr. Pollak, which is

18   whether or not the 2004 Framework was found to be invalid.

19             At least in our matter the 2004 Framework was never

20   found to be invalid.  In fact, the challenge was not to the

21   2004 Framework.  It was to the Environmental Impact Statement

22   that was done for it.  And under the APA, the reason why we

23   request vacatur is because when agency action is not in

24   compliance with the law, then the agency action must be set

25   aside.  So that's our response to that question.

1        And then also the question of whether or not the

2   Court has -- can act in equity and whether or not it could

3   leave portions of the 2004 Framework in place.  Certainly,

4   vacatur and injunctive relief are bound by the Court's powers

5   in equity.  But I think that it's important to go and look at

6   something that was challenged by the Government as regards to

7   vacatur.  And that is, vacatur is clearly the presumptive

8   remedy.  And both the U.S. Supreme Court in Florida Light and

9   the Ninth Circuit have made it clear that this presumptive

10  remedy of remand with vacatur is only not applied in rare

11  circumstances.  And that's the term the Supreme Court uses.  Or

12  limited circumstances.

13       And, here, there is two prongs, as Mr. Samford

14  pointed out, for the Court to take a look at in deciding if one

15  of those rare circumstances exists here.  We contend that it

16  does not.  The first is the seriousness of the deficiency, and

17  the second is the disruptive consequences.

18       Let me say as an aside that there is nothing about

19  the Ninth Circuit's case in Communities Against Toxics which

20  changes the standard.  That standard of Allied-Signal has been

21  applied before in federal courts in California, and it still

22  holds that the same two-prong standard applies, including that

23  the consequences must not just be disruptive but the disruption

24  must be severe.

25       Let me address, first, the Government's position that

1    this is not a serious deficiency.  The Ninth Circuit said that

2    the EIS entirely failed to analyze the impacts on fish.  In

3    cases where the Courts have found that there is not a serious

4    deficiency, it's because the Court's found that the defect

5    could be readily cured.  Here, no one, not the Forest Service,

6    or anyone else, knows what the impacts are to fish because

7    there's been no analysis of it so far.

8            There is examples in the case law of serious errors,

9    and that's where the agency fails to make an informed decision.

10           THE COURT:  Can't the agency simply look to the fish

11   and deal with that one issue?

12           MR. GAFFNEY:  I think --

13           THE COURT:  You and your co-counsel, Mr. Pollack,

14   have both used words such as "entirely" and "completely."  And

15   when you say it entirely failed to, and then you modified it

16   with the fish.  The whole analysis didn't fail.  It was just as

17   to the fish.

18           MR. GAFFNEY:  Yes, Your Honor.

19           THE COURT:  So why is it that the Court can't fashion

20   a remedy short of entirely throwing it out that deals with the

21   fish specifically?  That's what we're talking about, the fish.

22   Not the other projects.

23           But when you balance the equities on all sides, why

24   wouldn't the Court look to deal with this with the scalpel as

25   opposed to using a giant sword and wiping the whole thing out.

1           It seems to me that the best way to deal with issues

2      that have occurred would be to surgically deal with it as

3      opposed to just wholesale dumping.

4           It would seem that you start with the least

5      restrictive and work your way up.  I'm asking, why does it have

6      to be completely vacated?

7           MR. GAFFNEY:  I appreciate the Court's candor and the

8      fact that the Court's attempting to wrestle with its equitable

9      powers.

10          I think that what I go back to is that Congress has,

11     through the APA, said that the action must be -- shall be set

12     aside.  And the Supreme Court has said that the presumptive

13     remedy is vacatur.  And I think that if the Court --

14          THE COURT:  We can agree it's the fish.  Okay.  We

15     can agree that it shall be set aside as to the fish.

16          What about the remaining parts of it that were not

17     found to be in violation?  Why am I going that far if there is

18     no reason to do so?  I just ask the question.  Why?

19          MR. GAFFNEY:  Yes.  I think that if one were to take

20     a look at the agency action, it was the 2004 Framework.  So

21     let's look at its different components.  There's logging.

22     There's increased logs.  There's increased road building.

23     There's grazing without restrictions.  All of which -- each of

24     those components we've put evidence before the Court under the

25     injunctive relief part of our argument is more likely than not

1       to cause irreparable harm.

2                So if one were going to tailor something where one

3       allowed some portions of the 2004 Framework to go ahead because

4       one -- the Court found that that was the equitable thing to do,

5       I would ask the Court to bear in mind the evidence that's

6       before it that -- of the irreparable harm.  And I'm jumping a

7       little bit now.

8                But since it seems to be where the Court's mind wants

9       the query to go, I notice that in the Government's declarations

10      that at no point did they say that irreparable harm would not

11      happen.  Instead, it posited about the importance of fire

12      treatments.

13               And so it's our belief that there is unrefuted

14      evidence before the Court right know of irreparable harm from

15      the logging, from the grazing, from the roads.  And if I jump

16      to the other part of it, which is what's the disruptive

17      consequence, under that prong of whether or not vacatur should

18      -- whether or not this is one of those rare circumstances where

19      vacatur should not issue, the disruptive consequences are not

20      -- and not even Communities Against Toxics said that the

21      disruptive consequences was simply agency inconvenience or

22      delay.  It's the consequences that flow from that delay.

23               When we look even to the declarations of the Forest

24      Service -- and here I'm particularly pointing the Court to

25      Whitman's declaration and Parker's declaration.  Whitman tells

 1          the Court that there is some 146 agency actions -- and I may

 2          have the term wrong -- it might be timber sales -- that would

 3          have to be analyzed for inconsistency.  Now she says that of

 4          those 146, the large ones could be time consuming.  She defines

 5          one project as large.  Parker says something different.  Parker

 6          says there is 11 of the 146 that are large and perhaps seven

 7          more.

 8                    So I don't know the math, but it's some place between

 9          10 and 15 percent of the projects, according to Whitman and

10          Parker, that are large that are going to be time consuming.

11                    Now Mr. Pollak pointed out that we have a problem

12          here, which is the Government claims you either have to go with

13          the 2004 Framework in whole or in part, and they have the

14          possession and control of what the projects are, but there has

15          been no facts put forward as to what the projects are, what the

16          names are, and how large the area of each is.

17                    We've put evidence before Court from Frissell and

18          Rhodes of having been out on the land in the various national

19          forests, seeing post-fire salvage logging, and opining about

20          the harm that they've seen to the aquatic ecosystems, which is

21          the basis of our claim here.

22                    So I don't know if I've answered the Court's

23          questions, but I certainly think those are things for the Court

24          to take into consideration.

25                    THE COURT:  As a matter of fact you have.  Hold on

 1          for just a second.

 2                  Mr. Pollak, respond to this, the comments that

 3          counsel has just made.  I don't know if you were listening or

 4          not at this time.  But sorry to put you on the spot, but when

 5          I'm looking at this and trying to say, why not go with the

 6          least disruptive?  And counsel has made an argument, a decent

 7          argument as to why that would not be the best thing to do

 8          overall for this project.

 9                  MR. POLLAK:  Your Honor --

10                  THE COURT:  Response.

11                  MR. POLLAK:  -- I will.

12                  Let's talk first about vacatur of the '04 framework,

13          and then we can talk about the injunction.

14                  THE COURT:  Why don't we talk about just what he said

15          just now.  Because I was saying why not go with the least

16          restrictive, which is to deal with the fish.  And counsel has

17          provided other reasoning why it should not be restricted.  It

18          should be more of a wholesale.  And basically saying that there

19          are not that many large projects that are going on.  There may

20          be a number of them spread out over -- was it 11 million acres?

21                  MR. POLLAK:  Yes.

22                  THE COURT:  But when you balance it out according to

23          Mr. Gaffney, he would believe that the only remedy available,

24          besides the vacatur, would be injunction against those that are

25          already existing.  Because, apparently, it would not create

1          that much of an issue.

2                    MR. POLLAK:  Your Honor, to address -- there's two

3          declarations before the Court from the Forest Service

4          addressing the number of projects.  One is from Ms. Parker.  It

5          was submitted when we first came here for remedy.  And she

6          talks about projects specifically in the pilot, the HFQLG pilot

7          project area.  She talks about eleven projects at that time

8          that would have been implicated by an injunction, and explains

9          that it would cost on the order of a million dollars per

10         project, take a timeframe of a year or two years for each EIS

11         to fix them.  So that's where the eleven projects number comes

12         from.  It's limited, however, to the particular Quincy Library

13         Group pilot project area.

14                   Ms. Whitman's declaration, which is a more recent

15         declaration, explains that there are multiple projects.  There

16         are 146 that are in the planning stages now, region-wide, and

17         she chooses as an example one of them, which is a large

18         project.  I think it's called On Top.  And it's a project that

19         was already at the draft EIS stage.  So it was almost issued

20         when plaintiffs were asking for this relief.  So it represents

21         a large burden to fix.

22                   Now we did not go through, as Mr. Gaffney points out,

23         and present to the Court each of the 145 other projects and the

24         burden of fixing those projects to comply with the 2001

25         Framework.

1          And I think the point here, Your Honor, is that's not

2     our burden.  Plaintiffs are asking for an injunction, and yet

3     this case has been pending before the Court for eight years.

4     They haven't named a single project.  PRC has not named a

5     single project on the ground that impacts their interest.  They

6     have told this Court that they are harmed by increases in road

7     building.  But the testimony before the Court shows that

8     between 2000 and 2010 the net change in road construction is

9     minus 440.  The Forest Service has closed 440 miles of roads

10    under the 2004 Framework.  So they are not being harmed by

11    increased road construction.  There is not increased road

12    construction.

13         They suggest they are being harmed by increased

14    grazing.  But in fact the number of animal unit months, the

15    measure of grazing that's out there, has decreased by 125,000.

16         So they are asking this court to issue an injunction

17    against potentially hundreds of projects based on what could

18    happen under a programmatic document.  They haven't named a

19    project.  And when you look at what has actually happened under

20    that programmatic document, it shows that while the bounds are

21    out there, while it could increase, while road building could

22    increase, in fact it's decreased.

23         And so I would submit to the Court that they are the

24    ones who carry the burden -- excuse me -- of proving they

25    deserve an injunction, and they haven't shown it.  They haven't

1          shown how they are harmed.

2                    With regards to the Rhodes and Frissell declarations,

3          they don't identify projects.  They talk very generically about

4          the harms of grazing.  They talk very generically about the

5          harms from road construction.  But if you look, for example, at

6          the declaration of Mr. Rhodes, he talks about the amount of

7          sediment that comes from the entire road system.  Well, the

8          road system is a legacy of decades of road building.  He

9          doesn't attribute that to the 2004 Framework.

10                    And what plaintiffs have failed to do and what the

11         Ninth Circuit has told us we must do when crafting an

12         injunction, is show the difference between management under '04

13         and management under '01.  And plaintiffs haven't shown you how

14         road building will increase under '04 versus '01.  They've

15         testified about the amount of sediment increased -- the amount

16         of sediment, period, being generated from a legacy of roads.

17         They haven't shown you which roads were built under the '04

18         framework, and that they wouldn't be there under the '01

19         framework.

20                    I think that's, Your Honor, the answer to the

21         question of why you shouldn't enjoin the whole thing based on

22         speculative harms at the outer bounds of what the document

23         could allow.

24                    THE COURT:  Thank you.  Go ahead.

25                    MR. GAFFNEY:  Let me address these in order as I

1     heard them.

2            Just to be clear, I didn't mean to imply, Your Honor,

3     that vacatur and injunction of all the plans was the only

4     remedy the Court should order.  I said that inequity because of

5     the balance of harms under the test for injunctive relief, it's

6     the one that we believe equity should lead the Court to.

7            THE COURT:  Now we're on the same page.  Everything

8     is fine.  Counsel, I have to speed it up.  I have another

9     appointment coming up here.  I'm sorry.  But it's almost 3:30.

10           MR. GAFFNEY:  May I address one other point, Your

11    Honor?  It goes to the question that the Court asked about

12    equity.

13           You know, as for the law, there is not one case that

14    suggests, even remotely, that equity weighs against vacatur

15    simply because the agency will have to use more resources.

16           And as for injunctive relief, as a matter of law the

17    balance of harm always tips in favor of preventing the

18    environmental injury when on the other side of the scale is the

19    burden on the agency of cost and delay.  Even whatever claimed

20    injury there is to the timber companies, there is -- is because

21    they undertook, you know, to attempt to get more profit while

22    there was a challenge to -- turns out a valid challenge -- to

23    the document under NEPA.

24           Lastly, I would point out that to allow projects to

25    go forward and assume that somehow the analysis will happen on

1    a project's specific basis puts the cart before the horse under

2    both NEPA and the National Forest Management Act where the

3    long-range management plan is supposed to be what guides the

4    project specific.  And no project specific analysis will ever

5    be able to look at plan-wide impacts or alternatives.

6            And, finally, we agree with the Attorney General that

7    to the extent the Forest Service has suggested there be two

8    separate EIS's, that's just ripe for more legal error.  Because

9    then they have an alternative that may or may not look at fish,

10   and it never takes into account what the Ninth Circuit told us

11   about the failure of analysis.

12           THE COURT:  Thank you.

13           MR. SAMFORD:  Your Honor, if the Court will hear it,

14   I'll address two of those points very quickly.

15           The first one is that with regard to the seriousness

16   of the deficiencies, the case is, with regard to fish, first of

17   all we've submitted testimony to the Court.  It's clear from

18   the record that there's very unlikely to be a substantial

19   difference between management under the 2001 and under the 2004

20   Framework with regard to the direct impacts of management on

21   fish.  They both use the same aquatic management strategies,

22   the same best management practices, and virtually the same

23   standards and guidelines.

24           So the testimony of our experts is that the timber

25   operations under the framework will not have a substantial

1    impact on fish.  The same as 2001.

2            The second thing I think, Your Honor, is important to

3    note is we're not suggesting that project-specific NEPA will

4    fix the error in the document.  We think we will do that

5    through a supplemental document.  But project-specific NEPA

6    will enable plaintiffs to come to court and challenge a

7    decision that they think will hurt them.

8            There is no reason for them to seek an injunction

9    against hundreds of potential projects now when if a project

10   comes along that harms fish, they can come to court and seek to

11   enjoin that project.

12           THE COURT:  Be here for eight more years.

13           MR. SAMFORD:  It's always a pleasure, Your Honor.

14           THE COURT:  I like and enjoy seeing you as well, yes.

15           MR. SAMFORD:  With regard to the two separate EIS's,

16   Your Honor, we have submitted testimony from Don Yasuda, who is

17   a planning expert for the Forest Service, that explains why it

18   makes practical sense to do separate EIS's.

19           THE COURT:  Thank you.

20           MR. THOMAS:  Bill Thomas.  Best, Best and Krieger.

21   We represent the California Cattlemen's Association,

22   intervenors in the case.  Mindful of the time, I'll be very

23   brief.

24           THE COURT:  Thank you.

25           MR. THOMAS:  When we compare, as to grazing, the '01

1    to the '04 framework, there was no differences relative to

2    fish.  There was no differences relative to the standards and

3    guidelines.  The '04 framework was far more precise and far

4    more controlling relative to grazing as to the riparian species

5    in those riparian areas.  The Yosemite toad and the Willow

6    Flycatcher.  And that was because a lot more was known in '04

7    than had been known in '01.  And this Court has observed that

8    twice in its two rulings and upheld the Forest Service's

9    tailored, more restrictive grazing.  And the Ninth Circuit

10   didn't overturn any of that analysis as to grazing in the first

11   case.  And in the second case expressly upheld this Court's

12   review of those components.

13          The issues that had been raised by plaintiffs as to

14   fish really have to do with timber, and the sediment, and those

15   things.  Not grazing.  Very quickly, when you look at the

16   allegations that are contained in grazing, they don't go back

17   to the underlying case.  They are relying on their paid

18   declarants to talk about, well, it could possibly lead to

19   reduced flow.  Apparently because they think the cows drink too

20   much.  Or retard recovery where there has been some sort

21   damage.  No identification of any damage.  But just damage

22   generically.  And they talk about the potential of pesticides

23   being in the cattle ear tags to retard flies.

24          These are exactly the type of remote injuries that

25   Winter versus NRDC cautioned against leading to full injunctive

1      relief.

2             Mr. Gaffney.  I challenge a couple of things.  He

3      said there was no review whatsoever regarding fish.  That was

4      found as to '04.  The '01 framework had quite a bit of analysis

5      by fish, none of which was overturned.  But the Ninth did not

6      let them bridge back to that alternative.  So the fish has not

7      been forgotten in the process.  Thus, I think narrowly tailored

8      remedy would allow an easy course towards a solution.

9             The statement that grazing continues unrestricted -

10     totally untrue.  That's been pointed out and observed by this

11     Court.  Certainly, Ms. Yost of the Forest Service in their

12     declaration.  Mr. Samford made reference to.  Whether you look

13     at it by AUMs, by number of head, grazing has been reduced.

14            And when you look at the riparian area, grazing in

15     the areas of the toad and the Willow Flycatcher, those riparian

16     -- the aquatic areas, it's been reduced and significantly

17     restricted.

18            To turn, in 2013, the clock back to what was known in

19     2001 would be a great travesty of the balancing of the harm and

20     certainly not carrying forth the equity analysis that I think

21     is demanded in this case.  Thank you, Your Honor.

22            THE COURT:  Thank you very much, Mr. Thomas.

23            MR. POLLAK:  Your Honor, if I could?  I promise I'll

24     keep it to a minute.

25            THE COURT:  A lawyer minute or a real minute?

1           MR. POLLAK:  A real minute.  I don't see a clock.

2           THE COURT:  I'm looking at one right now.

3           MR. POLLAK:  So put your hand up when I'm at a

4    minute.

5           Three quick points.  First of all, the idea that the

6    2001 -- the 2001 Framework is not as restrictive as 2004, that

7    would be an example where, under the injunction that we're

8    proposing, activities proved under 2004 Framework, that are

9    consistent with 2001, could continue.

10           Mr. Samford had suggested that the Ninth Circuit's

11   finding that the Forest Service erred in not analyzing a

12   non-commercial funding alternative.  I absolutely disagree with

13   the characterization of the Ninth Circuit decision that

14   superseded the initial decision, the second decision.  The

15   reason the Court granted re-hearing was because the standard

16   for injunctive relief had changed.  There was a Supreme Court

17   case, NRDC, that changed it.

18           The Court stood behind and, again, it referenced the

19   fact that the agency had not considered a non-commercial

20   option.  So that's still the violation.

21           And then, finally, the Court questions and

22   suggestions about using a scalpel approach.  What I wanted to

23   say there is that while the legal deficiency is with the EIS,

24   ordering the Forest Service to simply go back and fix that

25   section of the EIS without also requiring them to re-examine

1    the decision they made based on the EIS, really turns NEPA into

2    a hollow exercise.

3          It would allow the Forest Service to go back, offer

4    an ex post facto or post justification for something they've

5    already done.  And so while the EIS is what's deficient, what

6    the public lost because of that deficiency was what Congress

7    passed NEPA to do, which is to require the Forest Service to,

8    itself, consider the impacts, to allow the public to consider

9    the impacts, to allow the public to comment on them.

10          And so this scalpel approach I think, unless it

11    requires that re-examination, really would not address what

12    NEPA is intended to do.  Thank you.

13          THE COURT:  All right.  Thank you, counsel.  Counsel,

14    thank you very much.  I'll take this matter under advisement

15    and under submission, and you will receive the Court's decision

16    shortly.  Thank you very much.  Very well argued.  Appreciate

17    it.  No other matters on calendar.  Court is adjourned.

18          (Court adjourned.  3:40 p.m.)

19                         CERTIFICATION

20          I, Diane J. Shepard, certify that the foregoing is a

21    correct transcript from the record of proceedings in the

22    above-entitled matter.

23

24                         /s/ DIANE J. SHEPARD
                           DIANE J. SHEPARD, CSR #6331, RPR
25                         Official Court Reporter
                           United States District Court